Jeffrey J. Neuman (*Pro hac vice forthcoming*)
Jeff@jjnsolutions.com
JJN Solutions, LLC
9445 Brenner Ct.
Vienna, VA 22180
Telephone: (202) 549-5079

Isaac S. Crum #026510
icrum@messner.com
MESSNER REEVES LLP
7250 N. 16th St. Ste 410
Phoenix, Arizona 85020
Telephone: (602) 457-5059
Facsimile:  (303) 623-0552

*Attorneys for Prime Loyalty, LLC, Crisby Studio AB, and Niklas Thorin*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Prime Loyalty, LLC, a New York limited liability company, Crisby Studio AB, a Swedish limited liability company,  and Niklas Thorin, a Swedish resident<br><br>Plaintiffs,<br><br>v.<br><br>GoDaddy, Inc., a Delaware corporation, GoDaddy.com, LLC, a Delaware corporation, and 123-Reg Limited, a UK company,<br><br>Defendants. | Case No. 2:24-cv-02165-SMB<br><br>COMPLAINT AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTION<br><br>(Conversion, Trespass to Chattel; Breach of Auction Membership Contract; Breach of Registration Agreement; Breach of the Covenant of Good Faith and Fair Dealing as to GoDaddy Defendants; Tortious Interference with Prospective Economic Advantage as to All Defendants;  Tortious Interference with Contract; Gross Negligence, Negligence, Negligent Misrepresentation, Estoppel, Request for Injunctive Relief)<br><br>(Jury Trial Demanded) |

Plaintiffs Prime Loyalty, LLC ("Prime"), Crisby Studio AB, and Niklas Thorin ("Crisby")

(collectively the "Plaintiffs") by and through their attorneys, for their Complaint against

defendants GoDaddy, Inc., GoDaddy LLC, and 123-Reg Limited ("Defendants") alleges as follows:

## INTRODUCTION

1. This action arises from Defendants' breach of its various domain name registration and auction agreements by (a) co-mingling its roles as an ICANN-Accredited Registrar and its separate role as a provider of domain name auction services, (b) improperly using its role as ICANN-Accredited registrar to unilaterally misappropriate two valuable .com domain name, calor.com and butane.com ("Domain Names"), from Plaintiffs' GoDaddy registrar accounts more than two months after Plaintiffs purchased the Domain Names from GoDaddy's auction services and registered, paid for, and began using the Domain Names through GoDaddy's separate role as an ICANN-Accredited Registrar.

2. By this action Plaintiffs seek the immediate return of the Domain Names to their respective accounts and compensation for damages actually incurred as a direct result of GoDaddy's wrongful actions.

## PARTIES

3. Plaintiff Prime Loyalty, LLC is a limited liability company with its principal place of business in Orangeburg, New York. Prime Loyalty, LLC, whose sole member is Jeffrey K. Garbutt, also located in Orangeburg, New York was incorporated in 2014 (Authentication No. 1407030192).

4. Plaintiff Crisby Studio AB is an Aktiebolag (or AB), which is roughly equivalent to a limited liability company formed under the laws of the Country of Sweden, with a principal place of business located in Stockholm, Sweden (Reg. No. 556880-8892). Unlike a United States limited liability company, however, the AB is managed by a Board of Directors, which is responsible for making major business decisions and overseeing general affairs of a company.

5. Plaintiff Niklas Thorin is the CEO and a Board Member of Crisby and is a Swedish citizen that currently resides in Vastra Gotaland, Sweden.

6.      Defendant GoDaddy, Inc., is a Delaware company with its principal place of business in Tempe, Arizona. Upon information and belief, GoDaddy Inc., is the parent company to both Defendant GoDadddy, LLC and 123-Reg.  Upon information and belief, GoDaddy, Inc. owns the technical platform that operates all of the services related to this litigation.  This includes the technical platform behind GoDaddy.com's domain name registration services and aftermarket services.  In addition, upon information and belief, by 2023, GoDaddy, Inc. migrated all of the technical services related to this litigation from Defendant 123-Reg to its own proprietary platform.

7.      Defendant GoDaddy, LLC is a wholly owned subsidiary of GoDaddy, Inc. It is registered in Delaware with its principal place of business in Tempe, Arizona. GoDaddy.com has two distinct and separate roles relevant to this dispute.  First, it operates an ICANN-Accredited domain name registrar under an agreement with the Internet Corporation Names for Assigned Names and Numbers ("ICANN").  In this capacity, Defendant either itself, or through its affiliates, registers and renews domain names on behalf of its customers.  This includes the management of the domain name records associated with the domain names that they register.  Separate and apart from its role as an ICANN-Accredited registrar, Defendant GoDaddy.com also offers domain name aftermarket services to enable the purchase and sale of previously registered domain names through an online auction, an offer/counteroffer transaction, or a "buy now" transaction (collectively "Aftermarket Services.").

8.      Defendant 123-Reg Limited is a domain name registrar and is upon information and belief, wholly owned by Defendant GoDaddy, Inc.   Upon information and belief, Defendant 123-Reg has an exclusive arrangement with GoDaddy.com pursuant to which 123-Reg submits all of its expired domain names to Godaddy.com in Arizona for auction.  Its official registered address is Studio 4th Floor, Parts C&D, East West Tollhouse Hill, Nottingham, England NG1 5FW, which is the same address as GoDaddy's UK office.

**JURISDICTION AND VENUE**

9.     This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332. Defendants GoDaddy, Inc. and GoDaddy.com LLC (collectively, "GoDaddy") are registered in Delaware with their principal place of business in Arizona.

10.     Defendant 123-Reg Limited is wholly owned by GoDaddy, Inc.  Its official registered address is Studio 4th Floor, Parts C&D, East West Tollhouse Hill, Nottingham, England NG1 5FW, which is the same address as GoDaddy's UK office. Upon information and belief, 123-Reg operates as an alter ego of GoDaddy, which exerts substantial control over 123-Reg.  Notably, (1) 123-Reg is a wholly owned subsidiary of GoDaddy, Inc., (2) One of 123-Reg's two directors is also a GoDaddy officer (*see* Ex. i)[1]; (3) 123-Reg's UK filings state they represent the "GoDaddy Inc. group of companies, which includes 123-Reg Limited" and align with GoDaddy's strategic reporting (Ex. ii), (4) 123-Reg's EU compliance disclosures use data for the GoDaddy group (Ex.  iii); (5) GoDaddy manages 123-Reg's technical and operational services, completing a full migration by the end of 2023 (Ex. iv); (6) GoDaddy controls 123-Reg's ICANN accreditation relationship with staff based in Arizona (Ex. v), (7) GoDaddy directs 123-Reg's communications and employment decisions (Ex. vi and vii); (8) GoDaddy exclusively auctions 123-Reg's expired domain names (including the Domains) presumably under an Arizona governed agreement; (9) GoDaddy in Arizona provides the "internal platforms and data centers supporting selected products in The Netherlands, Singapore & USA (e/g., Hosting and Server products, Authentication, Network and DNS Services)" (Ex. iii).  Finally, upon information and belief, Plaintiffs' claims arise directly from Defendants' actions (or inactions) in Arizona on behalf of Defendant 123-Reg.

---

[1] On November 8, 2024, GoDaddy announced a leadership change appointing a new Chief Accounting Officer of GoDaddy replacing Nicholas Daddario, the former CAO. *See* https://www.gov.uk/government/organisations/companies-house .  Mr. Daddario is one of the two Directors of 123-Reg.  As of the date of this filing, no official change have been made in the United Kingdom's "Companies House", which maintains the official records of UK companies.

11.    Plaintiff Prime is a New York limited liability company whoise principal place of business is in Orangeburg, New York.  Prime's sole member is Jeffrey K. Garbutt, a resident of Orangeburg, New York.

12.    Plaintiff Crisby is an "Aktiebolag", which is roughly equivalent to a Swedish limited liability company.  Unlike a limited liability company in the United States, however, Aktiebolag's do not have members, but rather are governed by a Board of Directors.  Crisby's principal place of business and registration are in Stockholm, Sweden. Plaintiff Niklas Thorin is the CEO and member of the Board of Directors of Crisby.  John Alfredsson is the only other member of the Board of Direcrors. Both Niklas Thorin and John Alfredsson are persons residing in Vastra Gotaland, Sweden.

13.    Further, the amount in controversy exceeds $75,000.

14.    Venue is proper in the District of Arizona pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), because it is the judicial district in which the defendants have their principal place of business and/or in which the events or omission giving rise to the claim occurred.

## **BACKGROUND**

15.    Defendants' Registrar Services Defendant GoDaddy, LLC is a domain name registrar accredited by the Internet Corporation for Assigned Names and Numbers ("ICANN") to provide domain name registration services.  More specifically, ICANN defines a "registrar" as an organization through which individuals and entities (registrants) register domain name[2]    "During the registration process, a registrar verifies that the requested domain  name meets registry requirements  and  submits  the  name  to  the appropriate registry  operator.  Registrars  are  also  responsible  for  collecting  required information from registrants and making the information available through WHOIS. After

---

[2] See definition of "registrar" at https://www.icann.org/en/icann-acronyms-and-terms?nav-letter=r&page=1.

registration, registrants can make updates to their domain name settings through their registrars." [3]

16.     An ICANN-Accredited Registrar is one that has entered into a Registrar Accreditation Agreement ("RAA") with ICANN. [4]  In order to serve as a registrar for any gTLD (including .com), registrars must be ICANN Accredited.  The RAA sets for the terms and conditions by which registrars may register, renew and/or delete domain names.  In addition, it also sets forth the minimum standards for the performance of registration functions, which not only includes registration services, but also the maintenance and modification of domain name records associated with domain names (eg., adding Name Server records to point to websites, or MX records to point to e-mail accounts, etc.).

17.     ICANN-Accredited registrars may, and often do, provide other value-added services which are not generally regulated by ICANN through the, including website hosting, e-mail services, and domain name after market services.  However, the offering of these services is not in their registrar capacity, but rather in their separate capacities as a website hosting, e-mail, and aftermarket service providers.

18.     An illustration of this distinction is that ICANN does have certain requirements with respect to the expiration of domain names.  It requires that (a) registrars list in a public WHOIS database the expiration date of a domain name registration, (b) registrars must delete a domain name within 45 days of either the registrar or the registrant terminating a registration record[5], (c) registrars must provide notice to registrants about their deletion and auto-renew policies, and (d) the circumstances by which a domain name can be redeemed by the registrant after expiration of the domain name.  However, ICANN does not regulate how aftermarket services are offered, so long as they are consistent with the ICANN-Agreement.  In other words, those that are offering aftermarket services, like

---

[3] *Id.*

[4] *Id.*

[5] See Expired Domain Deletion Policy, currently at
https://www.icann.org/resources/pages/registars/accreditation/eddp-en.

Defendants', are not doing so in their role as an ICANN-accredited registrar, but rather as a separate and distinct aftermarket service provider.

    A.    *Defendants' Expiring Domains Auction Service*

19.    Upon information and belief, the previous owner of the Domin Name, Calor Gas Ltd, was located in the United Kingdom.  It was registered using the domain name registrar, 123-Reg Limited (123-Reg).

20.    123-Reg was acquired by GoDaddy in 2017 as part of GoDaddy's purchase of 123-Reg's parent company, Host Entertainment Group.

21.    123-Reg describes the process it follows when a domain name expires at https://www.123-reg.co.uk/support/domains/what-is-the-domain-recovery-period-and-how-can-i-restore-my-domain-names/, set forth as Ex. A.

22.    More specifically, 123-Reg will try to auto-renew at the standard renewal price for up to fifteen (15) days after a domain name expires provided that the domain name registrar has been paid by the domain name registrant.  *Id.*

23.    If the domain name has not been renewed during that time period, the "domain will be auctioned" by 123-Reg's auction service provider *Id.*  Although an auction will begin on the domain name, the existing registrant will be allowed to recover the domain name at the standard renewal price.

24.    If the domain name has not been renewed within thirty (30) days after the expiration of the domain name, the "Domain is not recoverable" by the registrant.  "This timeframe is reserved for auction bids and backorders."

25.    If there are no bids on the domain name in the auction, or if there are no "backorders" on the domain name, the domain name will enter a "Redemption Grace Period" and can be recovered by the original registrant, an additional redemption fee will apply.

26.    As 123-Reg is owned by Defendant, expired domain names that are auctioned use the GoDaddy aftermarket auction system, a marketplace designed for the buying and selling of previously owned or expired domain names.

27.    As an expired domain aftermarket service provider, Defendant's auction platform is housed at http://auctions.godaddy.com.  According to Defendant's website, expired auctions last for ten (10) days.[6]  "Once a bid is placed, the registrant can no longer renew the domain in their account."  *Id.*

B.    *The Domain Names*

28.    Upon information and belief, the Domain Names Calor.com and Butane.com had expiration dates of February 25, 2024, and were allowed to expire.

29.    Upon information and belief, the Domain Names were not renewed by the then-current registrant within fifteen (15) days after the expiration date.  In accordance with Defendant 123-Reg's policy, the Domain Names were placed into the Defendant GoDaddy's auction platform on or about March 10, 2024.

30.    On or about March 26, 2024, and March 27, 2024, thirty (30) days after the Domain Names expired, the Domain Name registrants for Calor.com and Butane.com respectively were changed to "Afternic, LLC", the registrant's name Defendant GoDaddy uses to indicate that the domain names were no longer recoverable by the registrant, as described in ¶ 23 above.  Ex. C shows the WHOIS records for Calor.com from March 31, 2024. Ex 1 shows the WHOIS record for Butane.com from March 27, 2024.

C.    *Calor.com*

---

[6] See https://www.godaddy.com/help/listing-types-for-godaddy-auctions-1525, which is also attached as Ex. B.

31.     Plaintiff Niklas Thorin (GoDaddy Customer number 41750938) placed a bid on the domain name "calor.com" for $11,405.00 ("Calor.com Auction Bid Price") on or about March 31, 2024.

32.     On or about April 4, 2024, Plaintiff Thorin was notified that "the winning bidder of Item Number 548251391, calor.com, did not complete this transaction." (emphasis in original).  *See* Ex. D.  As the second highest bidder for the domain name, Plaintiff Thorin was declared the new winner of the calor.com domain name provided that it completed the purchase of the domain name through the auction service platform and renewed the domain name through Defendants' registrar system within 24 hours of being notified.  *Id.*

33.     On April 5, 2024, Plaintiff Thorin made the required payment $11,427.17 (which included the Auction Bid Price payable to Defendants' auction service provider, plus the price of the Domain Name renewal payable to Defendants' registrar service provider, $22.17).  Confirmation of Plaintiff Thorin's payment was e-mailed to Plaintiff Thorin immediately after completing the order from Defendant.  *See* Ex. E.  The confirmation states: "Thank you for your order, Niklas.  Here is your confirmation for order number 2987847541.  Review your receipt and get started using *your* products."  *Id.* (*emphasis added*).  The receipt identifies the Domain Name purchased as calor.com.

34.     At some point between April 5, 2024, and April 10, 2024, consistent with Plaintiff Thorin's  ownership of the Calor.com domain name. Plaintiff Thorin changed the DNS records of the Calor.com domain name through Defendants' registrar service platform to point to the IP address 162.19.152.159, which upon information and belief is operated by ClouDNS. Operating out of Bulgaria.  This change allowed the Calor.com Domain Name to resolve to the website content set forth in Ex. F.  The Website contains an Orange/Pink background with the word "CALOR" in a stylized font, followed by the Spanish words "Encuenta el Calor del Amor" (which loosely translates to "Find the Heat of Love" in English.  It then, in Spanish, invites users to send an email to  beta@calor.com

1  to access the service earlier.  Plaintiffs subsequently modified the website to state that the

2  owner of the domain name is Plaintiff's Swedish Company.  *See* Exhibit G.  The Domain

3  Name continues to resolve to this Calor.com Website owned by Plaintiff as of the date of

4  the filing of this Complaint.

5  35.    On or about that same time frame (between April 5, 2024, and April 10,

6  2024), Plaintiff Thorin activated e-mail on the Domain Name by adding the "MX Records"

7  of its e-mail provider, Migadu, a Swiss company.  Those MX records continue to be present

8  in the DNS Records for the Domain Name as of the date of the filing of this Complaint.

9  *See* Ex. H.

10  36.    On May 27, 2024, Plaintiffs Thorin and Crisby executed a Joint Venture

11  Agreement ("Crisby JV Agreement") with QLSC Consulting S.R.L., a Romanian company

12  with its principal office located at Str. Dristorului, m Sector 3, Municipuil Cucuresti

13  ("QLSC") for the purpose of developing and launching a dating app targeting the global

14  Spanish-speaking market, to be named after Plaintiff's .com domain name, CALOR.  In

15  Spanish, the term "Calor" translated to "Heat" or "Hot" in English.

16  37.    As part of the Crisby JV Agreement, Plaintiffs had to agree to a standard

17  warranty, namely that it "currently owns the domain name 'Calor.com'".  Plaintiffs also

18  had to agree to the transfer of ownership of the domain name to the Joint Venture upon the

19  achievement of certain milestones set forth in the JV Agreement.  Until such transfer,

20  Plaintiffs  contractually committed to "maintain ownership and control of the domain

21  name."

22

23  D.    *Butane.com*

24  38.    On March 27, 2024, a sales representative from Defendant GoDaddy

25  contacted Plaintiff Prime to inform them that the domain "Butane.com" was available as

26  part of the "expired auction" listings and suggested it as a name they might be interested

27  in. *See* Ex. 2.

28

39.     Prior to submitting any bids for the domain Butane.com, Plaintiff Prime secured investment funding from Mike Giordano, a long-time associate of Prime, with over twenty years of experience in the butane industry. Giordano had been engaged in the storage, distribution, and sale of butane-related products and services under a private white-label brand. Plaintiff Prime and Giordano mutually agreed that, should they successfully acquire the Butane.com domain name using funds contributed by both parties, they would establish a joint white-label butane business under the Butane.com brand, which Giordano would primarily oversee and manage.

40.     Prior to the close of the auction on March 31, 2024, Plaintiff Prime submitted a bid for the domain name Butane.com in the amount of $19,755.00 (the "Butane.com Auction Bid Price"). On March 31, 2024, Plaintiff Prime was notified that its bid for item 548251390, the domain "Butane.com," had been successful at the Butane.com Auction Bid Price. *See* Ex. 3.

41.     Within minutes of receiving the notification of the winning bid, Plaintiff Prime made the required payment of $19,765.43, which included the Butane.com Auction Bid Price payable to Defendants' auction service provider, as well as a $10.43 domain name renewal fee payable to Defendants' registrar service provider. A confirmation of Plaintiff Prime's payment was promptly emailed upon completion of the transaction. *See* Ex. 4.

42.     On April 7, 2024, in connection with Plaintiff Prime's ownership of the Butane.com domain name, Plaintiff Prime purchased the following services from Defendant GoDaddy's registrar services: (i) "Full Domain Protection," intended to safeguard against unauthorized domain actions, including the unauthorized transfer of the domain name; (ii) an additional nine (9) renewal years for Butane.com, inclusive of Full Domain Protection; and (iii) the premium-priced domains Butane.net and Butane.org, to further protect the emerging Butane.com brand that Plaintiff Prime was actively developing. The total cost of these services to Plaintiff Prime amounted to $7,024.34. *See* Ex. 5.

43.     Additionally, on April 7, 2024, Plaintiff Prime migrated the Butane.com domain to its own nameservers and IP address (72.167.43.221) in order to begin developing the Butane.com website, establish new Butane.com email addresses, and launch its new brand. *See* Ex. 6. To further promote and safeguard this brand, Plaintiff Prime created a LinkedIn social media account for the Butane.com brand on April 7, 2024, followed by the creation of an Instagram social media account on May 11, 2024. *See* Ex. 7 and 8.

44.     During the months of April and May 2024, Plaintiff Prime began its initial development of the Butane.com website as well as its butane business.  *See* Ex. 9[7]. According to the content that was displayed on the Butane.com website, "The Butane Brand mission is to establish itself as the foremost authority for everything related to butane. . . As the premier destination for all things butane, we will offer an extensive range of products and services tailored to various applications.  From household to industrial use, Butane.com is your one-stop shop for all things Butane." *Id.*  Plaintiff Prime was in the process of acquiring butane fuel, butane lighters, butane torches, butane stoves and butane heaters. *Id.*

45.     While Plaintiff Prime took primary responsibility for developing the Butane brand—including marketing, social media presence, and overall promotion of the new business—Giordano worked with his existing management team to incorporate the new product lines. He began preparing one of his warehouses in South Florida, which had already been certified as OSHA-compliant for the storage of butane-related products, to accommodate the initial supply of Butane.com-branded items. Additionally, Giordano entered into contractual negotiations with his established network of suppliers, distributors, and vendors to carry the new Butane.com-branded products.

---

[7] The content that was developed for Butane.com (and subsequently taken down by Defendants on or about June 4, 2024) was still resolving at the domain name's former IP Adress.  For purposes of this Complaint, Plaintiff Prime reproduced that content and placed it onto Butane.net.  Despite now being on butane.net, this exact content was on butane.com up until June 4, 2024.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

    E.    *Defendants' Unauthorized Transfer of Domain Names*

46.    On May 29, 2024, a Sales Manager for Defendant reached out to Plaintiff Thorin via e-mail stating that they "recently had a client request our assistance in potentially acquiring the above domain which appears to be owned/ registered to you. If you would please confirm that you are still the registrant of this domain, and whether you would be open to discussing the sale of this domain. I would greatly appreciate it. If you are open to selling the domain, can you please provide me with a ballpark figure that you would be willing to consider selling it for?" *See* Ex. I.

47.    On that same day, approximately five minutes after sending the e-mail to Plaintiff Thorin the same Sales Manager for Defendant reached out to Plaintiff Prime via e-mail stating that they "had a buyer inquire about acquiring Butane.com. Let me know your price on this one and I will do my best to get a deal in place." *See* Ex. 10.

48.    Plaintiff Thorin responded to Defendant putting in on notice that (a) it was already using the Domain Name to launch a project in early 2025, and that (b) it would only be willing to sell the domain name to Defendant's client for a high six-figure amount." *See* Ex. J.

49.    Plaintiff Prime responded to Defendant's Sales Manager, stating that it "curated an entire portfolio around the Butane.com Brand for a business that is currently in the butane space. The intention for this business s to grow a global Butane brand and is currently open to a Joint Venture/Partnership." *See* Ex. 10. Plaintiff Prime also told Defendant's sales manager that if the buyer wanted to submit an offer, it would "present it to them." Plaintiff Prime also made Defendant GoDaddy aware of the additional butane-related domain names Plaintiff Prime purchased to protect its new brand, including butanestore.com, butanefuel.com, butanegrills.com, and approximately twenty-six other domain names to complement the Butane.com, Butane.net and Butane.org domain names. *Id.*

50.    On June 4, 2024, sixty-five (65) days after Plaintiff Prime paid-for the Butane.com domain name, and just one day short of two (2) months after Plaintiff Crisby paid-for and took ownership of the Calor.com domain name (Butane.com and calor.com are collectively referred to herein as the "Domain Names"), and more than one hundred (100) days after the Domain Names expired for the previous registrant, the Plaintiffs each received an e-mail from Defendant GoDaddy, Inc's "CEO Team" informing Plaintiffs that GoDaddy, Inc. had "removed the domain from your account" and was "refund[ing] your original purchase and have added an . . . in-store credit to your account for the inconvenience."  *See* Ex. K and 11.    Plaintiff Thorin was offered an in-store credit of $350. Ex. K.  Plaintiff Prime was offered an instore credit of $7,350 to offset the cost of the Butane.net and Butane.org.  *See* Ex. 11.  On the same date, Plaintiff Prime received a refund for the nine (9) additional renewal years for Butane.com, as well as for the Full Domain Protection fees associated with the Butane.com domain name. *See* Ex. 12. However, no mention was made, nor were any refunds provided, for the additional domain names or services purchased in connection with the development of the Butane.com brand.

51.    On information and belief, GoDaddy, Inc. was working with 123-Reg when GoDaddy, Inc., through its CEO and "CEO Team" unilaterally and forcibly removed the Domain Names from Plaintiffs' control. On information and belief GoDaddy, Inc.'s actions to forcibly and unilaterally remove the Domain Names from Plaintiffs' control done in collaboration and at the request of 123-Reg.

52.    DNS and WHOIS records are authoritative records which are used globally to establish ownership of domain names.

53.    GoDaddy, Inc. and 123-Reg, after seizing control of the Domain Names from Plaintiffs, unilaterally and without consent of Plaintiffs updated these authoritative DNS and WHOIS records to reflect that the Domain Names were no longer owned by Plaintiffs.

54.    Despite the fact that Defendants GoDaddy and 123-Reg had actual knowledge that (i) Plaintiffs were the rightful owners of the Domain Names, (ii) Plaintiffs

were already using the Domain Names large projects dependent on the Domain Names, (iii) the commercial launch of the services for Calor.com was already planned to be launched in early 2025, and for Butane.com significant expenditures were undertaken to promote and protect the brand, and (iv) in response to Defendant's own sales agent's offer to purchase the Domain Name, Plaintiffs Thorin and Crisby were unwilling to do so unless Plaintiffs were compensated for the loss of their business and Plaintiff Prime indicated he would present an offer, but it was looking for partnerships and not a sale of the butane.com Domain Name,  Defendant unilaterally removed the Domain Names from Plaintiffs' GoDaddy registrar accounts thereby removing Plaintiffs' ability to use the Domain Names. Furthermore, after the Butane.com domain name was removed from Plaintiff Prime's account, Defendants replaced all of the curated content on Butane.com with a registrar parking page. This page not only offers the domain name for sale but also includes a variety of paid advertisement links, from which the Defendants are generating revenue.  *See* Exhibit 13.

55.    The removal of the Domain Names from Plaintiffs' registrar accounts, and the unauthorized changes to DNS and WHOIS records, not only meant the loss and control of Plaintiffs' property, but also: (i) put Plaintiffs Thorin and Crisby in breach of the JV Agreement that was executed with QLSC, and (ii) ended Plaintiff Prime's new butane sales business.  As a direct result of Defendant's wrongful taking of Plaintiffs' property, Defendant caused (a) QLSC to terminate the JV Agreement with Plaintiff and significantly damaged the reputation of Plaintiffs and the relationship with QLSC, and (b) irreparable damage to the reputation of Prime and his business partner (who is a prominent member of the butane sales industry).

56.    On June 17, 2024, Plaintiffs Thorin and Crisby through their counsel sent a letter to Defendants' Auction Disputes Team, Defendants' CEO Team, and its legal department notifying Defendants of their breaches of contracts and requested the immediate reinstatement of the domain name to Plaintiffs Thorin and Crisby, a detailed

written explanation for Defendants' actions in this matter, and compensation for damages incurred ("June 17th Letter").  *See* Ex. L.

57.    When no substantive response was received by Plaintiffs Thorin and Crisby to the Letter, on July 17, 2024, a follow up letter was sent by Plaintiffs through their counsel repeating its requests from the June 17th Letter.  *See* Ex. M.

58.    Finally on July 18, 2024, Defendants responded to Plaintiffs Thorin and Crisby essentially restating what it said on June 4, 2024.  Defendants provided no further detail, nor did Defendants return the domain name they misappropriated from Plaintiffs.

59.    On or about July 18. 2024, Defendant GoDaddy Inc.'s CEO Team spoke with Plaintiff Prime about Defendants' unauthorized taking of the Butane.com domain name. During that conversation Plaintiff Prime pressed GoDaddy, Inc.'s CEO Team representative for more information regarding the facts underlying GoDaddy Inc's actions but was told that they were working on gathering that information.  Plaintiff Prime made Defendant GoDaddy, Inc. aware that it had spent a considerable amount of time, money and resources on developing out the Butane.com business prior to Defendant's unauthorized taking of the domain name.

60.    On July 23, 2024, Matt T from GoDaddy Inc.'s Office of the CEO revealed that Defendant GoDaddy, Inc. determined it would seize the butane.com domain from Plaintiff Prime when its "Aftermarket Team received an inquiry about the domain."

61.    Subsequently, on August 5, 2024, Plaintiff Prime delivered to Defendant GoDaddy's CEO Team a list of expenses accrued for the Butane Brand as requested.  *See* Ex. 14.  "In addition to these tangible costs, there are intangible realized losses that cannot be calculated as easily.  Costs for supplier and client meetings, travel, lost opportunity costs, broken agreements, etc." *Id.*  Plaintiff Prime also revealed that "The actions taken have unfortunately compromised the integrity of our brand and undermined our reputation amongst our associates, investors, suppliers, and manufacturers.  This was all as a result of GoDaddy's" actions. *Id.*  Plaintiff Prime reported marketing and developmental expenses exceeding $78,000. *Id.*

{08731980 / 2}

16

62.    Upon information and belief, GoDaddy has since transferred the Domain Names to other owners.

## FIRST CLAIM FOR RELIEF

## (TRESSPASS TO CHATTEL AS TO ALL DEFENDANTS)

63.    Plaintiffs hereby restate and re-allege the allegations set forth in paragraphs 1 through 62 above and incorporate them by reference.

64.    On or about April 5, 2024, Plaintiffs became the rightful owners of their respective Domain Names and had the right to possess the Domain Name which was ultimately misappropriated by Defendants.  They completed the purchases of the Domain Names through Defendants' auction service as well as a required one-year renewal through Defendants' registrar.

65.    On May 29, 2024, in an e-mail from Defendants' domain name aftermarket service provider, Defendants acknowledged that Plaintiffs were indeed the rightful owners to the Domain Names and made an offer to Plaintiffs to purchase the Domain Name.

66.    On the same day, the Plaintiffs responded to Defendant's sales agent that they had already put the Domain Name to use and that (i) Plaintiffs Thorin and Crisby were working on a commercial launch of a product using the Calor.com Domain Name, and (ii) Plaintiff Prime had already curated an entire portfolio of butane-related domain names including Butane.com for a business that was already in the butane space.  Plaintiff Thorin told Defendant that he and his company, Plaintiff Crisby, would have to be compensated an amount in the "high six figures" in order to consider another domain name for the project.  Plaintiff Prime said that it would present the offer to the already established business, but that it was looking for partnerships for its butane business as opposed to a purchase of the Butane.com domain name.

67.    Apparently not satisfied with either of the Plaintiffs' responses, on June 4, 2024, more than 100 days from the date the Domain Name expired, sixty-five (65) days after Plaintiff Prime purchased butane.com, and sixty (60) days after Plaintiff Thorin

purchased the Domain Name via Defendant's auction system, Defendants, through GoDaddy, Inc.'s CEO's office intentionally dispossessed Plaintiffs of the Domain Names by inappropriately leveraging its domain name registrar services to seize control of the domain name.  In so doing, Defendants deprived Plaintiffs of possession and use of the property.  *See* Ex. K and Ex. 11.

68.    Defendants dispossessed Plaintiffs of their domain names by inappropriately filing transfer information with ICANN and updating the WHOIS registry to reflect that Plaintiffs were no longer the owners of the Domain Name.

69.    Furthermore, after the Butane.com domain name was removed from Plaintiff Prime's account, Defendants replaced all of the content on Butane.com with a registrar parking page. This page not only offered the domain name for sale but also included a variety of paid advertisement links, from which the Defendants are generating revenue. *See* Ex.13.

70.    Defendant's actions damages Plaintiffs in an amount to be proven at trial, but that exceeds $150,000.

## SECOND CLAIM FOR RELIEF
## (GROSS NEGLIGENCE AS TO ALL DEFENDANTS)

71.    Plaintiffs hereby restate and re-allege the allegations set forth in paragraphs 1 through 70 above and incorporate them by reference.

72.    Defendants owed Plaintiffs a duty of care to ensure that domain name auctions are properly conducted and that the sale of domain names as a result of such auctions are final and without error.

73.    Defendants breached this duty by not only negligently auctioning off domain names that it claims should not have been auctioned, but also by recklessly allowing sixty-five (65) days in the case of butane.com and two (2) months in the case of Calor.com, to pass before informing Plaintiffs of the alleged "error" and misappropriating the Domains.

74.     Defendants' actions, in allowing such a significant period to elapse before reclaiming the domains, constitute gross negligence, demonstrating a reckless disregard for the rights and interests of Plaintiffs.

75.     As a direct and proximate result of Defendants' gross negligence, Plaintiffs have suffered significant harm, including but not limited to: (a) the loss of the Domain Names, (b) costs incurred in developing and promoting the Domain Names during the two month period in which it owned the Domain Name, (c) business disruption and loss of potential revenue, and (d) reputational damage and loss of business opportunities.

76.      As a result of Defendant's gross negligence, Plaintiffs were damaged in an amount to be proven at trial, but at least $150,000.00.

## **THIRD CLAIM FOR RELIEF**
## **(NEGLIGENCE AS TO ALL DEFENDANTS)**

77.     Plaintiffs hereby restate and re-allege the allegations set forth in paragraphs 1 through 76 above and incorporate them by reference.

78.     Defendants owed Plaintiff a duty of care to ensure that domain name auctions are properly conducted and that the sale of domain names as a result of such auctions are final and without error.

79.     Defendants breached this duty by negligently auctioning off domain names that it claims should not have been auctioned, and by failing to adequately verify the eligibility of the domain names for auction before offering them for sale.

80.     As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered significant harm, including but not limited to: (a) the loss of the Domain Names, (b) costs incurred in developing and promoting the Domain Names during the two month period in which it owned the Domain Name, (c) business disruption and loss of potential revenue, and (d) reputational damage and loss of business opportunities.

81.     As a result of Defendant's negligence, Plaintiffs were damaged in an amount to be proven at trial, but at least $150,000.00.

## FOURTH CLAIM FOR RELIEF
### (NEGLIGENT MISREPRESENTATION AS TO ALL DEFENDANTS)

82.     Plaintiffs hereby restate and re-allege the allegations set forth in paragraphs 1 through 81 above and incorporate them by reference.

83.     By placing the Domain Names up for auction through Defendant's aftermarket services, Defendant represented that it had the right to sell the Domain Names to anyone that placed bids on the Domain Name.

84.     By declaring Plaintiffs the winners of their respective auctions for the Domain Names, and requesting payment for the Domain Names, Defendant again was representing that it has the right to sell the Domain Names to the respective Plaintiffs, and that upon payment of the purchase price, Defendant had the right to transfer title of the Domain Names to Plaintiffs.

85.     Upon Defendant's own admission, Defendant failed to exercise reasonable care in securing the appropriate rights to sell and transfer the Domain Names to the Plaintiffs.

86.     Plaintiffs justifiably relied on Defendant's authority and ability to sell the Domain Names to Plaintiff.

87.     As a result of Defendant's negligence, Plaintiffs were damaged in an amount to be proven at trial, but at least $150,000.00.

## FIFTH CLAIM FOR RELIEF
### (ESTOPPEL AS TO ALL DEFENDANTS)

88.     Plaintiffs hereby restate and re-allege the allegations set forth in paragraphs 1 through 87 above and incorporate them by reference.

89.     Defendant intentionally induced Plaintiffs to believe and have confidence that it was selling the Domain Names to the respective Plaintiffs.

90.     Upon consummating the sale of the Domain Name to Plaintiffs, Defendant intentionally induced Plaintiffs to believe and have confidence that Plaintiffs had owned all right, title, and interest in and to their respective Domain Names.  This was a material fact.

91.     Plaintiffs justifiably relied on Defendant's authority to sell the Domain Names, and to transfer all right, title and interest to the respective Plaintiffs.

92.     Plaintiffs were injured and damaged as a result of the reliance caused by Defendant, in an amount to be proven at trial but not less than $150,000.

**SIXTH CLAIM FOR RELIEF**

**(BREACH OF AUCTION MEMBERSHIP CONTRACT AS TO DEFENDANTS' GODADDY, INC AND GODADDY.COM, LLC)**

93.     Plaintiffs hereby restate and re-allege the allegations set forth in paragraphs 1 through 92 above and incorporate them by reference.

94.     Defendants' GoDaddy.com and GoDaddy, Inc. have a large number of agreements posted on their website, however, none of the agreements are presented to any of the purchasers of domain name or other services until the very final step in the purchase process.  Just below the "Complete Purchase" button, there is a paragraph in small print that states: "By clicking 'Complete Purchase," you agree to our Terms & Conditions and Privacy policy. . ."  The words "Terms and Conditions" contain a link to GoDaddy's Universal Terms of Service which consists of at least 33 single-spaced pages.   There is no checkbox requiring any user to affirm that it has read or agreed to any terms and conditions. In addition there is no requirement for any user to click on any of the hyperlinks to the agreements.

95.     Defendant GoDaddy claims that its expiring domain name auction services are governed under an Auction Membership Agreement ("AMA") as of the date in which a user places a bid on their respective domain names ("AMA").  See Ex. N.

96.     To the extent that the AMA is a valid and enforceable agreement, which Plaintiffs do not concede, the AMA requires that for an expired domain name auction to be completed, the winning bidder (called the "Buyer" in the AMA), must pay the winning bid amount plus a one (1) year renewal fee.  Once that is completed, "Change of ownership will begin upon the completion of the check-out process and receipt of Buyer's funds." See *Id.*

97.     On March 31, 2024, Plaintiff Prime made the required payment of $19,765.43 (which included the Butane.com Auction Bid Price payable to Defendants' auction service provider, plus the price of the Domain Name renewal payable to Defendants' registrar service provider ($10.43).  Confirmation of Plaintiff's payment was e-mailed to Plaintiff Prime immediately after completing the order from Defendant.  See Ex. 4.

98.     On April 5, 2024, Plaintiff Thorin made the required payment $11,427.17 (which included the Auction Bid Price plus the price of the Domain Name renewal ($22.17).   April 5, 2024, was approximately 41 days after the expiration of the Domain Name.

99.     On or about the same day that payments were made for their respective Domain Names, the transfer of the Domain Names to Plaintiffs was complete and the Domain Names were placed into Plaintiffs' GoDaddy *registrar* accounts.

100.    On June 4, 2024, More than 100 days after the domain name expired, sixty-five (65) days after Plaintiff Prime paid for butane.com, and nearly two months after Plaintiff Thorin acquired the Calor.com domain name, Defendant breached the AMA by nullifying the result of the Domain Name purchases.

101.    Defendant knew or should have known whether it had the right to offer the Domain Names for sale on its own auction platform.   At the time that Plaintiffs purchased

their respective domain names, Defendant knew or should have known whether it had the right to collect fees for the Domain Names.  More importantly, at the time Defendant transferred ownership of the Domain Names to each Plaintiff, it knew or should have known whether it had the right to transfer ownership of the Domain Names.

102.    Defendant had a process by which the previous owner could have reclaimed the expired domain names so long as that was done within 45 days after the expiration. Defendants did not follow its own process, which also is a breach of the AMA.

103.    To the extent that the AMA is a valid and enforceable agreement,  as a result of these multiple breaches of the AMA, Plaintiffs have suffered damages in an amount to be proven at trial, but that exceeds $150,000.

## SEVENTH CLAIM FOR RELIEF
## (BREACH OF REGISTRATION AGREEMENT AS TO DEFENDANTS' GODADDY, INC AND GODADDY.COM, LLC))

104.    Plaintiffs hereby restate and re-allege the allegations set forth in paragraphs 1 through 103 above and incorporate them by reference.

105.    Defendants' GoDaddy.com and GoDaddy, Inc. have a large number of agreements posted on their website, however, none of the agreements are presented to any of the purchasers of domain name or other services until the very final step in the purchase process.  Just below the "Complete Purchase" button, there is a paragraph in small print that states: "By clicking 'Complete Purchase," you agree to our Terms & Conditions and Privacy policy. . ."  The words "Terms and Conditions" contain a link to GoDaddy's Universal Terms of Service which consists of at least 33 single-spaced pages.

106.    In the upper left-hand corner of the UTOS page, there are links to four additional documents, including one titled the Domain Name Registration Agreement (the "DNRA").  There is no requirement to click on this agreement or read the agreement.  There is no checkbox requiring any user to affirm that it has read or agreed to any terms and conditions of the DNRA.  The DNRA is an additional 33 single spaced pages.

107.    To the extent that the DNRA is a valid and enforceable agreement, which Plaintiffs do not concede, in theory. at the moment the Domain Names transferred to Plaintiffs and were renewed for an additional one (1) year, services under the AMA were completed and Plaintiffs' relationship with Defendants would theoretically be governed under the Domain Name Registration Agreement ("DNRA"), currently set forth at https://www.godaddy.com/legal/agreements/domain-name-registration-agreement, and attached hereto at Exhibit O.

108.    The DNRA is a completely one sided agreement which gives Defendants' GoDaddy the right to modify the terms and conditions at any time, without notice, at their sole discretion by simply posting a new version on their website.  The DNRA contains a number of unbounded unconscionable terms and conditions.   However, even the unenforceable DNRA does not provide a mechanism for Defendant, as a *Registrar*, to deny, cancel or transfer any renewal of a domain name, for an error committed by an *expired domain name auction provider.*

109.    By removing the Domain Names from Plaintiffs' registrar accounts due to an "error" committed by it as an auction service provider, Defendant breached the DNRA. Although Defendants are both a registrar and an auction service provider, there is nothing in the DNRA that allows Defendants to use their position as a domain name registrar to correct errors by them performing non-registrar services (here, auction services).

110.    As a result of this breach of the DNRA, Plaintiffs have suffered damages in an amount to be proven at trial, but that exceeds $150,000.

### EIGHTH CLAIM FOR RELIEF

### (BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING AS TO DEFENDANTS' GODADDY, INC AND GODADDY.COM, LLC)

111.    Plaintiffs hereby restate and re-allege the allegations set forth in paragraphs 1 through 110 above and incorporate them by reference.

112.    To the extent that the GoDaddy Agreements are valid and enforceable, which the Plaintiffs' do not concede, there were two contracts existed between Defendant and each of the Plaintiffs.  The first of which was the AMA for the auction services, and the second, Defendants' domain name registration agreement (DNRA).

113.    Pursuant to those contracts, Plaintiffs expected Defendant would comply with its fiduciary duties, perform its professional obligations as an ICANN-Accredited registrar, separate and apart from its role as a provider of other non-registrar services, without impairing the businesses of Plaintiffs, and not convert Plaintiff's property, opportunities, interests and expectancies for Plaintiffs' use of the Domain Names.  In fact, Plaintiff Prime purchased Full Domain Protection' from Defendant GoDaddy for Butane.com, a service that was expressly intended to prevent unauthorized transfers of the Butane.com domain name. Ironically, Defendant GoDaddy carried out the very type of unauthorized transfer that this service was designed to protect against.

114.    Furthermore, after the Butane.com domain name was removed from Plaintiff Prime's account, GoDaddy replaced all of the content on Butane.com with a registrar parking page. This page not only offered the domain name for sale but also included a variety of paid advertisement links, from which the Defendants are generating revenue.

115.    Pursuant to those contracts, Plaintiffs expected Defendant would comply with its fiduciary duties, and not comingle its non-registrar services with it serving as an ICANN-Accredited registrar, As a result of this breach of the covenant of good faith and fair dealing, Plaintiffs have suffered damages in an amount to be proven at trial, but that exceeds $150,000.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NINTH CLAIM FOR RELIEF**

**(TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC**

**ADVANTAGE AS TO ALL DEFENDANTS)**

116.    Plaintiffs hereby restate and re-allege the allegations set forth in paragraphs 1 through 109 above and incorporate them by reference.

117.    Defendants actively market their domain name registrar as one where you can connect "your Websites + Marketing site to a domain . . . [within] . . . a few minutes but can take up to 72 hours."

118.    In fact, on March 31, 2024, and April 5, 2024, in the receipts received by Plaintiffs Prime and Thorin respectively, Defendant expressly tell Plaintiffs to "Activate your products today.  You have new products or services in your account waiting to be activated.  You've paid for them – now put them to work."  *See* Ex. E and Ex. 4.

119.    Defendants not only know that many businesses begin using their domain names immediately upon registering a domain name, but it actively markets this feature of its system.

120.    Defendant knew or reasonably should have known that Plaintiffs had set up MX Records on the Domain Name indicating that Defendant had been using the Domain Name for conducting business via e-mail.

121.    On June 4, 2024, More than 100 days after the domain name expired, sixty-five (65) days after Plaintiff Prime paid for butane.com, and nearly two months after Plaintiff Thorin acquired the Calor.com domain name, Defendants GoDaddy, Inc. and 123-Regbreached the AMA by nullifying the result of the Domain Name purchases.

122.    Defendant's conduct has damaged Plaintiffs in an amount to be proven at trial, but not less than $150,000.

**TENTH CLAIM FOR RELIEF**

**(TORTIOUS INTERFERENCE WITH  CONTRACT WITH RESPECT TO**

**PLAINTIFF THORIN/CRISBY)**

123.    Plaintiffs hereby restate and re-allege the allegations set forth in paragraphs 1 through 121 above and incorporate them by reference.

124.    A contract existed between Plaintiffs Thorin and Crisby and QLSC to create a dating application based entirely on the Domain Name.

125.    Defendants, GoDaddy, Inc. and GoDaddy.com, LLC, were made aware of the fact that the Domain Name was going to be used to launch a new product or service on May 29, 2024, when it inquired about purchasing the Domain Name for a "client".

126.    Defendants intentionally interfered with the contract between Plaintiffs Thorin/Crisby and QLSC causing Plaintiff Thorin to breach that contract.

127.    Defendants acted improperly when it unilaterally converted Plaintiff's property.

128.    As a result of Defendants' conduct, Plaintiffs Thorin and Crisby were damaged, in an amount to be proven at trial, but at least $150.000.

## ELEVENTH CLAIM FOR RELIEF

## (TORTIOUS INTERFERENCE WITH CONTRACT AS TO GODADDY, INC. AND 123-REG.)

129.    Plaintiffs hereby restate and re-allege the allegations set forth in paragraphs 1 through 128 above and incorporate them by reference.

130.    Defendants GoDaddy, Inc. and 123-Reg knew that Plaintiffs had purchased from Defendants the Domain Names pursuant to a contract entered into, at least between GoDaddy.com, LLC and Plaintiffs.

131.    Defendants GoDaddy, Inc. and 123-Reg, through the actions of GoDaddy, Inc's CEO and CEO Team instructed GoDaddy.com, LLC to stop performing under the Contract.

132.    Defendants GoDaddy, Inc. and 123-Reg, through the actions of GoDaddy, Inc's CEO and CEO Team instructed GoDaddy.com, LLC to remove the Domain Names from Plaintiffs accounts.

133.    Defendants GoDaddy, Inc and 123-Reg, did this knowing that Plaintiffs had purchased the Domain Names from GoDaddy.com, LLC pursuant to a contract between Plaintiffs and at least GoDaddy.com, LLC.

134.    Such actions by GoDaddy, Inc and 123-Reg through the CEO Team at GoDaddy, Inc. were inappropriate and resulted in Plaintiffs being denied the benefit of their bargain in purchasing the Domain Names.

135.    When Defendants GoDaddy, Inc. and 123-Reg, through the actions of GoDaddy, Inc's CEO and CEO Team interfered in Plaintiff's ownership of the purchased Domain Names, GoDaddy, Inc. and 123-Reg knew or reasonably should have known that Plaintiffs had set up MX Records on the Domain Name indicating that Defendant had been using the Domain Name for conducting business via e-mail.

136.    Defendants GoDaddy, Inc. and 123-Reg conduct and interference has damaged Plaintiffs in an amount to be proven at trial, but not less than $150,000.

**TWELFTH CLAIM FOR RELIEF**
**(INJUNCTIVE RELIEF AS TO ALL DEFENDANTS)**

137.    Plaintiffs hereby restate and re-allege the allegations set forth in paragraphs 1 through 136 above and incorporate them by reference.

138.    Pursuant to A.R.S. § 12-1801, the Court has the authority to grant injunctive relief.

139.    Plaintiffs have suffered irreparable injury or there is a substantial likelihood that they will continue to suffer substantial irreparable injury as a result of Defendant's conversion and misappropriation of each Plaintiff's property.

140.    Upon information and belief, Defendant's will attempt to aid further conversion and/or misappropriation of Plaintiffs' Domain Names if they are not enjoined from selling and/or transferring the Domain Name to a third party.

141.    Plaintiffs have no adequate remedy at law to protect its property from being further misappropriated by Defendant if the Defendants are not restrained.

142.    The misappropriation of the Domain Names to a third party would constitute an irreparable injury, with incalculable damages for Plaintiffs.

143.    Plaintiffs are entitled to a temporary restraining order and permanent injunction against Defendants.

**WHEREFORE**, Plaintiffs are entitled to and prays that the court enter a temporary restraining order and permanent injunction against Defendants ordering the following:

(a) That the Defendants be enjoined from allowing any modifications or changes to each Domain Name's registration information during the pendency of this litigation.  This includes not allowing the Domain Names to be deleted or transferred to any third party.

(b) That Defendants shall not be allowed to tamper with or interfere with, in any fashion, Plaintiffs use of the Domain Names.

(c) That Defendants do not interfere with Plaintiffs' ongoing business.

## PUNITIVE DAMAGES

144.    Defendants engaged in conduct, acts, and omissions to serve their own interests and pursued a course of conduct having reason to know of, yet consciously disregarding a substantial right that such conduct might significantly injure the rights of each Plaintiff.  The willful and intentional acts, as set forth in this complaint are of such an aggravated or outrageous nature to indicate motive by an evil mind, coupled with an evil hand.

145.    In addition, Defendants intentionally co-mingled its services as a domain name auction provider or aftermarket services with that of an ICANN-Accredited Registrar that provides critical domain name registration services to third parties.  As the largest ICANN-Accredited Registrar, Defendant believes that it can engage in self-help by using its separate domain name registrar to "correct errors" it commits as an auction service

provider and misappropriate Plaintiff's Domain Name.  In fact, if Plaintiffs were aware that this was something Defendant could do, it would have transferred its Domain Name to another registrar that could not take such actions.  In other words, had Plaintiffs purchased the domain names through Defendants' auction service, then subsequently transferred to Domain Names to a separate registrar, Defendant would not have been able to use its registrar service to convert Plaintiffs' property.  If there were any errors by the auction service provider, it would have had to bring a legal action to attempt to recover the names.  Rather than following the appropriate legal courses of action, Defendant abused its position as a registrar to misappropriate plaintiffs' property.

146.    Therefore, a punitive damages award against Defendant in an amount to be proven at trial is fully justified and warranted and would have the effect of deterring others from committing similar acts and omissions.

147.    Plaintiffs are entitled to a temporary restraining order and permanent injunction against Defendants.

## **DEMAND FOR JURY TRIAL**

148.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a jury trial of all issues triable to a jury in this action.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

A.    Entry of judgment in favor of Plaintiffs against Defendants

B.    An order returning the Domain Name Butane.com to Plaintiff Prime;

C.    An order returning the Domain Name Calor.com to Plaintiffs' Crisby and Thorin;

D.    An order awarding damages in an amount to be proven at trial, but in an amount no less than $75,000;

E.    Pre-judgment and post-judgment interest;

F.      An order awarding Plaintiffs its costs and attorneys' fees to the extent allowed by law.

G.      A temporary restraining order enjoining Defendants GoDaddy Inc. and GoDaddy.com LLC, its officers, agents, directors, affiliates, servants, employees, and all persons acting in concert with it, from directly or indirectly allowing either the calor.com domain name or butane.com to expire and/or revert to the domain name registry to be generally available for purchase by third parties;

H.      A temporary restraining order enjoining Defendants GoDaddy, Inc. and GoDaddy.com LLC from preventing or frustrating Plaintiffs' right, pursuant to GoDaddy's Domain Registration Agreement, to renew the registrations of the Domains;

I.      A temporary restraining order enjoining Defendants GoDaddy, Inc., GoDaddy.com LLC, 123-Reg Limited, their officers, agents, directors, affiliates, servants, employees, and all persons acting in concert with it (collectively "Defendants") from selling or otherwise transferring any ownership interest in either the calor.com or butane.com domain names, or purchasing any ownership interest in the domains, or otherwise accepting transfer of any ownership interest in the Domain Names;

J.      An order to show cause why a preliminary injunction should not issue, pursuant to Fed. R. Civ. P. 65, enjoining Defendants from directly or indirectly committing the above-described acts during the pendency of this action; and

K.      Granting Plaintiffs any such other and further relief as this Court deems just and proper, or that Plaintiffs may be entitled to as a matter of law or equity.


[SPACE LEFT INTENTIONALLY BLANK]

DATED:  November 27, 2024,

_/s/ Isaac S. Crum_
Isaac S. Crum, #026510
icrum@messner.com
MESSNER REEVES LLP
7250 N. 16th St. Ste 410
Phoenix, Arizona 85020
Telephone: (602) 457-5059
Facsimile: (303) 623-0552

Jeffrey J. Neuman (_pro hac vice_ forthcoming)
Jeff@jjnsolutions.com
JJN Solutions, LLC
9445 Brenner Ct.
Vienna, VA 22180

_Attorneys for Prime Loyalty, Crisby_
_Studio AB, and Niklas Thorin_

# LIST OF EXHIBITS

| EXHIBIT | DESCRIPTION |
| --- | --- |
| i | Def. 123-Reg List of Directors |
| ii | Def. 123-Reg UKAnnual Report Filings |
| iii | Def. 123-Reg EU Compliance Statement (Anti-Slavery Statement) |
| iv | GoDaddy Inc. Q2 2023 Financial Results Prepared Remarks |
| v | Def. 123-Reg ICANN Accreditation Relationship |
| vi | June 19, 2023 Article |
| vii | February 14, 2023 Domain Incite Article regarding layoffs |
| viii | 123-Reg Ltd. Change of Registered Office Address |
| A | Def. 123-Reg Domain Expiration Polcy |
| B | Def. GoDaddy Auction Website – Listing Types |
| C | March 31, 2024 WHOIS Record for Calor.com |
| D | Notification of Winning Auction Bid for Calor.com |
| E | Payment Receipt for Calor.com |
| F | June 2024 Screenshot of Calor.com |
| G | August 2024 Screenshot of Calor.com |
| H | DNS MX Record Change for Calor.com |
| I | Def. GoDaddy Sales E-mail to Plaintiff Thorin |
| J | Plaintiff Crisby Response to GoDaddy Sales E-mail |
| K | Def. Notification of Misappropriation of Calor.com |
| L | Plaintiff Crisby 6-17-24 Letter to Defendants |
| M | Plaintiff Crisby 7-17-24 Follow Up Letter to Defendants |
| N | Def. Auction Membership Agreement |
| O | Def. Domain Name Registration Agreement |
| 1 | March 27, 2024 WHOIS Record for Butane.com |
| 2 | Def. 3-27-24 E-mail to Plaintiff Prime about Auction Names incl. Butane.com |
| 3 | Butane.com Winning Bid Notice |
| 4 | Payment Receipt for Butane.com |
| 5 | Payment Receipt for additional butane-related domains |
| 6 | Plaintiff Prime web development initiation |
| 7 | Linked-in Account for Butane.com |
| 8 | Instagram Account for Butane.com |
| 9 | Butane.com Website (reproduced on Butane.net) |
| 10 | Def. GoDaddy Sales E-mail to Plaintiff Prime |
| 11 | Def. 6-4-24 Notice of Misappropriation of Butane.com |
| 12 | Def. Notice of Refund for Full Protection Service |
| 13 | Butane.com Website Content  on 9-24-24 |
| 14 | Plaintiff Prime 8-5-24 E-mail to Defendants |
| 15 | Def. August 14, 2024 E-mail |