Jeffrey J. Neuman (*pro hac vice* forthcoming)
Jeff@jjnsolutions.com
JJN Solutions, LLC
9445 Brenner Ct.
Vienna, VA 22180
Telephone: (202) 549-5079

Isaac S. Crum, #026510
icrum@messner.com
MESSNER REEVES LLP
7250 N. 16th St. Ste 410
Phoenix, Arizona 85020
Telephone: (602) 457-5059
Facsimile: (303) 623-0552

*Attorneys for Prime Loyalty, Crisby
Studio AB, and Niklas Thorin*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Prime Loyalty, LLC, a New York limited liability company, Crisby Studio AB, a Swedish limited company, and Niklas Thorin, a Swedish resident<br><br>Plaintiffs,<br><br>v.<br><br>GoDaddy, Inc., a Delaware corporation, GoDaddy.com, LLC, a Delaware corporation, and 123-Reg Limited, a UK company,<br><br>Defendants. | Case No. 2:24-cv-02165-SMB<br><br>**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION** |

{08731985 / 2}

Plaintiffs Prime Loyalty, LLC ("Prime"), Crisby Studio AB, and Niklas Thorin ("Crisby")(collectively the "Plaintiffs"), by and through their attorneys, respectfully move this Court pursuant to Fed. R. Civ.P. 65 and Local Rule 65.1 for:

(1)    A temporary restraining order enjoining Defendants GoDaddy, Inc., GoDaddy.com, LLC and 123-Reg Limited (collectively "GoDaddy"), its officers, agents, directors, affiliates, servants, employees, and all persons acting in concert with it, from directly or indirectly causing the expiration of the butane.com and calor.com domain names ("Domains") or allowing the Domains to revert to the registry to be generally available for purchase by third parties;

(2)    a temporary restraining order enjoining Defendants GoDaddy from preventing or frustrating Plaintiffs' ownership over and/or right to renew the registration of the Domains and ordering GoDaddy to restore Plaintiffs' access to the Domains;

(3)    a temporary restraining order enjoining Defendants GoDaddy, their officers, agents, directors, affiliates, servants, employees, and all persons acting in concert with them from selling, or otherwise transferring ownership, or allowing others to sell or transfer ownership interest in the Domains to any party, or purchasing or accepting ownership interest in the Domains; and

(4)    an order to show cause why a preliminary injunction should not issue, pursuant to Fed. R. Civ. P. 65, enjoining Defendants from directly or indirectly committing the above-described acts during the pendency of this action.

## FACTUAL BACKGROUND

### A.    *Defendants' Role as Domain Name Registrars*

Defendants GoDaddy.com and 123-Reg operate ICANN-Accredited domain name registrars under an agreement with the Internet Corporation Names for Assigned Names and Numbers ("ICANN").  ICANN defines a "registrar" as an organization through which individuals and entities (registrants) register domain names.[1] "During the registration

---

[1] See definition of "registrar" at https://www.icann.org/en/icann-acronyms-and-terms?nav-letter=r&page=1.

{08731985 / 2}

process, a registrar verifies that the requested domain name meets registry requirements and submits the name to the appropriate registry operator. . . .After registration, registrants can make updates to their domain name settings through their registrars."[2]  Domain name setting include pointing domain names to particular websites, inserting "MX records" to establish e-mail accounts, and adding other records relating to the use of a domain name.

An ICANN-Accredited Registrar is one that has entered into a Registrar Accreditation Agreement ("RAA") with ICANN.[3]  The RAA sets forth the terms and conditions by which registrars may register, renew and/or delete domain names.  In addition, it also sets forth the minimum standards for the performance of registration functions, which not only includes registration services, but also the maintenance and modification of domain name records associated with domain names (e.g., adding Name Server records to point to websites, or MX records to point to e-mail accounts, etc.).

### B.    *Defendant GoDaddy's Separate Role as a provider of Aftermarket Services*

ICANN-accredited registrars often offer additional, unregulated services such as website hosting, email hosting, and domain name aftermarket services. These services can also be provided by non-registrars and non-accredited entities. For example, while a registrar may offer email hosting, not all email hosting providers are registrars. Similarly, one can register a domain with a registrar like GoDaddy but use a separate provider, such as Microsoft 365, for email hosting by updating the domain's records with the registrar.

GoDaddy also provides "aftermarket services," enabling the purchase and sale of previously registered domain names through auctions, offers, or "buy now" transactions, as detailed in its February 29, 2024, SEC filing[4].  These services, often offered by third parties, are distinct from GoDaddy's registrar services and can be used independently of them.

---

[2] *Id.*

[3] *Id.*

[4] See  https://www.sec.gov/ix?doc=/Archives/edgar/data/0001609711/000160971124000022/gddy-20231231.htm  at p. 10,, accessed on August 19, 2024.

**C.**     **_Defendants' Non-Registrar Expiring Domains Aftermarket Service_**

In 2017, 123-Reg became a wholly owned subsidiary of GoDaddy, Inc.   Upon information and belief, as of 2024, all of the technical services provided by 123-Reg are currently hosted on GoDaddy Inc.'s platform.

Per 123-Reg's policies (*See* Complaint ("Comp.") Ex. A), expired domains are auto-renewed for up to 15 days if the registrant has enabled auto-renew or manually renews during this time. If not, the domain is auctioned via GoDaddy, but the original registrant can still recover it at the standard renewal price within the next 15 days.

Thirty days after expiration, the domain is no longer recoverable by the registrant, as this period is reserved for auction bids and backorders. Under 123-Reg's registration agreement, the registrant consents to their domain being sold through GoDaddy's auction platform. If no bids or backorders occur, the domain enters a "Redemption Grace Period," during which the original registrant may recover it by paying the standard renewal fee plus a redemption fee.

**D.**     **_Plaintiffs' acquired the Domains through GoDaddy's Non-Registrar Aftermarket Auction Service_**

Defendants' aftermarket auction platform is housed at http://auctions.godaddy.com. According to Defendants' website, expired auctions last for ten (10) days.[5]  "Once a bid is placed, the registrant can no longer renew the domain" with their domain name registrar even if they use GoDaddy as their registrar.

According to the WHOIS records prior to Plaintiffs' purchase of the Domains, both butane.com and calor.com had expiration dates of February 25, 2024, and were allowed to expire.  Comp. Ex. C and Ex. 1.  In accordance with Defendant 123-Reg's registrar policy, the Domains were placed into the Defendant GoDaddy's auction platform on or about March 10, 2024.  On or about March 26, 2024, thirty (30) days after the Domains expired, the Domain Name registrants for the Domains were changed to "Afternic, LLC", indicating

---

[5]  See https://www.godaddy.com/help/listing-types-for-godaddy-auctions-1525, which is also attached as Complaint Ex. B.

both that the Domains were no longer recoverable by the previous registrant, as described above and that the Domains were under the control of Defendants' non-registrar after-market service. *Id*.

> 1. *Calor.com*

Plaintiff Thorin placed a bid on calor.com for $11,405.00 on or about March 31, 2024. (Declaration of Niklas Thorin ("Thorin Decl.") ¶¶ 2-3). Thorin was notified shortly thereafter that he was the winning bidder of calor.com (after the original high bidder did not pay for the name). Compl. Ex. D and *Thorin Decl. ¶ 4*. The next day Thorin made the required payment to the auction provider plus the renewal price of the Domain to the GoDaddy Registrar. *Id*. ¶ 5. Plaintiff received immediate email confirmation of the payment from GoDaddy, and the Domain was placed into Thorin's GoDaddy registrar account. Compl. Ex. E. Despite renewing the domain through GoDaddy, the WHOIS record still listed 123-Reg as the registrar of record. *Id*. ¶ 5.

Between April 5 and April 10, 2024, Plaintiffs, as the owners of the Domain Name, updated the DNS records through Defendant GoDaddy's registrar and added MX records to activate e-mail services. *Id*. at ¶¶ 7-8. These changes allowed calor.com to direct users to the website shown in Compl. Ex. F and enabled Thorin to receive emails. These MX records remain present in the DNS records as of the filing of this Complaint. Compl. Ex. H.[6]

On May 27, 2024, Plaintiffs Thorin/Crisby entered into a Joint Venture Agreement (the "JV Agreement") with QLSC Consulting S.R.L., a Romanian company headquartered in Bucharest, to develop and launch a Spanish-language dating app named after Plaintiffs' calor.com domain, CALOR. In Spanish, "Calor" translates to "Heat" or "Hot" in English (Compl. Ex. I). As part of the JV Agreement, Plaintiffs had to agree to a standard warranty,

---

[6] Although the Plaintiff was able to change its domain name records through GoDaddy's registrar to receive e-mail and to resolve to its new website, the WHOIS records at all times continued to list 123-Reg as the registrar. Despite listing 123-Reg as the registrar, Plaintiff made all DNS changes through GoDaddy, who provided Plaintiffs with the ability to manage the Domain. *See* Thorin Decl. at 8, n. 1.

namely that it "currently owns the domain name 'Calor.com'".  Thorin Decl. at ¶ 9. Plaintiffs also had to agree to the transfer of ownership of the domain name to the Joint Venture upon the achievement of certain milestones set forth in the JV Agreement.  Until such transfer, Plaintiffs contractually committed to "maintain ownership and control of the domain name." *Id.* at ¶ 10.

### 2.    *Butane.com*

On March 27, 2024, a GoDaddy sales representative informed Plaintiff Prime that Butane.com was available via the "expired auction" listings and suggested it as a potential acquisition. *Declaration of Jeffrey K. Garbutt ("Prime Decl.")* at ¶ 3 and Comp. Ex. 2. Before bidding, Plaintiff Prime secured funding from Mike Giordano, a long-time associate with over 20 years of experience in the butane industry. They agreed to establish a joint white-label butane business under the Butane.com brand, with Giordano managing its operations if the domain was successfully acquired.

Before the auction closed, Prime placed a bid of $19,755 for Butane.com. The same day, Prime was notified of his successful bid. Within minutes, Prime paid $19,765.43, covering the auction price (paid to the auction provider) and a $10.43 renewal fee (paid to Defendant's registrar). A confirmation email promptly acknowledged the transaction. *Prime Decl.* at ¶¶6-8, Comp. Ex. 3 and 4.

On April 7, 2024, Plaintiff Prime purchased additional services from GoDaddy, including Full Domain Protection, extended renewals for <Butane.com>, and premium domains <Butane.net> and <Butane.org>, totaling $7,024.34. *Prime Decl.* at ¶9, Compl. Ex. 5. That same day, Prime migrated <Butane.com> to its nameservers and IP address (72.167.43.221) to begin website development, establish branded email addresses, and launch the brand, along with creating social media accounts.[7] *Prime Decl.* at ¶ 11, Comp. Ex. 6-8

---

[7] Although Prime was able to change its domain name records through GoDaddy's registrar to receive e-mail and to resolve to its new website, the WHOIS records at all times continued to list 123-Reg as the registrar. Despite listing 123-Reg as the registrar, Plaintiff

In April and May 2024, Plaintiff Prime began developing the Butane.com website and initiating its butane business. *See* Ex. 9 and Prime Decl. ¶. 12[8]. Prime also began efforts to acquire butane fuel, lighters, torches, stoves, and heaters under the Butane.com brand. Plaintiff Prime focused on brand development, marketing, and social media promotion, while Giordano leveraged his existing management team to integrate the new product lines. He prepared his OSHA-certified warehouse in South Florida for storing Butane.com-branded products and negotiated contracts with his network of suppliers, distributors, and vendors to support the new venture.  Prime Decl. ¶ 13.

**E.** *Defendant GoDaddy uses its Domain Name Registrar to remove Domains from Plaintiffs' Registrar Accounts without any notice.*

On May 29, 2024, a Sales Manager for Defendant contacted Plaintiffs Prime and Crisby via email, stating that a client was interested in purchasing their Domains. Thorin Decl. ¶10, Complaint Ex. I; Prime Decl. ¶14, Complaint Ex. 10. Plaintiff Thorin responded, informing Defendant that the Calor.com domain was being used for a project launching in early 2025 and would only be sold for a high six-figure amount. Thorin Decl. ¶11, Compl. Ex. J. Plaintiff Prime similarly explained that Butane.com was central to a growing global butane brand and open to joint ventures or partnerships, while also notifying Defendant of related domain names acquired to protect the brand. Prime Decl. ¶15, Comp. Ex. 10.

On June 4, 2024—65 days after Plaintiff Prime paid for <Butane.com>, nearly two months after Plaintiff Crisby acquired <Calor.com>, and over 100 days after the domains had expired under the prior registrant—GoDaddy, Inc's "CEO Team" emailed both Plaintiffs, stating that the domains were erroneously sold to them and should not have been

---

made all DNS changes through GoDaddy, who provided Plaintiffs with the ability to manage the Domain.   *See* Prime Decl. at ¶ 11, n. 1.

[8] While the content is now available on Butane.net, the content displayed on Butane.net, as shown in Complaint Ex.9, accurately reflects the content that was present on Butane.com as of June 4, 2024, prior to GoDaddy's unauthorized transfer of the Butane.com domain name. Prime Decl. ¶ 12.

included in the auction.  Before the e-mails were received, the Domains were removed by GoDaddy from their Plaintiffs accounts. Refunds for the Domains were issued, and in-store credits of $350 and $7,350 were offered to Plaintiffs Thorin and Prime, respectively. Thorin Decl. ¶11, Compl. Ex. K; Prime Decl. ¶16, Compl. Ex. 11.

Despite Plaintiffs' ownership and plans for the domains, Defendant unilaterally removed them, causing severe consequences: (i) breaching the Joint Venture Agreement between Thorin, Crisby, and QLSC, leading to its termination and damaging their reputation Thorin Dec. at ¶¶14-15; and (ii) ending Plaintiff Prime's butane business, irreparably harming its reputation and that of Prime's business partner, a prominent industry figure. Prime Decl. at ¶19.

Defendants further compounded the harm by replacing the content of <Butane.com> with a registrar parking page advertising the domain for sale and displaying paid advertisements for profit. Prime Decl. at ¶ 18 and Compl. Ex.13.

### F.      *Plaintiffs Will be Irreparably Injured without the granting of a Temporary and Preliminary Injunctions*

Without the issuance of a Temporary and/or a Preliminary injunction, the Domains may be transferred, sold or otherwise registered by a non-party to this lawsuit.  In addition, the Domains may be transferred to a party that is outside the jurisdiction of this or any other United States court.  The granting of a TRO will ensure that the status quo is maintained with the Domains until the court can rule on the merits of this case.

## LEGAL STANDARD

The standard for issuing a temporary restraining order is "substantially identical" to the standard for issuing a preliminary injunction. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). However, a TRO's requirements are less rigid since a TRO's duration is much shorter than a preliminary injunction. *L.A. Unified Sch. Dist. v. U.S. Dist. Ct.*, 650 F.2d 1004, 1008 (9th Cir. 1981).

To obtain a TRO, plaintiff must demonstrate that (1) it is "likely to succeed on the merits," (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3)

"the balance of equities" tips in its favor, and (4) an "injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)).

In certain cases, a TRO may be issued where there are "serious questions going to the merits" and the hardship balance tips sharply toward the plaintiff, assuming the other elements are met. *Alliance for the Wild Rockies*, 632 F.3d at 1132. Serious questions "need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (internal citations omitted).

## ARGUMENT

This Court's intervention is necessary to protect Plaintiffs' rights and interests in the Domains and to block Defendants' GoDaddy from improperly depriving Plaintiffs of their ability to access and control the Domains to which they are beneficial registrants. A TRO is further necessary to enjoin the improper and unlawful effort to transfer ownership in the Domains to third parties, which would cause immediate and irreparable harm to Plaintiffs' and potentially open the door to allowing the Domains to escape from this Court's jurisdiction and/or cause additional damage to a third party if Defendants' transfer these Domains to those parties and they have to be returned to Plaintiffs' as a result of this action.

Temporary Restraining Orders are routinely granted in domain name cases in Arizona to ensure that the status quo is maintained. Usually, the domain name registrar is a third-party to those matters. See e.g. Order issued in *Whaleco Incorporated v. TemuExpress.com, et. al.,* No. CV-23-02243-PHX-MTL, Document 13 as amended by Document 16 (Nov. 3, 2023 as amended on November 16, 2023); *See also Orchid Labs Inc. v. Anonymous Ultimate Licensee of Sale-Orchid.Com*, No CV-18-00582-PHX-DJH, 2018 U.S. Dist. LEXIS 250142, at1-2 (D. Ariz. May 4, 2018)(granting the plaintiff's motion against the defendants and ordering "the transfer of the domain. . . to 'Plaintiff' and 'non-party GoDaddy, ad registrar.'). It is even more critical that a TRO issue where the

entity serving as domain name registrar itself is one of the entities to have committed the wrongful act.

**A.    _CRISBY AND PRIME ARE LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS AGAINST DEFENDANTS._**

Plaintiffs are entitled to injunctive relief if they show a likelihood of success on the merits of any one of its claims.  Indeed, Plaintiffs can show that they are likely to prevail on each of its claims for relief.

**1.    _Gross Negligence / Negligence / Estoppel_**

In Arizona, gross negligence is defined as a reckless disregard for the rights or safety of others, exceeding mere carelessness to show deliberate indifference to consequences. See _Lutfy v. Lockhart_, 37 Ariz. 488, 295 P. 975 (1931). Defendants' conduct meets this standard.  Defendants, like all sellers, had a duty to ensure they had rights to the domains they listed for sale.   For example, the Arizona Consumer Fraud Act prohibits misrepresentation in connection with the sale or advertisement of merchandise.  _See_ A.R.S. § 44-1521. _Et. seq._  If Defendants' claim of error is true (unsupported by evidence), they failed to exercise due diligence before listing and auctioning the Domains, particularly when they knew or should have known that Plaintiffs would suffer harm as a result of such breaches of duty.

Despite Plaintiffs having fulfilled all obligations associated with the auctions, including payment in full for the domain names to Defendant GoDaddy, Defendant GoDaddy, Inc. acting through their registrar subsidiaries, GoDaddy.com, LLC and 123-Reg, subsequently reclaimed the Domains from Plaintiffs, citing an unspecified "error" without justification or evidence.  Defendants' gross negligence is demonstrated by:

- **Failure to Verify Auction Rights:** Defendants collectively did not confirm their right to sell the domains, recklessly disregarding the rights of participants like Plaintiffs.

- **Post-Auction Reclamation:** After the auction, Defendants wrongfully reclaimed the domains undermining the platform's integrity and depriving Plaintiffs of

valuable assets without notice or justification.

- **Failure to Mitigate Harm:** After identifying their error, Defendants failed to negotiate or compensate Plaintiffs, instead exacerbating harm to Plaintiffs' businesses and reputations, which Defendants knew depended on these Domains.

As a result of Defendants' grossly negligent actions, Plaintiffs face irreparable harm to their operations, reputation, and relationships. These domain names are unique, integral assets, and their loss cannot be fully remedied by monetary damages. Moreover, if Defendants' assertions of an "error" are accepted, Defendants have effectively admitted that its tortious conduct occurred before any enforceable contract was formed, rendering their actions even more egregious.

   2. *Tortious Interference with Contract/Prospective Economic Advantage*

Plaintiffs are ikely to prevail on their claim for tortious interference with prospective economic advantage. Under Arizona law, this claim requires: (1) a valid business relationship or expectancy, (2) the defendant's knowledge of it, (3) intentional interference causing breach or termination, and (4) resultant damage. *See Miller v. Servicemaster by Rees*, 174 Ariz. 518, 521 (Ct. App. 1992).

   a) *Calor.com*

On May 27, 2024, Plaintiffs Thorin/Crisby entered a JV Agreement with QLSC Consulting S.R.L. to develop a Spanish-language dating app branded under the domain Calor.com. Plaintiffs warranted ownership of the domain, agreed to transfer it upon milestones, and committed to maintaining control until then. *Thorin Decl.* at ¶ 8.

On May 29, 2024, Defendant GoDaddy's sales manager e-mailed Thorin/Crisby under false pretenses claiming that a third party wanted to purchase calor.com which it admitted was owned by Thorin. *See* Compl. Ex. I. Thorin informed Defendant that the domain was actively being used for the JV and stated a six-figure price for any sale. Compl. Ex. J. At the direction of GoDaddy, Inc.'s CEO team, Defendants' wrongfully removed the domain, breaching Plaintiffs' obligations under the JV Agreement and causing QLSC

to terminate the partnership. This loss significantly damaged Plaintiffs' reputation and their relationship with QLSC. *Thorin Declaration* ¶¶ 9, 14-15.

> b)   Butane.com

On April 7, 2024, Plaintiff Prime migrated the Butane.com domain to its own nameservers, began developing the Butane.com website, established new Butane.com email addresses, and launched its new brand. *Prime Decl.* at ¶11.   By May 2024, Plaintiff Prime began the process of acquiring butane fuel, butane lighters, butane torches, butane stoves and butane heaters. *Id* at ¶12.  While Plaintiff Prime took primary responsibility for developing the Butane brand—including marketing, social media presence, and overall promotion of the new business—Giordano began preparing one of his OSHA-compliant warehouses in South Florida to accommodate the initial supply of Butane.com-branded items. *Id.* at ¶13.

On May 27, 2024, Defendant's sales manager contacted Plaintiff Prime with a similar inquiry to Plaintiff Thorin. Plaintiff informed Defendant of the ongoing brand development and was open to offers, emphasizing additional butane-related domains purchased to protect the brand. *Id.* at ¶¶14-15. Despite this, Defendants wrongfully removed Butane.com, disrupting supplier and vendor negotiations, terminating business opportunities, and damaging Plaintiffs' reputation in the butane industry.

> 3.   <u>Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing</u>

Plaintiffs are likely to prevail on their breach of contract claims, as GoDaddy's Universal Terms of Service ("UTOS") and other agreements are unenforceable.  Even if enforceable, Defendants GoDaddy clearly GoDaddy clearly violated the agreements and the covenant of good faith and fair dealing.

> a)   *GoDaddy's Terms of Service Are Unenforceable*

When purchasing the Domains Plaintiffs were required to click "Complete Purchase,"  with small print text stating "By clicking "Complete Purchase", you agree to

our Terms and Conditions and Privacy Policy," which were only accessible via hyperlinks. Thorin Decl. ¶¶ 20-21, Prime Decl. at ¶¶22-23.  These Terms included GoDaddy's UTOS, a 33-page, single spaced agreement containing a separate ling to its Domain Name Registration Agreement ("DNRA"), neither of which users were required to read, scroll through, or affirmatively acknowledge. Prime Decl. at ¶¶22-28, Thorin Decl. at ¶¶ 20-26.

This setup raises serious enforceability issues, resembling a "browser wrap" rather than a "clickwrap" agreement. *See Tate v. Progress Residential, LLC*, CV-23-01203-PHX-SMM (D. Ariz. Feb. 12, 2024)(finding the Terms of Use more akin to an unenforceable browser wrap agreement as opposed to an enforceable clickwrap agreement); and *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171 (9th Cir. 2014)(discussing the difference between browser wrap and clickwrap agreements). Additionally, the TOS and DNRA allow GoDaddy broad, unlimited discretion to transfer domain names "for any reason" or to "correct mistakes," without time limits. These provisions are unconscionable, overly broad, and contrary to public policy, as they undermine contractual stability and predictability, particularly for business-critical domain names.

> b)    *Plaintiffs Are Likely to Succeed on Their Breach of Contract Claims*

Assuming, *arguendo,* that the UTOS and DNRA are enforceable, Defendants clearly breached their terms.  Neither of the Defendant's unilateral agreements—the UTOS or DNRA—contain any specific terms outlining the services provided to customers. In the absence of any such terms, reference to materials on Defendants' websites and to ICANN information is required.

When a person registers a domain name with any registrar, it is purchasing the ability to use the domain name for a specified period in connection with a website, to sell products or services, create professional email accounts, process payments without a website, and develop content that enhances one's brand.[9] ICANN states: "When you register a domain name, you're able to use it for the period of time you registered it for,

---

[9] https://www.godaddy.com/help/how-do-i-register-a-domain-with-godaddy-341

which is typically between one to ten years. If you want to keep using the domain name and any of the services associated with it (such as a website or email service), you must renew the domain name registration prior to its expiration."[10]

Additionally, ICANN's policies, including the Expired Domain Deletion Policy (EDDP), require registrars to clearly disclose domain deletion procedures and ensure registrants can retain domain use during the registration period if renewed timely. See RAA § 3.7.5.5.

In this case, there is no evidence as to why GoDaddy, Inc.'s CEO Team instructed the removal of the Domain Names from Plaintiffs registrar accounts. Both GoDaddy and 123-Reg provide clear expiration timelines on their respective websites,[11] none of which allow domain seizure over 100 days after expiration or two months after purchase by a bona fide buyer.  In addition, none of the agreements allow the reclamation of Domains for errors committed by an auction service provider or by the previous registrant.  In fact, the only reason Defendant was able to physically remove the Domains from either Crisby's or Prime's accounts was because Defendant GoDaddy was the current registrar of the Domains.   Ironically, Plaintiff Prime purchased Defendant's Full Domain Protection service which was designed to prevent the very type of unauthorized transfer that was effectuated by the Defendant itself.  If either Plaintiff had elected to transfer the Domains to another registrar, Defendants would not have been able to remove the Domains. Therefore, if Defendant's auction provider committed an error in placing the Domain Names up for auction, or if there was an error by the previous registrant, Defendants' GoDaddy not only breached its agreements by using its registrar to take "corrective action", but it also clearly constitutes a a breach of a covenant of good faith and fair dealing. See *Rawlings v. Apodaca*, 151 Ariz. 149, 153 (1986) ("The essence of that duty is that neither party will act to impair the right of the other to receive the benefits which flow from their

---

[10]   See   https://www.icann.org/resources/pages/domain-name-renewal-expiration-faqs-2018-12-07-en.

[11]   See https://www.123-reg.co.uk/support/domains/what-is-the-domain-recovery-period-and-how-can-i-restore-my-domain-names/

agreement or contractual relationship"); *Arizona v. Tohono O'odham Nation*, 944 F. Supp. 2d 748, 768 (D. Ariz. 2013) ("The covenant acts to prevent a party from doing something that, while not specifically prohibited by a contract, prevents the other party from enjoying benefits they reasonably expected to flow from the contract.").

Even if Defendants had the right to remove the domains, doing so months after the purchase, knowing Plaintiffs were actively using them for new ventures, and without notice, is unconscionable. These actions deprived Plaintiffs of the benefits reasonably expected under the agreements and violated the principles of fairness inherent in contractual relationships.

**B.    *CRISBY AND PRIME STAND TO SUFFER IRREPARABLE HARM IF THE DOMAINS ARE ALLOWED TO EXPIRE OR BE OPERATED BY, OR TRANSFERRED TO, A THIRD PARTY.***

Without a TRO or injunction, Plaintiffs will continue to suffer substantial, immediate, and irreparable harm. Defendants' actions have deprived Plaintiffs of their property, causing breaches of commitments to third parties and jeopardizing business ventures dependent on the Domains. Specifically: (i) The launch of the calor.com service planned for Q1 2025 has been indefinitely delayed, and (ii) Plaintiff Prime's butane business has been terminated.

A TRO is essential to preserve the status quo. Without it, Defendants may further transfer the Domains, removing them from the Court's reach and undermining its ability to provide meaningful relief. Such actions could occur instantly after notice of this action. Additionally, domain expiration could allow the Domains to be acquired by third parties outside this Court's jurisdiction, compounding the harm to Plaintiffs.

**C.    *THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF A TEMPORARY RESTRAINING ORDER***

The balance of equities and the public interest heavily favor Plaintiffs here. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). The temporary restraining order is limited in scope. It does nothing more than preserve the status quo and ensure that the Defendants

do not take steps contrary to the Agreement or Plaintiffs' ownership interests in Domains. Indeed, courts have found that the public "has a strong interest in holding private parties to their agreements." *See Epic Games v. Apple Inc.*, 2020 WL 5073937, at *4 (N.D. Cal. Aug. 24, 2020). Further, Defendants will not face any legitimate harm due to the requested relief, which seeks only to prevent Defendants from unilaterally and improperly interfering with Plaintiffs' existing rights and interests in the domain names.

Absent an injunction from this Court, Plaintiffs might forever lose their control and ownership interest in the Calor.com and Butane.com Domains. (Thorin Decl. ¶ 16) In short, preserving the status quo during the pendency of this action is the most equitable outcome. This Court recently in *True Names Ltd. v. GoDaddy Inc*. granted a Temporary Restraining Order (which was converted into a Preliminary Injunction Order) on September 5, 2022, against these same Defendants. No. CV-22-01494-PHX-JJT, 2022 WL 4121401 (D. Ariz. Sept. 9, 2022). Although the case did not involve Defendants' aftermarket services, it did involve a domain name which the Plaintiffs' claimed was improperly taken by Defendants. In that case, this Court granted the preliminary injunction citing the Ninth Circuit Court of Appeals, employing a sliding scale analysis, has also stated "'serious questions going to the merits' and a hardship balance that tips sharply toward the [movant] can support issuance of an injunction, assuming the other two elements of the Winter test are also met." *Id.* at *1, quoting *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1078 (9th Cir. 2013) cert. denied, 134 S. Ct. 2877 (2014) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011)).

After converting its motion for a Temporary Restraining Order into a motion for a Preliminary Injunction, this Court in *True Names* found serious questions going to the merits and a hardship balance that tips sharply towards the Plaintiffs. *Id.* at *2. As a result, and recognizing that absent such an order, the domain name could be transferred to a third party, the Court entered an order:

(1)    enjoining Defendants GoDaddy from directly or indirectly causing the expiration of the Domain or allowing the Domain to revert to the registry to be generally

available for purchase by third parties (*id.*);

(2)    enjoining Defendants GoDaddy from preventing or frustrating Plaintiffs' right, pursuant to the Domain Name Registration Agreement with GoDaddy, to renew the registration of the Domain (*id.*); and

(3)    enjoining all Defendants from selling or otherwise transferring ownership interest in the Domain to any party, or otherwise purchasing or accepting any ownership interest in the Domain. *Id.*

This Court has also issued Temporary Restraining Orders / Preliminary injunctions in several other domain name cases. Although many of these cases have been in actions involving trademark infringement, the balance of hardships is similar because issuance of the restraining order / injunction would merely maintain the status quo and failure to issue the restraining order would cause Plaintiffs to suffer and incur additional expense in having to file additional lawsuit(s) if the domain name were to be transferred to other registrants during the pendency of this action. *See* Temporary Restraining Order and Order Setting Hearing on Preliminary Injunction *KeyState Holdings, LLC v. keystateholdings.com*, CV-32-02530-PHX-SMB (September 8, 2021); see also *Fornix Holdings LLC v. Unknown Party*, CV-22-00494-PHX-DLR (May 23, 2022).

## **CONCLUSION**

Plaintiffs are at risk of immediate and further irreparable harm from Defendants. The Court should grant Plaintiffs' motions for a temporary restraining order and order to show cause. The Court should grant these requests to preserve the *status quo* and permit the Court to grant effective relief on the merits of Plaintiffs' claims.

For the foregoing reasons, Plaintiffs respectfully request that the Court issue:

1. a temporary restraining order enjoining Defendants GoDaddy from directly or indirectly causing the expiration of the Domains or allowing the Domains to revert to the registry to be generally available for purchase by third parties;

2. a temporary restraining order enjoining Defendants GoDaddy from preventing or frustrating Plaintiffs' ownership over and/or right to renew the registration of the Domains and ordering GoDaddy to restore Plaintiffs' access to the Domains;

3. a temporary restraining order enjoining all Defendants from selling or otherwise transferring ownership interest in the Domains to any party, or otherwise purchasing or accepting any ownership interest in the Domain; and

4. an order to show cause why a preliminary injunction should not issue, pursuant to Fed. R. Civ. P. 65, enjoining Defendants from directly or indirectly committing the above-described acts during the pendency of this action.

DATED:  November 27, 2024,

_____        _/s/ Isaac S. Crum_
                                        Isaac S. Crum, #026510
                                        icrum@messner.com
                                        MESSNER REEVES LLP
                                        7250 N. 16th St. Ste 410
                                        Phoenix, Arizona 85020
                                        Telephone: (602) 457-5059
                                        Facsimile: (303) 623-0552

                                        Jeffrey J. Neuman (*pro hac vice* forthcoming)
                                        Jeff@jjnsolutions.com
                                        JJN Solutions, LLC
                                        9445 Brenner Ct.
                                        Vienna, VA 22180

                                        *Attorneys for Crisby Studio AB, and Niklas Thorin*