Jeffrey J. Neuman (Admitted *pro hac vice*)
Jeff@jjnsolutions.com
JJN Solutions, LLC
9445 Brenner Ct.
Vienna, VA 22180
Telephone: (202) 549-5079


Isaac S. Crum #026510
icrum@messner.com
MESSNER REEVES LLP
7250 N. 16th St. Ste 410
Phoenix, Arizona 85020
Telephone: (602) 457-5059
Facsimile:  (303) 623-0552

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Prime Loyalty, a New York limited liability company, Crisby Studio  AB, a Swedish limited liability company,  and Niklas Thorin, a Swedish citizen<br><br>Plaintiffs,<br><br>v.<br><br>GoDaddy, Inc., a Delaware corporation, GoDaddy.com,  LLC,  a  Delaware corporation, and 123-Reg Limited, a UK company,<br><br>Defendants. | Case No. 2:24-cv-03359-JJT<br><br><br>**PLAINTIFFS PRIME LOYALTY, LLC, CRISBY STUDIO AB AND NIKLAS THORIN'S OPPOSITION TO DFENDANTS GODADDY INC., GODADDY.COM, LLC, AND 123-REG LIMITED'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT** |

# **Table of Contents**

Table of Contents ................................................................................................... i

Table of Authorities ............................................................................................ iii

I.    Introduction ................................................................................................. 1

II.   Background ................................................................................................. 2

III.  Argument .................................................................................................... 3

    A.    Plaintiffs have Established Subject Matter Diversity Jurisdiction, and a Jurisdictional Supplement is Proper .......................................................... 3

        1.    Plaintiffs Have Properly Alleged Diversity Jurisdiction ....................... 4

        2.    Jurisdictional Supplement Is Proper and Complies with Federal Rules ................................................................................................ 5

            a)    The Court Recognizes Jurisdictional Supplements as a Valid Mechanism ................................................................................ 5

            b)    Rule 15(d) Permits the Filing of Supplemental Pleadings .......... 6

            c)    The Jurisdictional Supplement Promotes Efficiency and Avoids Waste ............................................................................ 6

    B.    There is Personal Jurisdiction over 123 Reg ......................................... 7

        1.    There is General Jurisdiction over 123 Reg ......................................... 8

        2.    There is Specific Jurisdiction over 123 Reg ....................................... 10

    C.    Plaintiffs Must Survive a 12(b)(6) Motion to Dismiss ....................... 12

        1.    GoDaddy's Agreements are Both Substantively and Procedurally Unconscionable and Unenforceable ..................................................... 13

            a)    GoDaddy's Agreements are Procedurally Unconscionable ...... 13

            b)    GoDaddy's Agreements are Substantively Unconscionable .... 15

        2.    Even if Contracts are Enforceable, Plaintiffs' Breach of Contract Claims Must Survive ........................................................................ 21

        3.    Plaintiffs' Claim for Breach of the Covenant of Good Faith and Fair Dealing Must Survive a Motion to Dismiss (Claim 8) ........................ 23

        4.    Plaintiffs' Tort Claims Must Survive a Motion to Dismiss ................. 24

i

a)    Economic Loss Rule ................................................................. 24

b)    Trespass to Chattel (Claim 2) .................................................. 25

c)    Tortious Interference with Perspective Economic Advantage
       and Contract (Claims 6 and 7) ................................................ 27

d)    Gross    Negligence,    Negligence,    and    Negligent
       Misrepresentation ....................................................................... 28

IV.    Conclusion ........................................................................................... 30

# Table of Authorities

Cases

*Anchor Equities, Ltd. v. Joya*,
  160 Ariz. 463 (1989)...................................................................................32

*Apollo Group, Inc. v. Avnet, Inc.*,
  58 F.3d 477 (9th Cir.1995) .........................................................................28

*Ash v. North American Title Company*,
  223 Cal. App. 4th 1258 (2014) ...................................................................22

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).....................................................................................14

*AT&T v. Compagnie Bruxelles Lambert*,
  94 F.3d 586 (9th Cir. 1996) ...........................................................................7

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).....................................................................................14

*Bennett v. Isagenix Int'l LLC*,
  118 F.4th 1120 (9th Cir. 2024) ...................................................................20

*Best Choice Fund, LLC v. Low & Childers, P.C.*,
  228 Ariz. 502 (2011)...................................................................................32

*Bike Fashion Corp. v. Kramer*,
  46 P.3d 431 (Ariz. Ct. App. 2002)..............................................................26

*Billman v. Ace Restaurant Supply Co.*,
  5 Ariz.App. 56 (1967)..................................................................................31

Broehmmer v. Abortion Services of Phoenix, Ltd.,
  173 Ariz. 148 (Ariz. 1992) ..........................................................................22

*Calder v. Jones*,
  465 U.S. 783 (1984).....................................................................................12

*Carstens v. City of Phoenix*,
  206 Ariz. 123, 75 P.3d 1081 (App.2003) ....................................................27

*Cavan v. Maron*,
  2016 WL 4429674 (D. Ariz. Aug. 22, 2016) ..............................................25

*Clark v. Renaissance W., LLC*,
  232 Ariz. 510, 307 P.3d 77 (App. 2013) .....................................................18

*Cousins v. Lockyer*,
    568 F.3d 1063 (9th Cir. 2009) ................................................................. 14

Crisby Studio AB, et al. v. GoDaddy Inc., et al.,
    CV-24-02165-PHX-SMB, 2024 WL 4785815 (2024) ................................. 6

*Cullen v. Auto-Owners Ins. Co.*,
    218 Ariz. 417 (2008) ................................................................................ 23

*Cybersell v. Cybersell*,
    130 F.3d 414 (9th Cir. 1997) ..................................................................... 8

*Daimler AG v. Bauman*,
    134 S. Ct. 746 (2014) .............................................................................. 10

*Daniels v. Maximus Fed. Servs.*,
    No. CV-22-01702-SMB, 2024 WL 3758017 (D. Ariz. Aug. 12, 2024)...... 26

*Demand v. Foley*,
    463 P.2d 851 (Ariz. App. 1970) ............................................................... 24

*Demasse v. ITT Corp.*,
    194 Ariz. 500 (1999) .................................................................... 17, 18, 20

*Douglas v. U.S. Dist. Court ex rel. Ninth Circuit*,
    495 F.3d 1062 (9th Cir. 2007) ........................................................... 16, 19

*ENS Labs Ltd. v. GoDaddy, Inc.*,
    No. CV-22-01494-PHX-JJT, 2023 WL 4746115 (D. Ariz. 2023) ....... 11, 26

*Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp.*,
    905 F.3d 597 (9th Cir. 2018) ..................................................................... 8

*Fuqua Homes, Inc. v. Grosvenor*,
    116 Ariz. 424 (1977) ................................................................................ 33

*Grupo Dataflux v. Atlas Glob. Grp., L.P.*,
    541 U.S. 567 (2004) ................................................................................... 4

*Helicopteros Nacionales de Colombia v. Hall*,
    466 U.S. 408 (1984) ................................................................................... 8

*Inter123 Corp. v. Ghaith*,
    2014 WL 1343508 (D. Ariz. Apr. 4, 2014) ............................................... 13

*Koepnick v. Sears Roebuck & Co.*,
    158 Ariz. 322 (App. 1988) ........................................................................ 28

iv

*Leo India Films Ltd. v. GoDaddy.com LLC*,
 CV-19-04803-PHX-DLR, 2022 WL 836812 (D. Ariz. Mar. 21, 2022)............... 14, 24

*Marciniak v. Veritas Technologies, LLC*,
 No. CV-21-00617-PHX-DWL, 2021 WL 162750 (D. Ariz. Jan. 19, 2021) ............... 18

*Martinez v. Aero Caribbean*,
 764 F.3d 1062 (9th Cir. 2014) ............................................................................ 9

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
 647 F.3d 1218 (9th Cir. 2011) ............................................................................ 11

*Maxwell v. Fid. Fin. Servs. Inc.*,
 184 Ariz. 82, 88–89, 907 P.2d 51, 57–58 (1995) ................................. 15, 17

*McAlister v. Loeb & Loeb, LLP*,
 No. 1 CA-CV 23-0212, 2024 WL 372214  (Ariz. Ct. App. Feb. 1, 2024)........... 28, 30

*Miller v. Hehlen*,
 209 Ariz. 462, ¶ 32, 104 P.3d 193, 202 (App.2005)..................................... 30

*Miller v. Mason-McDuffie Co. of Southern California*,
 153 Ariz. 585 (1987)........................................................................................ 32

*Navarro v. Block*,
 250 F.3d 729 (9th Cir. 2001) ............................................................................ 13

*Nguyen v. Barnes & Noble, Inc.*,
 763 F.3d 1171 (9th Cir. 2014) ............................................................................ 16

*Northern Arizona Gas Service, inc. v. Petrolane Transport, Inc.*,
 145 Ariz. 467 (1984)........................................................................................ 22

*Pac. Am. Leasing Corp. v. S.P.E. Bldg. Sys., Inc.*,
 152 Ariz. 96 (Ct. App. 1986) ............................................................................ 14

*Pebble Beach Co. v. Caddy*,
 453 F.3d 1151 (9th Cir. 2006) ............................................................................ 11

*Perkins v. Benguet Consolidated Mining Co.*,
 342 U.S. 437 (1952)........................................................................................ 10

*Phoenix Western Holding Corp. v. Gleeson*,
 18 Ariz.App. 60, 67-68 (1972) ............................................................................ 33

*Rennie & Laughline, inc. v. Chrysler Corp.*,
 242 F.2d 208, 213 (9th Cir, 1957) ............................................................................ 33

*Rizzio v. Surpass Senior Living,*
    251 Ariz. 413 (2021) ................................................................................. 18

*Schwarzenegger v. Fred Martin Motor Co.,*
    374 F.3d 797 (9th Cir. 2004) ............................................................... 8, 11

*Shattuck v. Precision-Toyota, Inc.,*
    115 Ariz. 586 (1977) ............................................................................... 19

*Sher v. Johnson,*
    911 F.2d 1357 (9th Cir. 1990) .................................................................. 7

*Sports Imaging of Ariz. L.L.C. v. 1993 CKC Trust,*
    No. 1 CA-CV 05-0205, 2008 WL 4448083 (Ariz. App. 2008) .................. 27

*Steinberger v. McVey Ex rel. County of Maricopa,*
    234 Ariz. 125, 318 P.3d 419 (2014) ................................................. 17, 23

*Tate v. Progress Residential, LLC,*
    CV-23-01203-PHX-SMM (D. Ariz. Feb. 12, 2024) .................................. 15

*Transure, Inc. v. Marsh and McLennan, Inc.,*
    766 F.2d 1297 (9th Cir. 1985) ................................................................... 4

*Voltage Pictures, LLC v. Gussi, S.A. de C.V.,*
    92 F.4th 815 (9th Cir. 2024) .................................................................. 3, 4

*Walden v. Fiore,*
    571 U.S. 277 (2014) .............................................................................. 8, 12

*Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of Governors,*
    184 Ariz. 419, 909 P.2d 486 (App.1995) ................................................ 30

*Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund,*
    201 Ariz. 474, 38 P.3d 12 (2002) (corrected Apr. 9, 2002) ....................... 26

*Whitehead v. Grand Canyon University,*
    2024 WL 4436614 (D. Ariz Oct. 7, 2024).......................................... 29, 30

*Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme,*
    433 F.3d 1199 (9th Cir. 2006) ............................................................ 11, 12

Yu v. Fydeski,
    No. CV-22-02182-PHX-JAT, 2023 WL 5720246 (D. Ariz. June 8, 2023) ................. 6

*Zancanaro v. Cross,*
    85 Ariz. 394, 339 P.2d 746 (1959) .......................................................... 25

Statutes

28 U.S.C. § 1332(a)(2) ................................................................................................ 3

28 U.S.C.A. § 1332(a)(3) .......................................................................................... 3, 4

A.R.S. § 44-1521 ....................................................................................................... 28

A.R.S. § 47-2312 ....................................................................................................... 28

Other Authorities

Aktiebolagslag (2005:551) ........................................................................................... 4

*Black's Law Dictionary*, *Sixth Pocket Edition*, Thomson Reuters (2021) .......................... 19

*Dobbs, 2 Law of Remedies § 10.7 (2d ed. 1993)* ...................................................... 13

Rules

Ariz. R. Civ. P. 4.2(a) .................................................................................................. 7

Treatises

Restatement (Second) of Torts § 217 (1965) ............................................................. 28

Restatement (Second) of Torts § 221 .......................................................................... 28

## I.    INTRODUCTION

Plaintiffs Prime Loyalty, LLC (**"Prime"**), Crisby Studio AB (**"Crisby"**), and Niklas Thorin (**"Thorin"**) (collectively, **"Plaintiffs"**) submit this Response in Opposition to Defendants GoDaddy Inc., GoDaddy.com, LLC (collectively, **"GoDaddy"**), and 123-Reg Limited's (**"123 Reg"**) Motion to Dismiss (Doc. 40; **"Motion"**). As detailed in the Complaint (Doc. 1; **"Complaint"**), the prior registrant of the domain names *Butane.com* and *Calor.com* (the **"Domains"**) failed to renew their registrations, leading to expiration. 123 Reg, a wholly owned GoDaddy subsidiary, then facilitated the sale of the Domains through GoDaddy's auction platform, where Plaintiffs acquired full ownership rights.

Plaintiffs have suffered direct and undeniable harm due to Defendants' tortious conduct, having lawfully purchased the Domains through GoDaddy, which acted as the alter ego or agent of 123 Reg. Plaintiffs reasonably relied on Defendants' authority to sell the Domains and convey clear title. Defendants cannot assert that buyers of expired domain names assume the risk of indefinite unilateral repossession, particularly beyond the 30-day domain recovery period defined in Defendants' own policies. The notion that Defendants may revoke ownership of a domain weeks, months, or years after a valid purchase—without notice, justification, or due process—is commercially unreasonable and contrary to established contract and property law. Provisions permitting such conduct in a non-negotiable, one-sided clickwrap contract—subject to unilateral modification without notice—are unconscionable and unenforceable.

Even if GoDaddy had a contractual right to reclaim the Domains due to an alleged "error," dismissal of Plaintiffs' breach of contract claims would still be improper. Whether such an error occurred and, if so, whether it was caused by GoDaddy, 123 Reg, or the prior registrant, are factual disputes requiring discovery and trial. Notably, GoDaddy has never specified the nature of this supposed error. Its argument thus constitutes an affirmative defense, not a valid basis for dismissal under Rule 12(b)(6).

1

## II.    BACKGROUND

As detailed in the Complaint, GoDaddy operates two types of aftermarket auction services. The first, unrelated to this case, involves connecting buyers and sellers where GoDaddy acts solely as a platform, remitting proceeds to the registrant minus a commission.   The second auction model, relevant here, involves the sale of expired domains no longer owned by the prior registrant. In these cases, GoDaddy (both for its own domain names and as an agent for 123 Reg's registrar) retains full control over the domain and collects all auction proceeds. Unlike in the first model, where the original owner conveys ownership to the purchaser, GoDaddy itself (or as an agent to 123 Reg) transfers ownership rights for expired domains.  Unlike the general registration of domain names whereby a consumer can go to any one of hundreds of domain name registrars to obtain domains, with respect to GoDaddy's expired domain names, these domains *can only be registered through GoDaddy.*  GoDaddy is the sole source for its own and 123 Reg's expired domain names.

Plaintiffs Prime and Crisby purchased the Domains through GoDaddy's expired domain auction, in transactions managed by GoDaddy as 123 Reg's agent. After investing significant resources into developing these domains, Plaintiffs were contacted by a GoDaddy representative on May 29, 2024, under false pretenses.  The representative claimed that an unnamed client was interested in purchasing the domains, suggesting a routine sales inquiry. Plaintiffs responded, emphasizing the domains' importance to their businesses and declined to sell.[1]

Despite this, more than 60 days after the Domains were purchased, and **more than 100 days** after the Domains had expired, ***GoDaddy Inc's CEO***, acting as an agent of 123 Reg, removed the Domains from Plaintiffs' accounts without notice, citing an unexplained

---

[1] In a deliberate attempt to mislead the court, Defendants state out of context that Plaintiff Crisby "sought 'a high-six-figure amount' for it. *See Motion*, Doc. 41 at p. 3.  In reality, Crisby stated:  "We're currently launching a project on Calor.com in Q1-2025, and the domain has been specifically purchased for that purpose. **In order for us to consider another domain for the project, the offer would need to be in the high six figure range**." *See Complaint*, Doc. 1-1 at Ex. J (emphasis added).

"error" and asserting that the Domains "should not have been available for your purchase." *See* Complaint at Exhibits K and 11 (showing that e-mail came from "The Office of the CEO of GoDaddy").  Plaintiffs were offered no further explanation about this so-called "error", no proof that an error actually occurred, nor were they given any opportunity to challenge or dispute the actions taken by GoDaddy.  Defendants deliberate and coordinated actions not only led to the shutdown of Plaintiffs' businesses but, in the case of Plaintiff Crisby, caused a breach of its joint venture agreement with a third party. Furthermore, all Plaintiffs suffered substantial financial losses and irreparable damage to their reputations as a direct result of Defendants' conduct.

## III.    ARGUMENT

### A.    Plaintiffs have Established Subject Matter Diversity Jurisdiction, and a Jurisdictional Supplement is Proper

This Court has subject matter jurisdiction over this matter based on section 1332(a)(3) of the diversity jurisdiction statue.  That section provides as follows:

> (a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—
>
> * * *
>
> (3) citizens of different States and in which citizens or subjects of a foreign state are additional parties.

28 U.S.C.A. § 1332(a)(3).  That is, so long as the U.S. parties are diverse, the addition of foreign parties as "additional parties" will not destroy diversity. This is contrasted with 1332(a)(2), where the addition of foreign parties on both sides of a case can destroy diversity.

That difference was described by the Ninth Circuit last year in *Voltage Pictures, LLC v. Gussi, S.A. de C.V.*, 92 F.4th 815, 822 (9th Cir. 2024), cert. denied, No. 23-1261, 2024 WL 4426624 (U.S. Oct. 7, 2024).  There the Ninth Circuit explained

> Section 1332(a)(2) vests federal district courts with subject matter jurisdiction over suits involving "citizens of a State and citizens or

3

subjects of a foreign state," 28 U.S.C. § 1332(a)(2), but not over suits in which "aliens [are] on both sides of the case," *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 569, 124 S.Ct. 1920, 158 L.Ed.2d 866 (2004). Section 1332(a)(3), by contrast, does confer jurisdiction over **suits in which aliens are on both sides of the case, but only if there are also diverse U.S. citizens on both sides.** *See Transure, Inc. v. Marsh and McLennan, Inc.*, 766 F.2d 1297, 1298–99 (9th Cir. 1985) (citing 28 U.S.C. § 1332(a)(3)).

*Voltage Pictures,* 92 F.4th at 822 (emphasis added).

Defendants' challenge to Plaintiffs' jurisdictional allegations is without merit. Plaintiffs have sufficiently alleged diversity jurisdiction, and the Court should reject Defendants' unfounded arguments regarding the nature of Swedish Aktiebolag (AB) entities and the propriety of jurisdictional supplements.

### 1. Plaintiffs Have Properly Alleged Diversity Jurisdiction

Defendants erroneously equate shareholders of a Swedish Aktiebolag (AB) with "members" of a limited liability company (LLC) to argue against diversity jurisdiction. However, their reasoning is flawed.

A Swedish Aktiebolag (AB) is a separate and distinct legal entity, structured similarly to a corporation rather than an LLC. It is managed by a Board of Directors, which is responsible for major business decisions and overseeing company affairs. Directors are elected by shareholders, and the managing director—who runs daily operations—is appointed by the board. Other officers are also appointed either by the board or by the managing director.

Defendants cite Swedish law, stating that "the member-equivalents of a Swedish Aktiebolag appear to be referred to as aktieägarna, which roughly translates to 'shareholders.'" *See* Aktiebolagslag (2005:551), at chap. 1, § 3. However, while the term may translate to "shareholders," this does not equate to shareholders being members in the LLC sense. Rather, an Aktiebolag operates more like a corporation, where decision-making authority rests with the Board of Directors rather than individual shareholders.

Regardless of whether an AB is treated like an LLC or a foreign corporation, Plaintiffs have alleged sufficient facts to establish diversity jurisdiction.

Plaintiffs' Jurisdictional Supplement states: "There are two shareholders of Crisby that also serve as the two Board of Directors members."  Doc 33.  This statement is factually accurate—there are only two shareholders of Crisby, and both serve as its sole Board of Directors members. *See Declaration of Niklas Thorin in Support of Plaintiffs' Opposition to Defendants Motion to Dismiss Plaintiffs' Complaint*, attached as **Exhibit A** (*Thorin Decl. II*) at ¶¶3-5. Defendants' attempt to infer that there may be additional, undisclosed shareholders is unfounded. Their argument appears to be based on a selective grammatical interpretation rather than substantive legal reasoning. Plaintiffs have clearly identified all relevant parties for jurisdictional purposes, and their allegations satisfy the diversity requirements.

### 2. Jurisdictional Supplement Is Proper and Complies with Federal Rules

Defendants' contention that the Jurisdictional Supplement is improper is baseless and unnecessarily wastes judicial resources.  Defendant bases its entire erroneous argument that a Jurisdictional Supplement is not a "pleading" and therefore any statements made therein cannot be considered.  However, Defendant cites no case law or any authority that a Jurisdictional Statement cannot be considered a "pleading" despite this court's acceptance of such statements previously and the fact that it did so in a case involving these same parties.  *See Crisby Studio AB, et al. v. GoDaddy Inc., et al.*, CV-24-02165-PHX-SMB, 2024 WL 4785815 at *1 (2024) ("Crisby No. 1").

#### a) The Court Recognizes Jurisdictional Supplements as a Valid Mechanism

During the hearing on Plaintiffs' Motion for a Temporary Restraining Order on December 17, 2025, Plaintiffs expressly represented to the Court that they would file a supplemental jurisdictional statement to cure any pleading deficiencies regarding Plaintiffs' domicile. Defendants raised **no objection** to this approach at that time.

Moreover, this Court has previously recognized the validity of jurisdictional supplements. In *Crisby No. 1*, the Court explicitly acknowledged that "[s]everal remedial exercises exist when a complaint does not allege the citizenship of all LLC members," including the filing of a jurisdictional supplement. *Id.* at *1; *see also Yu v. Fydeski*, No. CV-22-02182-PHX-JAT, 2023 WL 5720246, at *2 (D. Ariz. June 8, 2023). While dismissal may be appropriate when deficiencies remain uncorrected, Plaintiffs' Jurisdictional Supplement fully resolves any procedural concerns.

> b)      *Rule 15(d) Permits the Filing of Supplemental Pleadings*

Defendants' assertion that a jurisdictional supplement is not a proper "pleading" under the Federal Rules of Civil Procedure is incorrect. Federal Rule of Civil Procedure 15(d) expressly provides that a court may permit the filing of a **supplemental pleading** "setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented," even if the original pleading is defective.

Neither the Federal Rules nor the Local Rules prohibit courts from construing a jurisdictional supplement as a proper procedural remedy. As recognized in *Yu v. Fydeski*, courts routinely allow supplementation to address technical defects in jurisdictional allegations.[2]

> c)      *The Jurisdictional Supplement Promotes Efficiency and Avoids Waste*

Defendants' claim that Plaintiffs engaged in "gamesmanship" is baseless. Plaintiffs sought to avoid unnecessary costs and inefficiencies by filing a Jurisdictional Supplement rather than redrafting the entire Complaint to remove now-irrelevant references to a temporary restraining order, preliminary injunction, and other resolved matters.

Reformatting, reprinting, and resubmitting the original Complaint and its voluminous exhibits would have been an unnecessary waste of time and resources—

---

[2] Black's law dictionary defines a *Pleading* as "[a] document in which a party to a legal proceeding (esp. a civil lawsuit) sets forth or responds to allegations, claims, denials, or defenses." *Black's Law Dictionary*, *Sixth Pocket Edition*, Thomson Reuters (2021).  The Jurisdictional Supplements meets that definition.

1    particularly since there are no substantive changes to Plaintiffs' claims. If the Court

2    ultimately requires an Amended Complaint, Plaintiffs are fully prepared to comply.

3    However, Plaintiffs maintain that the Jurisdictional Supplement adequately and efficiently

4    resolves the issues raised by Defendants.

5           **B.       There is Personal Jurisdiction over 123 Reg**

6           When a defendant asserts a lack of personal jurisdiction,   "The plaintiff need only

7    make a *prima facie* showing of jurisdictional facts." *Sher v. Johnson*, 911 F.2d 1357, 1361

8    (9th Cir. 1990). In determining whether the plaintiff has met this burden, uncontroverted

9    allegations in the plaintiff's complaint must be taken as true, and "conflicts between the

10   facts contained in the parties' affidavits must be resolved in [the plaintiff's] favor for

11   purposes of deciding whether a prima facie case for personal jurisdiction exists." *AT&T v.*

12   *Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996) (cleaned up).

13          When no federal statute governs personal jurisdiction, "the district court applies the

14   law of the forum state." *Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp.*, 905 F.3d

15   597, 602 (9th Cir. 2018). Arizona exerts personal jurisdiction to the "maximum extent

16   permitted by the Arizona Constitution and the United States Constitution." Ariz. R. Civ. P.

17   4.2(a). Thus, personal jurisdiction under Arizona law and federal due process are the same.

18   *Schwarzenegger v. Fred Martin Motor Co*., 374 F.3d 797, 800-01 (9th Cir. 2004).

19          Under the Due Process Clause, "a nonresident's physical presence within the

20   territorial jurisdiction of the court is not required, [but] the nonresident generally must have

21   certain minimum contacts . . . [so as to] not offend traditional notions of fair play and

22   substantial justice." *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (cleaned up). A court may

23   assert general or specific jurisdiction over a nonresident defendant. *Cybersell v. Cybersell*,

24   130 F.3d 414, 416 (9th Cir. 1997). General jurisdiction exists when there are "continuous

25   and systematic" contacts with the forum state, whereas specific jurisdiction exists when the

26   controversy arises from or is related to the defendant's contact with the forum state. See

27   *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414-16 (1984).

28

As outlined in Plaintiffs' Complaint, Doc 1, as well as Plaintiff's motion for Preliminary Injunction, Doc 2,  substantial evidence supports both specific and general jurisdiction over 123 Reg. While Defendant argues that Plaintiffs have failed to show sufficient Arizona contacts for personal jurisdiction, it asks the Court to disregard Plaintiffs' evidence rather than directly addressing it, and to look solely at a self-serving Affidavit submitted by one of the two Directors despite no evidence to back up the information contained therein. Defendant's failure to rebut Plaintiffs' evidence effectively concedes that such contacts do exist.

1.    **There is General Jurisdiction over 123 Reg**

Defendant's contacts with Arizona are "so constant and pervasive as to render it essentially at home" in the state. *Martinez v. Aero Caribbean*, 764 F.3d 1062, 1066 (9th Cir. 2014). Contrary to Defendant's assertions, Plaintiffs' argue that 123 Reg operates as an alter ego of GoDaddy, which exerts substantial control over 123 Reg, establishing general jurisdiction.  Notably: (1) Its official registered address is Studio 4th Floor, Parts C&D, East West Tollhouse Hill, Nottingham, England NG1 5FW, which is the same address as GoDaddy's UK office;  (2) 123 Reg is a wholly owned subsidiary of GoDaddy, Inc., (3) One of 123 Reg's two directors is also a GoDaddy officer (*see* Doc 1-1, Ex. i); (4) According to its 2023 Annual Report, Doc 1-1, Ex.ii, 123 Reg operated at a significant loss and stated "The company has seen a decrease in revenue of £4.4m in 2023 compared to 2022 across all revenue streams due to low volume of new sales and decrease in renewals *as the customers were transitioned to the GoDaddy Inc. platform." Id.* at p. 1 (*Emphasis Added*); (4) GoDaddy Inc. issued a letter of support to provide "financial support as needed for a period until 31 December 2025." *Id.* at p. 8; (5) 123 Reg's UK filings state they represent the "GoDaddy Inc. group of companies, which includes 123 Reg Limited" and align with GoDaddy's strategic reporting (*see* Doc 1-1, Ex. ii); (6) 123 Reg's EU compliance disclosures use data for the GoDaddy group (Doc 17, Ex. iii); (7) GoDaddy manages 123 Reg's technical and operational services, completing a full migration by the end of 2023 (Doc 1-1, Ex. iv); (8) GoDaddy controls 123 Reg's ICANN accreditation

relationship with staff based in Arizona (Doc 1, Ex. v); (9) GoDaddy directs 123 Reg's communications and employment decisions (*see* Doc 1, Ex. vi and vii) (10) GoDaddy exclusively auctions 123 Reg's expired domain names (including the Domains) presumably under an Arizona governed agreement; (11) GoDaddy in Arizona provides the "internal platforms and data centers supporting selected products in The Netherlands, Singapore & USA (e/g., Hosting and Server products, Authentication, Network and DNS Services)" (Doc. 1-1, Ex. iii).

These facts suggest that 123 Reg and GoDaddy operate as a single entity, allowing the Court to exercise general jurisdiction over 123 Reg, as in *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 447–48 (1952). *See also Daimler AG v. Bauman,* 134 S. Ct. 746, 755–56 (2014) (summarizing *Perkins*). GoDaddy administers 123 Reg's expired domain auctions in Arizona, where GoDaddy's systematic and continuous contacts have generated substantial interstate business. Through such contacts, and likely interparty contracts with GoDaddy governed under Arizona law, 123 Reg benefits from Arizona's laws, including court access for rights enforcement.

As further evidence of their operation as a single entity—or at the very least, their deliberate obfuscation of the relationship between GoDaddy and 123 Reg—although the Domain Names were sold through GoDaddy's platform in Arizona, purchasers are led to believe that GoDaddy becomes the official registrar upon purchase. This is due to the fact that purchasers use their GoDaddy accounts to complete the transaction. However, unbeknownst to the purchasers, the official domain name registration records do not reflect GoDaddy as the registrar; instead, 123 Reg is identified as the sponsoring registrar. *See Declaration of Jeff Garbutt in Support of Plaintiffs' Motion for Temporary Restraining Order and Order to Show Cause for Preliminary injunction,* Doc 3 ("Garbutt Decl. I"), Attachment 3 at pages 4-11 and *Declaration of Niklas Thorin in Support of Plaintiffs' Motion for Temporary Restraining Order and Order to Show Cause for Preliminary Injunction*, Doc. 4 ("Thorin Declaration I"), Attachment 3, at pages 4-11.

Moreover, once control of the domains is transferred to purchasers—as occurred in this case—the official domain name records continue to list 123 Reg, even though the domains are managed through GoDaddy registrar accounts. Consequently, consumers perceive 123 Reg and GoDaddy not only as identical entities but also as a single, integrated entity.

### 2.    There is Specific Jurisdiction over 123 Reg

Moreover, even if general jurisdiction is not established, specific jurisdiction exists. "Whether a court may exercise specific jurisdiction in a given case turns on the extent of the defendant's contact with the forum and the degree to which the plaintiff's suit is related to the defendant's contacts." *ENS Labs Ltd. v. GoDaddy, Inc.,* No. CV-22-01494-PHX-JJT, 2023 WL 4746115, *3 (D. Ariz. 2023) (citing *Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme,* 433 F.3d 1199, 1210 (9th Cir. 2006)). The Ninth Circuit uses the following approach to determine whether a court may exercise specific jurisdiction over a nonresident defendant: (1) the nonresident defendant must do some act in or consummate some transaction with the forum, or perform some act by which it purposefully avails itself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or results from the defendant's forum-related activities; and (3) the exercise of jurisdiction must be reasonable. *Id*

To meet the first element, the plaintiff must show the defendant "either (1) 'purposefully availed' himself of the privilege of conducting activities in the forum, or (2) 'purposefully directed' his activities towards the forum." *Pebble Beach Co. v. Caddy,* 453 F.3d 1151, 1155 (9th Cir. 2006) (quoting *Schwarzenegger,* 374 F.3d at 802). The purposeful direction analysis is most commonly applied in cases alleging tortious conduct, as alleged against 123 Reg in this case. *See Mavrix Photo, Inc. v. Brand Techs., Inc.,* 647 F.3d 1218, 1228 (9th Cir. 2011).

To determine whether a defendant's actions constitute purposeful direction, courts apply the "effects" test developed in *Calder v. Jones,* 465 U.S. 783, 789–90, 104 S.Ct.

1482, 79 L.Ed.2d 804 (1984). The effects test requires that "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Yahoo!*, 433 F.3d at 1206. "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects [it] to the forum in a meaningful way." *Walden*, 571 U.S. at 290. In other words, the relationship between the defendant, the forum state, and the litigation must arise out of contacts that the defendant itself creates with the forum State. *Id.* at 284.

In this matter, 123 Reg's contacts with Arizona—and the actions taken by its agent, GoDaddy, within the state—have directly harmed the Plaintiffs. First, 123 Reg intentionally designated GoDaddy as its agent to sell all expired domain names in its GoDaddy expired domains auction, including the two domains at issue in this litigation. As such, 123 Reg intentionally authorized and instructed GoDaddy to use its technical platform—owned and operated in Arizona—to provide these services. Second, 123 Reg intentionally authorized GoDaddy in Arizona to sell, and the Plaintiffs purchased, the Domain Names via GoDaddy's platform in Arizona. Indeed, 123 Reg's intentional use of GoDaddy and obfuscation of its involvement led purchasers to believe that the Arizona-based GoDaddy was the official registrar. This is an intentional decision by GoDaddy and 123 Reg, who intentionally misled purchasers into believing the Arizona-based GoDaddy would be the sponsoring registrar throughout all relevant periods—prior to, during, and following both the auction and the Plaintiffs' acquisition of the Domain Names. *See* Garbutt Decl. I, Doc. 3, Attachment 3 at pages 4-11 and  Declaration of Jeff Garbutt in Support of Plaintiffs' Opposition to Defendants Motion to Dismiss Plaintiffs' Complaint, attached as **Ex. B** (Thorin Decl. II) at ¶¶ 8-9; and Thorin Decl. I, Doc. 4, Attachment 3, at pages 4-11 and Thorin Decl. II, Ex. A at ¶¶10-11.

Notwithstanding 123 Reg's designation as the registrar of record, GoDaddy, acting as 123 Reg's agent and being intentionally authorized and instructed by 123 Reg, sold the Domain, transferred it to Plaintiffs, conferred control over the Domain and its related DNS

1  records and email accounts, and redirected the Domains to Plaintiffs' content. Moreover,

2  although the WHOIS records identified 123 Reg as the "Registrar," for both of the names,

3  its intentionally authorized agent in Arizona, GoDaddy, unilaterally removed the Domain

4  Name from both Plaintiffs' GoDaddy registrar accounts without notice.

5      Existing evidence already demonstrates, and additional evidentiary discovery will

6  reveal, that (i) Defendant's business dealings with GoDaddy constitute purposeful

7  availment of Arizona's business privileges, *see Inter123 Corp. v. Ghaith*, 2014 WL

8  1343508, at *2-3 (D. Ariz. Apr. 4, 2014) (holding that Plaintiff purposefully availed itself

9  of Arizona's business privileges); and (ii) Plaintiffs' claims would not have arisen "but for"

10 these contacts[3]. Specifically, *if* an "error" occurred as Defendant GoDaddy claims (acting

11 as 123 Reg's agent), then (a) the error likely originated in Arizona, (b) it was committed

12 by GoDaddy as 123 Reg's agent in Arizona, and/or (c) it resulted from 123 Reg's actions

13 (or a former registrant's failure to renew) leading 123 Reg to direct GoDaddy in Arizona

14 to reclaim the Domains. In any case, Plaintiffs' claims arise directly from GoDaddy's

15 actions in Arizona on behalf of 123 Reg.

16      ### C.    Plaintiffs Must Survive a 12(b)(6) Motion to Dismiss

17      Rule 12(b)(6) is designed to "test[ ] the legal sufficiency of a claim." *Navarro v.*

18 *Block*, 250 F.3d 729, 732 (9th Cir. 2001). When analyzing a complaint for failure to state

19 a claim, the well-pled factual allegations are taken as true and construed in the light most

20 favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).

21 A plaintiff must merely allege "enough facts to state a claim to relief that is plausible on

22 its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial

23 plausibility when the plaintiff pleads factual content that allows the court to draw the

24 reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.*

25

26 [3] In *Inter123 Corp.*, the court held that the "but for" prong was not satisfied because
   GoDaddy's role as a registrar was unrelated to the contract dispute between the plaintiff

27 and an unrelated defendant. In contrast, here, Plaintiffs' claims directly arise from
   Defendants' collective actions in auctioning and subsequently reclaiming the Domains

28 within Arizona. 2014 WL 1343508.

*Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

        1.    **GoDaddy's Agreements are Both Substantively and Procedurally Unconscionable and Unenforceable**

Unconscionability is categorized into two forms: procedural and substantive. *Pac. Am. Leasing Corp. v. S.P.E. Bldg. Sys., Inc*., 152 Ariz. 96, 103 (Ct. App. 1986). Plaintiffs allege both procedural and substantive unconscionability. Plaintiff has sufficiently stated a claim by alleging that (i) both the contract formation and contract modification processes for the purchase of expired domain names, including the fact that there is only one source for those domain names render the process unfair, and (ii) "that certain provisions of the UTOS are unconscionable because of an overbroad award of discretion to GoDaddy." *Leo India Films Ltd. v. GoDaddy.com LLC*, CV-19-04803-PHX-DLR, 2022 WL 836812, at *3* (D. Ariz. Mar. 21, 2022).

        *a)*    *GoDaddy's Agreements are Procedurally Unconscionable*

        (1)    GoDaddy's Contract Formation Process Raises Serious Enforceability Concerns

Procedural unconscionability arises from "unfair surprise," fine print clauses, and the inability to negotiate key terms. *Maxwell v. Fid. Fin. Servs. Inc.*, 184 Ariz. 82, 88–89, 907 P.2d 51, 57–58 (1995) (citing *Dobbs, 2 Law of Remedies § 10.7, at 706 (2d ed. 1993))*. Courts consider factors such as relative bargaining power, contract drafting, the ability to negotiate terms, and whether alternative options exist. *Maxwell*, 184 Ariz. at 89, 907 P.2d at 58.

GoDaddy's contract formation process is fundamentally flawed. To complete an auction purchase, Plaintiffs had to click "Complete Purchase," beneath which a small-print disclaimer states: "By clicking 'Complete Purchase,' you agree to our Terms and Conditions and Privacy Policy." *Thorin Decl I.* at ¶¶20 - 28*; Prime Decl. I* at ¶ 29*. These terms were hyperlinked, but users were not required to open them. The Universal Terms of Service ("UTOS") is a dense, 33-page document that further incorporates a separate 33-

page Domain Name Registration Agreement ("DNRA"). *Id.* Users were not required to check a box, scroll through, or affirmatively agree to these terms. *Id.*

Regardless of Plaintiffs' sophistication, the disputed domain names were only available through GoDaddy's auctions—eliminating alternative means of acquisition. *See* Garbutt Decl. II, Ex. A at ¶ 7 and Thorin Decl. II, Ex. B at ¶ 9 respectively. As the Court noted: "So, it's the monopoly power of GoDaddy?" *See Doc. 31 at p. 50:16-19.* While the Court denied a temporary restraining order, it recognized the unique value of the domains: "[t]here is specific value in those names, Calor.com, Butane.com, and the suffix dot com as opposed to dot net or dot eu." *Id. at p. 72:3-12.* These facts raise serious questions about the enforceability of GoDaddy's contracts under established principles. *See generally Tate v. Progress Residential, LLC*, CV-23-01203-PHX-SMM (D. Ariz. Feb. 12, 2024) (finding terms of use resembled unenforceable browsewrap agreements); *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171 (9th Cir. 2014) (distinguishing browsewrap from enforceable clickwrap agreements).

(2)    <u>GoDaddy's Unilateral Modifications Undermine Contractual Enforceability</u>

GoDaddy's agreements further contain unilateral modification clauses:

> "GoDaddy may, in its sole and absolute discretion, change or modify this Agreement, and any policies or agreements which are incorporated herein, at any time, and such changes or modifications shall be effective immediately upon posting to [the GoDaddy website]."

*See* Doc. 24-1, Ex. A at ¶ 2.

Since the March 2024 auctions, GoDaddy has revised its UTOS at least four times without notice. The Internet Archive confirms that when Prime purchased *Butane.com* on March 31, 2024, the applicable UTOS was last revised on February 13, 2024. However, just six days before the domain's transfer, GoDaddy revised the UTOS again on April 1, 2024, replacing the prior version at the same web address—without alerting users or specifying changes. *See* Doc. 24-1, Ex. A. Under GoDaddy's own language, merely using *Butane.com* after April 7, 2024, bound Prime to an agreement he had never seen:

14

"Your use of this site or the Services" after such changes or modifications have been made "shall constitute your acceptance of this Agreement as last revised."

*Id.*

This practice exemplifies a lack of mutuality and fairness. Courts have consistently held that unilateral contract modifications—particularly those imposed retroactively without notice or assent—are unenforceable. *Douglas v. U.S. Dist. Court ex rel. Ninth Circuit*, 495 F.3d 1062, 1068 (9th Cir. 2007); *Demasse v. ITT Corp.*, 194 Ariz. 500, 506, 984 P.2d 1138, 1144 (1999) ("A mere continuation of the relationship is not sufficient consideration to support a modification.").

GoDaddy's contract formation process and unilateral modification practices render its agreements unenforceable. Plaintiffs were never given a meaningful opportunity to review, understand, or affirmatively assent to the terms governing their purchases. Further, GoDaddy's ability to retroactively alter terms at will—without notice or user consent— makes the agreements illusory and unenforceable.

### b) *GoDaddy's Agreements are Substantively Unconscionable*

Substantive Unconscionability examines the relative fairness of the obligations assumed by the parties, including whether the "contract terms [are] so one-sided as to oppress or unfairly surprise an innocent party," whether there exists "an overall imbalance in the obligations and rights imposed by the bargain," and whether there is a "sufficient cost-price disparity." *Steinberger v. McVey Ex rel. County of Maricopa*, 234 Ariz. 125, 143, 318 P.3d 419, 437 (2014)(quoting *Maxwell,* 184 Ariz. at 88–89.[4]

(1) GoDaddy's Agreements Confer Unilateral, Unreviewable Power

---

[4] Defendant asserts that "many courts have upheld the enforceability of GoDaddy's UTOS as a matter of law" based on rulings addressing different contractual provisions within that agreement (Doc. 41 at p.19). However, none of the cited cases pertain to the specific provisions or issues at hand in this matter. It is misleading and improper to suggest that the enforceability of unrelated provisions establishes that the entire agreement is enforceable as a matter of law.

15

Defendants concede that GoDaddy retains sole discretion to determine what constitutes an "error" or "mistake" and may unilaterally reclaim domain names at any time—without notice, due process, or evidentiary support. This provision grants GoDaddy unchecked power to seize domain names arbitrarily, without requiring proof of an actual mistake. Worse, customers have no recourse to challenge or review these determinations, making GoDaddy both the accuser and judge—an arrangement that violates fundamental principles of fairness and contract law.

The Arizona Supreme Court in *Rizzio v. Surpass Senior Living,* 251 Ariz. 413 (2021) adopted the standards for substantive unconscionability set forth in *Clark v. Renaissance W., LLC*, 232 Ariz. 510, 512 ¶ 8, 307 P.3d 77, 79 (App. 2013). While both cases addressed arbitration clauses, the central concern was whether the provisions prevented plaintiffs from meaningfully vindicating their rights. In *Clark*, the court found an arbitration clause unconscionable because it effectively foreclosed the plaintiff's ability to challenge an adverse determination. Conversely, in *Rizzio*, the court upheld the arbitration agreement because it did not impose such a barrier.

Here, although the provision does not involve arbitration, it similarly strips Plaintiffs of any ability to contest an adverse determination. GoDaddy retains unilateral, unreviewable authority to declare a "mistake" (regardless of whether one actually occurred) and to reclaim a domain name without challenge. Because GoDaddy alone decides both (a) whether a mistake occurred and (b) the remedy, the provision effectively eliminates Plaintiffs' ability to vindicate their rights. Accordingly, it is substantively unconscionable and unenforceable.

(2)    GoDaddy's Terms Reder the Contract Illusory

A contract is unenforceable when one party retains unrestricted authority to alter or rescind its obligations without meaningful limitation. See *Demasse,* 194 Ariz. at 506 (holding that a valid contract modification requires an offer, acceptance, and consideration). The Arizona Supreme Court has long held that "an agreement which permits one party to withdraw at his pleasure is void." *Marciniak v. Veritas Technologies,*

*LLC*, No. CV-21-00617-PHX-DWL, 2021 WL 162750, at *4 (D. Ariz. Jan. 19, 2021) (citing *Shattuck v. Precision-Toyota, Inc.*, 115 Ariz. 586, 588 (1977)).

Plaintiffs lawfully acquired the disputed domain names through binding transactions, provided consideration, and satisfied all contractual requirements. Yet, Section 15 of GoDaddy's UTOS[5] grants GoDaddy unilateral authority to cancel or transfer any domain name "for any reason" . This effectively allows GoDaddy to retroactively nullify completed transactions, revoke property rights, and unilaterally declare an undefined "error" to terminate service at its sole discretion. Because cancellation or transferring a domain name effectively terminates the governing agreement, GoDaddy's unrestricted discretion renders the contract—at minimum, Section 15—illusory.

Further, no temporal restrictions exist on GoDaddy's ability to invalidate transactions, meaning it can do so months or even years later. This lack of limitation enables GoDaddy to strip domain owners of their rights at any time, regardless of substantial financial and developmental investments. The Ninth Circuit has held that contracts permitting one party to unilaterally alter or rescind obligations lack mutuality and are unenforceable. *Douglas*, 495 F.3d at 1068 (holding unilateral, retroactive contract modifications unenforceable).

Additionally, the UTOS and Domain Name Registration Agreement ("DNRA") allow GoDaddy to unilaterally modify terms at any time, with changes taking immediate effect upon posting—without notice or user consent. This unrestricted power deprives Plaintiffs of meaningful contractual protection. Courts have consistently held that the mere continuation of a contractual relationship does not constitute valid consideration for a modification. *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1127 (9th Cir. 2024) (quoting

---

[5] Although Section 8 of GoDaddy's Domain Name Registration Agreement, Doc 1-1, Ex. O, contains a similar Reservation of Rights which it can invoke at its sole discretion, it does not state that GoDaddy can cancel or transfer a domain name registration "for any reason". *Id. at § 8.* Rather, it only grants the right for GoDaddy to cancel or transfer domain names for enumerated reasons. Though it does not contain the language "for any reason", the fact that it is subject to GoDaddy's "unlimited and sole discretion" without affording any due process to registrants is nonetheless unconscionable as set forth herein.

*Demasse*, 984 P.2d at 1145). To be enforceable, modifications require that parties be informed of new terms, understand their impact, and affirmatively consent. *Demasse*, 984 P.2d at 1146.

Accordingly, GoDaddy's ability to unilaterally alter or terminate its contractual obligations at will renders the agreements illusory and unenforceable.

(3)    GoDaddy's Agreements Deprive Customers of Due Process and Redress

The fundamental lack of procedural safeguards in GoDaddy's agreements further underscores their unconscionability. Plaintiffs, like all GoDaddy customers, are deprived of due process protections and left without any mechanism to challenge GoDaddy's decisions, obtain evidence, or seek independent review. This violates core contract principles by granting GoDaddy unchecked authority while depriving customers of a meaningful remedy.

Consider the following scenario:

- A domain registrant knowingly allows a domain to expire, anticipating its entry into an auction.

- Plaintiffs lawfully acquire the domain through GoDaddy's auction platform and invest in building a business around it.

- The original registrant later regrets the decision, contacts GoDaddy, and falsely claims they allowed the domain to expire by mistake.

- GoDaddy, motivated by financial incentives, reclaims the domain and resells it at a higher price—without evidence, notice, or due process.

This scenario is not hypothetical; it exemplifies precisely the type of conduct that GoDaddy's agreements permit. Without discovery, it is impossible to determine whether such an abuse occurred here. GoDaddy's ability to invalidate completed transactions based on vague, discretionary criteria incentivizes bad-faith claims and undermines fair market transactions.

GoDaddy asserts that it acted properly by returning the domain name to the original registrant, yet it provides no mechanism to verify this claim. GoDaddy merely states that a

1    *"technical issue"* prevented the original registrant from renewing the domain, that it did

2    *"what it thought was the right thing to do,"* and that it can *"appreciate why Plaintiffs are

3    frustrated."* *See* Doc 31, pg. 20: 8-22. However, GoDaddy fails to provide any evidence of

4    the alleged technical error, nor does it offer Plaintiffs any means to challenge its unilateral

5    determination.

6            Whether a technical error occurred is a question of fact—one that alone warrants

7    denial of Defendants' motion to dismiss. More importantly, GoDaddy's failure to

8    substantiate its actions or provide Plaintiffs with any recourse underscores the fundamental

9    lack of due process in its agreements. As articulated in *Rizzio* and *Clark*, the deprivation of

10   a meaningful opportunity to challenge an adverse determination renders a contractual

11   provision substantively unconscionable. Accordingly, GoDaddy's agreements cannot be

12   upheld.

13                    (4)    GoDaddy's Limitation of Liability Clauses are
                            Substantively Unconscionable

14           Section 20 of the UTOS states, "IN NO EVENT SHALL GODADDY, ITS

15   OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, AND ALL THIRD-PARTY

16   SERVICE PROVIDERS, BE LIABLE TO YOU OR ANY OTHER PERSON OR

17   ENTITY FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, OR

18   CONSEQUENTIAL DAMAGES WHATSOEVER . . ." Doc 24-1 § 20. Although the

19   disclaimer of Incidental, Special or Consequential damages have routinely been upheld,

20   GoDaddy's agreements also disclaim **"Direct Damages."**

21           Direct damages, or actual damages, are defined as "an amount awarded to a

22   complainant to compensate for a proven injury or loss; damages that repay actual losses."

23   *Black's Law Dictionary*, *Sixth Pocket Edition*, Thomson Reuters (2021). More

24   specifically, direct damages are those damages that **"flow directly and necessarily from a

25   breach of contract, or that are a natural result of a breach and are within the contemplation

26   of the parties."** *Ash v. North American Title Company*, 223 Cal. App. 4th 1258, 1270

27   (2014) *reh'g denied* (Mar. 5, 2014) (internal quotation omitted). In other words, direct

28

                                            19

damages recoverable in a contract action are those proximately caused by the breach. *Northern Arizona Gas Service, inc. v. Petrolane Transport, Inc.*, 145 Ariz. 467, 478 (1984).

By disclaiming both direct and indirect damages, GoDaddy's overly oppressive contracts of adhesion prohibit the recovery of *any* form of damages caused by its conduct or its services. The disclaimer of all damages or any kind must be deemed substantively unconscionable if there is to be any accountability for an organization that breaches a contract or engages in tortious conduct.

(5)    GoDaddy's Contracts of Adhesion Violate Reasonable Expectations

Arizona law holds that a contract of adhesion is unenforceable when it (1) does not fall within the reasonable expectations of the weaker party, or (2) is unduly oppressive. *Broehmmer v. Abortion Services of Phoenix, Ltd.*, 173 Ariz. 148, 151 (Ariz. 1992). GoDaddy's policy that allows it to claw back any domain name, "for any reason (as determined by GoDaddy in its sole and absolute discretion)"[6] contradict reasonable expectations regarding domain name retention. GoDaddy's policies explicitly state that **36 days** after expiration, "you cannot renew the domain name if a purchase is pending"[7]. GoDaddy's Auction Membership Agreement states that "no sale will be final until forty-five (45) days after the date of expiration."(*AMA, Doc 1-1, Ex. N §6 and Ex. A*). If these Domains were clawed back within 45 days of the expiration, such a claw back would have met the reasonable expectations of Plaintiffs. However, it is entirely outside reasonable expectations that a domain could be removed from an account **100 days or more after expiration**, especially without recourse.

The policy governing domain expiration sales (*AMA, Doc 1-1, Ex. N §6 and Ex. A*) states that all sales are final after 45 days if the domain has received bids at auction. Yet here, GoDaddy removed Plaintiffs' domains **more than 100 days after expiration**—in direct conflict with its own policies. GoDaddy's contracts provide **no transparency, no**

---

[6] *See* Doc. 24-1 at § 15.
[7] *See* Doc. 1-1 at Ex. B, p. 3.

**appeal process, and no independent review**, allowing it to unilaterally reclaim domains under the pretext of an undefined "error."

> ### 2. Even if Contracts are Enforceable, Plaintiffs' Breach of Contract Claims Must Survive

Assuming, *arguendo,* that the UTOS and DNRA are valid and enforceable, the question of whether GoDaddy had the authority to take the actions it took under the agreements is a question of fact and "factual disputes are not addressed at the pleadings stage; our review is limited to the legal sufficiency of the allegations contained in [the] complaint." *Steinberger*, 234 Ariz. at 141 (citing *Cullen v. Auto-Owners Ins. Co.*, 218 Ariz. 417, 419, 189 P.3d 344, 346 (2008) .

The DNRA states in Section 8 that that  it "reserves the right to deny, cancel or transfer any registrations or transaction . . .(ii) to protect the integrity and stability of, and correct mistakes made by, any domain name registry or registrar.[8]" Defendants' claim that "The Domains were returned to [the original registrant] to correct 'an unexpected error' that prevented [the former registrant] from being able to renew the Domains, and because the Domains should not have expired or been auctioned." *See* Doc. 41 at p. 24 (referencing Doc 1-1 at Ex. 11, 15).  They also claim that the UTOS and the DNRA expressly allow GoDaddy to correct those mistakes. *Id.*  Dismissal of Plaintiffs' breach of contract claims, however, would be improper, as (i) the determination of whether an "unexpected error" occurred, as Defendants—not Plaintiffs—allege, (ii) whether the type of error that occurred is a type for which Defendants may correct under the DNRA or UTOS, present questions of fact for trial.

Notably, as previously stated, GoDaddy has never identified or specified the nature of any such error.  In short, GoDaddy has provided no evidence in the record that there was a technical error nor that that technical error was of the type of the contract allows GoDaddy

---

[8] Unlike the UTOS which states it may cancel or transfer any domain name "for any reason. . . including, but not limited to", the DNRA does not contain the words "for any reason". As stated in Section III.C.1.b.2 above, the ability to cancel a domain name "for any reason" is a contract that lacks mutuality and therefore illusory.

to correct via cancellation or transfer of the Domain Names.  This is similar to *Leo India Films Limited v. GoDaddy.com, LLC*, 2022 WL 836812, at *2 where this same Defendant suspended the plaintiff's domain name claiming that it was authorized to take the action in response to a letter from Indian law enforcement.  GoDaddy did not provide proof of that letter but rather cited the same section of the UTOS cited here, claiming that they could suspend a domain name for any reason.  This Court, however, denied GoDaddy's 12(b)(6) motion to dismiss the breach of contract claim.  *Id.*

If, for example, their failure to renew the domain names were the fault of the registrant or if there was in reality no error that prevented the renewal of the Domain Names, then Defendants' activity would not have been allowed under the DNRA which only allows for the corrections of mistakes made by the *registry or registrar but not the registrant.*  Accordingly, GoDaddy's argument amounts to an affirmative defense rather than a valid basis for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Defendants contend that Plaintiffs' breach of contract claims fail because Plaintiffs did not identify any breached provisions of the AMA or DNRA. However, under Arizona law, contracts must be interpreted based on the parties' intentions, with express and implied terms given equal weight. See *Demand v. Foley*, 463 P.2d 851, 856 (Ariz. App. 1970); *Zancanaro v. Cross*, 85 Ariz. 394, 398, 339 P.2d 746 (1959) (holding that implied promises are as enforceable as express terms).

Although the AMA, UTOS, and DNRA lack explicit service commitments, a reasonable interpretation suggests GoDaddy agreed to (a) transfer domain ownership under the AMA and (b) provide registration services for the registered term. See *Cavan v. Maron*, 2016 WL 4429674 (D. Ariz. Aug. 22, 2016) (upholding a breach of contract claim based on implied terms inferred through judicial experience and common sense).

Since GoDaddy's agreements omit service obligations, it is necessary to reference its website and industry standards. Registering a domain grants usage rights for the term purchased, enabling website hosting, email services, payment processing, and brand

development[9]. ICANN states: "When you register a domain name, you're able to use it for the period of time you registered it for… If you want to keep using [it], you must renew [it] prior to its expiration." [10]

Registrars must also follow ICANN's Expired Domain Deletion Policy (EDDP) [11], per the Registrar Accreditation Agreement (RAA), which mandates disclosure of domain deletion procedures. *See* RAA § 3.7.5.5. Both GoDaddy and 123-Reg publish clear expiration policies, defining when former registrants may reclaim domains. Therefore, all applicable policies, whether explicitly stated in Defendants' UTOS or not, must be integrated into their agreements, and the UTOS cannot be interpreted in isolation.

### 3. Plaintiffs' Claim for Breach of the Covenant of Good Faith and Fair Dealing Must Survive a Motion to Dismiss (Claim 8)

Plaintiffs also allege that Defendants breached the implied covenant of good faith and fair dealing. Under Arizona law, "every contract" includes an implied covenant of good faith, which "prohibits a party from doing anything to prevent other parties to the contract from receiving the benefits and entitlements of the agreement." *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 38 P.3d 12, 28 (Ariz. 2002) (corrected Apr. 9, 2002); *ENS,* 2023 WL 4746115, at *7. This covenant can be breached even without an express violation of the contract. Indeed, Arizona law recognizes that "a party can breach the implied covenant of good faith and fair dealing both by exercising express discretion in a way inconsistent with a party's reasonable expectations and by acting in ways not expressly excluded by the contract's terms but which nevertheless bear adversely on the party's reasonably expected benefits of the bargain." *Id.* at 435.  *Daniels v. Maximus Fed. Servs*., No. CV-22-01702-SMB, 2024 WL 3758017, at *5 (D. Ariz. Aug. 12, 2024) (quoting *Bike Fashion Corp. v. Kramer,* 46 P.3d 431, 434 (Ariz. Ct. App. 2002)).

---

[9] *See* https://www.godaddy.com/help/how-do-i-register-a-domain-with-godaddy-341.
[10]    *See*    https://www.icann.org/resources/pages/domain-name-renewal-expiration-faqs-2018-12-07-en.
[11] Found at https://www.icann.org/resources/pages/registars/accreditation/eddp-en.

Defendant argues that Plaintiffs cannot allege a breach of the implied covenant based on actions GoDaddy was explicitly authorized to take. As stated above, that is simply not the law. A breach of the covenant can occur by acting in ways that are not prohibited under the agreement but which adversely affect a party's benefits. *Id.* That is exactly what was pleaded to have happened here. Furthermore, Plaintiffs assert that GoDaddy's claim of "mistake" or "error" was used as a pretext without providing any evidence of an error or its source. Even if an error has occurred, questions remain regarding the enforceability of the relevant provision, both procedurally and substantively. If enforceable, this provision must be interpreted with reasonable limits as to scope and timing. Further, GoDaddy's authority to act hinges on factual issues suited for trial, not dismissal. For example, if the error originated with the former registrant, GoDaddy's publicly posted policies would prohibit it from taking such actions under its agreement.

### 4.    Plaintiffs' Tort Claims Must Survive a Motion to Dismiss
#### a)    *Economic Loss Rule*

The economic loss rule may be applied to preclude a party with contract remedies from recovering in tort if the party has suffered a purely economic loss.  The rule is designed to ensure that plaintiffs bring "suits against those defendants actually liable in contract" to recover their economic loss damages, rather than bringing independent tort actions to recover such damages. *Carstens v. City of Phoenix,* 206 Ariz. 123, 127, 75 P.3d 1081, 1085 (App.2003).  This means that the economic loss rule cannot apply to any of the tort claims asserted against either GoDaddy Inc. or 123-Reg, Ltd., since there was no express contract between Plaintiffs and either of those parties.  Indeed, Defendants do not even argue that the ELR would apply to claims between Plaintiffs and either of those parties.

With respect to the application of the economic loss rule to the tort claims asserted against GoDaddy.com, LLC, it is also inappropriate to dismiss those tort claims based on the application of that rule for two reasons.  First, as articulated in the previous section, Plaintiffs are asserting that the alleged contracts in this matter are unenforceable in whole

24

or in part. Given that this issue will be litigated, and it could be found that the contracts are entirely unenforceable, there may be no contract which would support the application of the economic loss rule.   Next, the economic loss rule only applies in very narrow circumstances, generally applying it to products liability and construction defect litigation. *Sports Imaging of Ariz. L.L.C. v. 1993 CKC Trust,* No. 1 CA-CV 05-0205, 2008 WL 4448083, at *20 (Ariz. App. 2008) (citing *Apollo Group, Inc. v. Avnet, Inc.,* 58 F.3d 477, 480 & n. 3 (9th Cir.1995) (recognizing that "Arizona courts have yet to rule on th[e] question" whether "negligent misrepresentation falls outside the 'economic loss' rule" and noting that "[t]here is no consensus among courts that have been squarely faced with this issue").

In *Sports Imaging*, the court held that the economic loss rule does not bar claims based on independent duties outside the contract. *Sports Imaging,* 2008 WL 4448063, at *21.   This principle is particularly applicable when claims involve conversion, trespass to chattel, or other intentional or negligent actions distinct from those that breached the contract. In such cases, applying the economic loss rule "would not serve the rule's purpose—allowing contracting parties to allocate risk upon entering a contract—and would contravene basic principles of equity." *Id.* at *20*.

### b) *Trespass to Chattel (Claim 2)*

Arizona law defines trespass to chattel consistent with the Restatement (Second) of Torts ("Restatement") § 217 (1965): "intentionally dispossessing another of the chattel or using or intermeddling with a chattel in the possession of another." *Koepnick v. Sears Roebuck & Co.*, 158 Ariz. 322, 330–31 (App. 1988). Dispossession occurs when chattel is taken from another's physical control, Restatement § 221, and intermeddling occurs when physical contact is brought about with chattel in another's possession, Restatement § 217 cmt. e.

In *McAlister v. Loeb & Loeb, LLP,* No. 1 CA-CV 23-0212, 2024 WL 372214, at *7-8 (Ariz. Ct. App. Feb. 1, 2024), the court held that in Arizona, trespass to chattels can occur in the context of digital property and "electronic touching".  *See also Whitehead v. Grand*

*Canyon University*, 2024 WL 4436614 (D. Ariz Oct. 7, 2024).  Contrary to Defendant's argument, domain names, DNS records, and interfering with ones right to use e-mail are precisely the types of property protected under trespass to chattel.

As stated in the Complaint, the domain names *Butane.com* and *Calor.com* ("Domains") were registered through 123 Reg, with the registrant having until February 24, 2024, to renew them. Under 123 Reg's policy, any domains not renewed within 15 days of expiration are sent to Defendant GoDaddy for auction, consistent with the practice for all domains registered through companies in the GoDaddy group. *See* Complaint, Doc 1, Exhibit A. Although 123 Reg's policy allows the original registrant an additional 15-day period to reclaim expired domains, the registrant did not do so. As a result, the Domains officially expired and, once bid on at auction, became unrecoverable by the former registrant.

On or about March 31, 2024, and April 5, 2024—over thirty days after expiration— Prime and Crisby purchased the domains Butane.com and Calor.com, respectively, and registered them through the Plaintiffs' GoDaddy account. Although the Plaintiffs managed their domains through their GoDaddy account, including setting up email and developing websites, the WHOIS records continued to list Defendant 123 Reg as the Registrar of Record (see WHOIS records from March 31 and April 7). Defendants 123 Reg and GoDaddy, through a GoDaddy sales representative, contacted each Plaintiff under false pretenses to gauge interest in selling the domains to an undisclosed client. Each Plaintiff notified Defendants that they were using the domains for active businesses and had invested significant time, money, and resources in them.

On June 4, 2024—over 100 days after the Domain expired, 65 days after Plaintiff Prime purchased Butane.com, and 60 days after Plaintiff Thorin purchased Calor.com via Defendant GoDaddy's auction platform—Defendants forcibly took control of the domains by misusing their registrar authority. This action effectively deprived Plaintiffs of their ownership and use of the domains.

Defendants executed this transfer by submitting unauthorized information to VeriSign, the domain name registry operator for .com, and altering the WHOIS records to remove Plaintiffs as owners. Following this, Defendant 123 Reg replaced the content on *Butane.com* with a registrar parking page featuring advertisements and an offer for sale, generating revenue for 123 Reg. This electronic interference with Plaintiffs rights in its purchased domains is exactly the type of interference which results in liability for electronic trespass to chattels. *See McAlister*, 2024 WL 372214, at *7-8; *Whitehead*, 2024 WL 4436614.

          *c)*     *Tortious Interference with Perspective Economic Advantage and Contract (Claims 6 and 7)*

A plaintiff asserting a claim for tortious interference must allege " 'the existence of a valid contractual relationship or business expectancy; the interferer's knowledge of the relationship or expectancy; intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted.' " *Miller v. Hehlen*, 209 Ariz. 462, ¶ 32, 104 P.3d 193, 202 (App.2005), *quoting Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of Governors*, 184 Ariz. 419, 427, 909 P.2d 486, 494 (App.1995).

All of these elements are met and have been pleaded here. Defendants were aware of Plaintiff's contractual purchase the domains from GoDaddy LLC, nevertheless, GoDaddy, Inc., its "CEO Team", and 123 Reg induced GoDaddy LLC to breach that contract and to take the domains back from Plaintiffs. Further, as pleaded, Plaintiffs have been damaged as a result. Plaintiff Prime was developing a branded butane distribution business, advertising services on its website hosted at *butane.com*. Plaintiffs Crisby and Thorin had also entered into a joint venture to create a dating app using *calor.com*. In response to Defendants' earlier inquiry, framed as interest from a potential buyer, Plaintiffs had informed Defendants of these active business uses.

The unauthorized reclamation of Plaintiffs' domains effectively ended these business ventures, resulting in actual damages, and, in the case of Plaintiffs Crisby and Thorin, breached their joint venture agreement with a third-party partner.

> d)    *Gross    Negligence,    Negligence,    and    Negligent Misrepresentation*

Under Arizona law, every contract for sale carries an implied warranty by the seller that (1) the title conveyed will be valid and the transfer rightful, and (2) the goods will be free from any security interest, lien, or encumbrance unknown to the buyer at the time of the contract. A.R.S. § 47-2312. *See Billman v. Ace Restaurant Supply Co.*, 5 Ariz.App. 56 (1967). Additionally, sellers, including Defendants, have a duty to ensure they possess the goods offered for sale. Under the Arizona Consumer Fraud Act, it is unlawful for a seller to misrepresent material facts in connection with the sale or advertisement of merchandise. *See* A.R.S. § 44-1521, et seq.

If Defendants' claim of an "error" causing the unauthorized auction and sale of Plaintiffs' domains is to be believed, Defendant 123 Reg and its agent, GoDaddy, breached this duty of care. Defendants had an obligation to ensure they could convey clear title and ownership of the domains. However, if such an error occurred, Defendants negligently failed to perform adequate due diligence before listing, auctioning, and selling the domains, despite knowing or having reason to know that such breaches would likely harm Plaintiffs.

More specifically, Defendants had a duty to ensure that any domain names listed as expired had, in fact, expired, and to correct any errors before the sale—not months afterward—particularly when they knew or should have known that such breaches would harm Plaintiffs. If Defendants' claim that the domain was auctioned due to their error is to be believed, they have effectively conceded gross negligence at best, and intentional misrepresentation at worst. GoDaddy cannot escape liability by invoking a questionable clickwrap agreement made at the time of purchase, which seeks to disclaim accountability for the pre-contractual conduct that induced the sale. Allowing such a defense would permit

28

1    Defendants to evade responsibility for pre-contractual misrepresentations and negligent
2    actions that directly harmed Plaintiffs.

3        Plaintiffs argue that Defendants' position is flawed, as the estoppel claim arises from
4    Defendants' pre-contractual actions that induced Plaintiffs to enter into the purchase
5    agreement, not from conduct governed by any contract between the parties. Although
6    Defendant 123 Reg attempts to pass this off as simply a dispute between Defendant
7    GoDaddy and Plaintiffs, the reality is that Defendant GoDaddy was acting as an agent of
8    123 Reg when it sold the Domains to Plaintiffs though its aftermarket auction services.

9        As principal, Defendant 123 Reg may be held liable for the actions of its agent if its
10   conduct led third parties to reasonably believe the agent had authority to act on its behalf.
11   *See Best Choice Fund, LLC v. Low & Childers, P.C.*, 228 Ariz. 502, ¶ 26 (2011). The
12   critical factor is whether the third party's reliance on the agent's apparent authority was
13   reasonable *Miller v. Mason-McDuffie Co. of Southern California,* 153 Ariz. 585, 590
14   (1987); *Anchor Equities, Ltd. v. Joya*, 160 Ariz. 463, 466 (1989).

15       Here, Plaintiffs clearly relied on GoDaddy's apparent authority to transfer title of
16   the domains. Further, by permitting Plaintiffs to manage the domains post-purchase (while
17   123 Reg remained listed as the registrar in the WHOIS records), Defendant 123 Reg
18   effectively ratified the sales and cannot now deny that it authorized GoDaddy to conduct
19   them (*Phoenix Western Holding Corp. v. Gleeson*, 18 Ariz.App. 60, 67-68 (1972)). Even
20   if 123 Reg were to assert that GoDaddy lacked such authority, its inaction led Plaintiffs to
21   reasonably believe GoDaddy was indeed authorized to sell the domains (*Fuqua Homes,*
22   *Inc. v. Grosvenor*, 116 Ariz. 424, 426 (1977)).

23       Under Arizona law, promissory estoppel is only barred when an express contract
24   directly addresses the subject matter at issue. Here, if Defendants' assertions are accepted,
25   they effectively concede that the domain was included in the auction due to a pre-
26   contractual 'error.' But for Defendants' conduct, Plaintiffs would not have purchased the
27   domain. Plaintiffs relied on Defendants' representations prior to the formation of any
28   enforceable contract, if one was formed at all. Therefore, estoppel is appropriate to hold

Defendants accountable for their pre-contractual actions, addressing the resulting harm without overriding any contractual claims.

## IV.    CONCLUSION

Motions to dismiss complaint for failure to state a claim upon which relief can be granted are viewed with disfavor in federal courts.  *See Rennie & Laughline, inc. v. Chrysler Corp.*, 242 F.2d 208, 213 (9th Cir, 1957).  Plaintiffs have presented well-pleaded allegations which, when accepted as true, establish a plausible entitlement to relief under various tort and contract claims. Therefore, the Court should deny Defendants' motion to dismiss.

DATED:  March 6, 2025,

/s/ Isaac S. Crum
_____
Isaac S. Crum, #026510
icrum@messner.com
MESSNER REEVES LLP
7250 N. 16th St. Ste 410
Phoenix, Arizona 85020
Telephone: (602) 457-5059
Facsimile: (303) 623-0552

Jeffrey J. Neuman (*admitted pro hac vice*)
Jeff@jjnsolutions.com
JJN Solutions, LLC
9445 Brenner Ct.
Vienna, VA 22180

*Attorneys for Plaintiffs*