**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Prime Loyalty LLC, *et al.*, | No. CV-24-03359-PHX-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| GoDaddy Incorporated, *et al.*, | |
| Defendants. | |

At issue is Defendants' Motion to Dismiss (Doc. 41, MTD),[1] to which Plaintiffs filed a Response (Doc. 44, Response) and Defendants filed a Reply (Doc. 47, Reply). The Court held oral argument on June 26, 2025. Having read the parties' memoranda, heard their arguments, and thoroughly considered the issues, the Court now grants in part and denies in part Defendants' Motion.

I.    **Background**

Plaintiff Prime Loyalty LLC ("Prime Loyalty") is a limited liability company whose principal place of business is located in Orangeburg, New York and whose sole member is also "located" in Orangeburg, New York. (Doc. 1, Complaint ¶ 3.) In a two-page "Jurisdictional Supplement" filed a month and a half after the Complaint, Plaintiffs clarify that Prime Loyalty's sole member is in fact domiciled in Orangeburg, New York. (*See* Doc. 33, Supplement at 2). Plaintiff Crisby Studio AB ("Crisby Studio") is a Swedish entity

---

[1] Defendants separated into two distinct filings their motion to dismiss and their memorandum of law in support thereof. As the motion itself contains no substantive content, (*see* Doc. 40), the Court will simply refer to the memorandum of law as the MTD.

that is "roughly equivalent to a limited liability company." (Complaint ¶ 4.) The Complaint does not allege the citizenship of the members of Crisby Studio, but the Jurisdictional Supplement clarifies that "[t]here are two shareholders of Crisby that also serve as the two Board of Directors members." (Supplement at 2.) "Plaintiff Niklas Thorin, a Swedish citizen, domiciled in Vastra Gotaland, Sweden, is the CEO of Crisby and primary shareholder. The other shareholder and Board Member is John Alfredsson who is also a Swedish citizen domiciled in Vastra Gotaland, Sweden." (Supplement at 2.)

Both Defendant GoDaddy, Inc. and Defendant GoDaddy, LLC have their principal places of business in Tempe, Arizona. (Complaint ¶¶ 6–7.) The latter is a wholly owned subsidiary of the former. (Complaint ¶¶ 6–7.) Defendant 123-Reg Limited ("123-Reg") is a British entity that is wholly owned by GoDaddy, Inc. (Complaint ¶ 8.) The Jurisdictional Supplement alleges that 123-Reg is a United Kingdom limited liability company. (Supplement at 1.)

Plaintiffs allege as follows.[2] Both GoDaddy, LLC and 123-Reg are domain name registrars. (Complaint ¶¶ 15, 19.) As noted, both entities are wholly owned by GoDaddy, Inc. Although both GoDaddy, LLC and 123-Reg are domain name registrars, GoDaddy, LLC offers a suite of incidental and aftermarket services that 123-Reg does not. (*See* Complaint ¶¶ 16–18, 23, 26.) "[R]egistrars [such as GoDaddy, LLC] may, and often do, provide other value-added services . . . , including website hosting, e-mail services, and domain name after market services." (Complaint ¶ 17.) "However, the offering of these services is not in their registrar capacity, but rather in their separate capacities as a website hosting, e-mail, and aftermarket service providers." (Complaint ¶ 17.) 123-Reg utilizes some aspects of GoDaddy, LLC's aftermarket platform, which utilization is streamlined by the fact that the two entities are subject to common ownership under GoDaddy, Inc. As relevant here, 123-Reg uses GoDaddy, LLC's aftermarket auction system to identify

---

[2] The Court includes only those facts that are material to the disposition of the instant Motion. Some of the allegations in the Complaint do not adequately specify which "Defendant" and/or which "GoDaddy" entity is being referred to. The Court summarizes the facts according to its best understanding of what Plaintiffs meant. In the event that the Court has misapprehended a fact, it trusts that the parties will correct it as necessary.

1  purchasers for domain names whose registrations have expired and whose prior registrants
2  have not renewed the registrations. (Complaint ¶ 26.)

3      In March and April of 2024, Plaintiffs separately purchased two expired domain
4  names at auction on GoDaddy, LLC's platform. 123-Reg was the registrar for both domain
5  names. (Complaint ¶¶ 28–30.) Both domain names were expired domain names, meaning
6  that they were owned by prior registrants who failed to renew their registrations. Upon a
7  registrant failing to renew its domain name, 123-Reg affords a 30-day period within which
8  the prior registrant can belatedly reclaim their domain name. (Complaint ¶ 24.) After the
9  lapse of 30 days, the domain name becomes unrecoverable. (Complaint ¶ 24.) That is
10  precisely what Plaintiffs allege happened here. Both of the domain names purchased at
11  auction by Plaintiffs eventually became unrecoverable to whomever previously held them.

12      After Plaintiffs had consummated their purchases of the two domain names, and
13  after the domain names had become unrecoverable, representatives of GoDaddy, Inc.
14  separately reached out to Plaintiffs to inquire whether they would be willing to sell the
15  domain names. (Complaint ¶¶ 46–47.) Plaintiffs declined to sell. (Complaint ¶¶ 48–49.)
16  GoDaddy, Inc. then unilaterally revoked the domain names, unwound the purchases, and
17  issued a full refund plus some in-store credit. Plaintiffs, who had been actively using these
18  domain names, were injured by the nonconsensual revocation thereof. Plaintiffs believe
19  that Defendants have since sold the domain names to other owners.

20      Plaintiffs bring the following claims: (1) trespass to chattels as to all defendants, (2)
21  gross negligence as to all defendants, (3) negligence as to all defendants, (4) negligent
22  misrepresentation as to all defendants, (5) estoppel as to all defendants, (6) breach of
23  contract as to GoDaddy, LLC and GoDaddy, Inc., (7) breach of the registration agreement
24  as to GoDaddy, LLC and GoDaddy, Inc., (8) breach of the covenant of good faith and fair
25  dealing as to GoDaddy, LLC and GoDaddy, Inc., (9) tortious interference with prospective
26  economic advantage as to all defendants, (10) tortious interference with [third-party]
27  contract as to all defendants, (11) tortious interference with contract as to GoDaddy, Inc.
28  and 123-Reg, and (12) injunctive relief as to all defendants. (Complaint ¶¶ 63–143.)

The sixth and seventh claims merit a few additional words. Plaintiffs allege that, when purchasing a domain name through GoDaddy, LLC's auction service, Plaintiffs were confronted with a sentence stating the purchaser thereby agreed to GoDaddy, LLC's terms and conditions. (Complaint ¶ 94.) The phrase "terms and conditions" was hyperlinked to a 33-page document entitled Universal Terms of Service ("UTOS"). This agreement references another 13-page agreement called the Auction Membership Agreement ("AMA"), which governs expiring domain name auction services. (Complaint ¶ 95.) Plaintiffs assert that, insofar as the AMA is a valid agreement, Defendants breached it by revoking the domain names after the prior registrant's 45-day grace period had elapsed. (Complaint ¶ 102.) That allegation seems to grate against the prior allegation that 123-Reg extends a grace period of only 30 days to prior registrants, but that perceived inconsistency is of no moment to the instant Motion. Plaintiffs attach the AMA, but not the UTOS, to the Complaint. (*See* Complaint Ex. N.)

Plaintiffs allege that the UTOS also contains a reference to an additional 33-page agreement called the Domain Name Registration Agreement ("DNRA"). (Complaint ¶ 106.) This agreement governs the post-auction relationship between the parties. (Complaint ¶ 107.) Plaintiffs attach the DNRA to their Complaint. (Complaint Ex. O.) Plaintiffs assert that the DNRA contains several "unbounded and unconscionable" terms, but that even these terms do not provide "a mechanism for Defendant, as a *Registrar*, to deny, cancel or transfer any renewal of a domain name, for an error committed by an *expired domain name auction provider*." (Complaint ¶ 108 (emphasis in original).) "By removing the Domain Names from Plaintiffs' registrar accounts due to an "error" committed by it as an auction service provider, Defendant breached the DNRA." (Complaint ¶ 109.) "Although Defendants are both a registrar and an auction service provider, there is nothing in the DNRA that allows Defendants to use their position as a domain name registrar to correct errors by them performing non-registrar services (here, auction services)." (Complaint ¶ 109.)

. . .

### III.    Discussion

Defendants' Motion asserts three separate bases of dismissal. First, Defendants argue that the Court lacks subject matter jurisdiction over this lawsuit and that the entire action must therefore be dismissed. Second, Defendants argue that the Court lacks personal jurisdiction over 123-Reg and that all claims against it must therefore be dismissed. Third, Defendants argue that each of Plaintiffs' twelve claims fails as a matter of law for a variety of claim-specific reasons. The Court examines each argument in turn.

### A.    Subject Matter Jurisdiction

Defendants' argument regarding subject matter jurisdiction, although well-crafted, ultimately fails to persuade. This case is premised on the Court's diversity jurisdiction, specifically that jurisdiction created by 28 U.S.C. § 1332(a)(3). (*See* Complaint ¶ 9; Response at 3.) Section 1332(a)(3) provides district courts with jurisdiction over civil actions between "citizens of different States and in which citizens or subjects of a foreign state are additional parties." The instant lawsuit falls within the ambit of § 1332(a)(3) only if there are diverse Americans on both sides of the dispute and the foreign additional parties do not break diversity. *See Transure, Inc. v. Marsh & McLennan, Inc.*, 766 F.2d 1297, 1298–99 (9th Cir. 1985). Therefore, to exercise jurisdiction over this case, the Court must satisfy itself that the foreign additional parties are in fact foreign, rather than diversity-breaking domestic parties.

Here, there is no dispute that complete diversity exists between Plaintiffs Prime Loyalty and Mr. Thorin, on the one hand, and Defendants GoDaddy, Inc. and GoDaddy, LLC, on the other hand. However, Defendants contend that jurisdiction is nevertheless absent because Plaintiffs have failed to fully allege the citizenship of both Crisby Studio and 123-Reg. The Court disagrees.

### 1.    Crisby Studio

Regarding the citizenship of Crisby Studio, Defendants contend that Plaintiffs were required to aver the citizenship of each of Crisby Studio's shareholders, as a Swedish aktiebolag is akin to an LLC, and it is hornbook law that a party seeking to invoke a district

court's diversity jurisdiction over a case involving an LLC must state the citizenship of each member of the LLC. (MTD at 8–10.) Although Plaintiffs state in their Complaint and Jurisdictional Supplement that an aktiebolag is roughly equivalent to a Swedish limited liability company, they go on to assert that an aktiebolag does not have "members" in the same sense as an American LLC. (Complaint ¶ 12; Supplement at 2).) Plaintiffs argue in their Response that "[a] Swedish Aktiebolag (AB) is a separate and distinct legal entity, structured similarly to a corporation rather than an LLC." (Response at 4.). The Court need not settle this dispute, however, because even assuming *arguendo* that an aktiebolag is equivalent to an LLC for purposes of the diversity-jurisdiction inquiry, Plaintiffs have adequately established Crisby Studio's citizenship.

As noted above, Plaintiffs allege that "[t]here are two shareholders of Crisby that also serve as the two Board of Directors members." (Supplement at 2.) "Plaintiff Niklas Thorin, a Swedish citizen, domiciled in Vastra Gotaland, Sweden, is the CEO of Crisby and primary shareholder. The other shareholder and Board Member is John Alfredsson who is also a Swedish citizen domiciled in Vastra Gotaland, Sweden." (Supplement at 2.) Defendants contend that Plaintiffs' use of a restrictive clause, as indicated by their employment of the relative pronoun "that" and their omission of a comma, implies that there are an indefinite number of shareholders of Crisby Studio and that Niklas Thorin and John Alfredsson are merely the two shareholders who also happen to be members of the board of directors. (MTD at 9; Reply at 4.) The Court agrees with Defendants' reading of the Jurisdictional Supplement. Although Plaintiffs' subsequent use of the comparative adjective "other" indicates that there are only two things being considered, the word "other" could be read to modify the phrase "shareholder and Board Member," in which case the sentence would shed no light on how many pure shareholders there are. Defendants' grammatical argument, although correct, is misplaced, as Plaintiffs have now clarified that they committed a syntactical blunder in their Jurisdictional Supplement and that what they *meant* was "there are only two shareholders of Crisby Studio, and both serve

as its sole Board of Directors members." (Response at 5.) In other words, Crisby Studio does not break diversity.

Undeterred, Defendants contend that the Court should simply disregard the intended meaning of Plaintiffs' words and instead "assume that Plaintiffs mean what they say based on the rules of the English language." (Reply at 4.) Although that argument may be instructive in the realm of statutory interpretation, the Court perceives no reason to deliberately misconstrue Plaintiffs' Jurisdictional Supplement in favor of strict textualism. And such an approach plainly does not apply to a filing drafted by an attorney who is available to clarify what he meant. It is of course a feature of oral argument that the parties can illuminate the portion of their briefing was not clear in writing. In light of the fact that the grammatical error committed by Plaintiffs was esoteric and readily discernible, the Court elects to give effect to the intended meaning of Plaintiffs' Jurisdictional Supplement.

Unfortunately, that conclusion still does not resolve the dispute over subject matter jurisdiction. Defendants argue that the Jurisdictional Supplement is invalid as a filing, irrespective of what content it may contain. Defendants have chosen to bring a facial challenge to the Court's subject matter jurisdiction, and Defendants contend that that choice absolutely and categorically precludes the Court from considering any material outside of Plaintiffs' Complaint. (MTD at 6–8.) The Court disagrees. Although Defendants are correct that federal courts typically characterize facial challenges as turning upon the sufficiency of the pleadings, the Court does not read any of the cases cited by Defendants to prohibit a plaintiff from rebutting a facial attack by pointing to content outside the complaint. The judiciary's myriad statements that facial attacks focus upon the sufficiency of the pleadings are intended to protect plaintiffs from the burden of having to produce evidence supporting their invocation of subject matter jurisdiction. Thus, the dichotomy between facial attacks and factual attacks serves judicial economy. The Court is aware of no cases, and Defendants cite to none, in which a court has used a defendant's choice to mount a facial jurisdictional attack as a sword against a plaintiff and thereby has enjoined him from submitting additional allegations extraneous to the complaint.

The most on-point citation offered by Defendants is *NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606 (9th Cir. 2016), which Defendants represent as standing for the proposition that a plaintiff must amend his complaint if he seeks to rebuff a facial attack to subject matter jurisdiction with an allegation not present in his pleading. (MTD at 7.) *NewGen* does not so hold. Rather, *NewGen* simply makes the unremarkable statement that amendment is one avenue by which a plaintiff can cure the jurisdictional defect of insufficient allegations of the citizenship of an LLC's members. 840 F.3d at 614–615. It does not hold that amendment is the only avenue. *NewGen* also states that "[o]nly upon a factual attack does a plaintiff have an affirmative obligation to support jurisdictional allegations with proof." *Id.* That proposition supports the Court's conclusion that the facial/factual bifurcation is primarily designed to protect both the parties and the Court from unnecessary and time-consuming evidentiary disputes, not to permit Defendants to artificially cabin the scope of information that a court may consider in ascertaining whether it possesses subject matter jurisdiction over a case. *See also Doe v. Schachter*, 804 F. Supp. 53, 57 (N.D. Cal. 1992) (reiterating that the "facial attack" designation exists for the non-movant's benefit by assuring that "the nonmoving party is entitled to the same protections it would receive in defending against a motion to dismiss for failure to state a claim").

Moreover, Defendants overreach when they state that federal courts may not examine matters outside the complaint. Many federal courts characterize facial adjudications of subject matter jurisdiction as turning upon "the allegations of the complaint and documents referenced therein and attached thereto." *See, e.g.*, *Laborers' Int'l Union of N. Am., Loc. 341 v. Main Bldg. Maint., Inc.*, 435 F. Supp. 3d 995, 999 (D. Alaska 2020) (citation omitted). As the Jurisdictional Supplement is literally entitled "Jurisdictional Supplement to Complaint," it would seem to qualify as an attachment to the Complaint, even though after-filed.

Finally, the Court cannot accept Defendants' conflation of procedural niceties with subject matter jurisdiction. Even if Defendants are correct that Plaintiffs' Jurisdictional Supplement is procedurally improper and that the Court therefore ought not consider it, it

does not logically follow that the Court lacks subject matter jurisdiction over this case. Article III and § 1332(a)(3) are concerned with whether subject matter jurisdiction exists in fact. Where, as here, there is no legitimate dispute that the Court does indeed possesses subject matter jurisdiction over the case, no constitutional or statutory infirmity arises simply because the Court divined its subject matter jurisdiction via inspection of a filing that is procedurally improper in some immaterial manner. Again, the Court perceives no procedural invalidity in the contemplation of the Jurisdictional Supplement, but even if a procedural issue did exist, the Court fails to see how it flows therefrom that subject matter jurisdiction is lacking here. Unlike subject matter jurisdiction, which federal courts are powerless to excuse or ignore, small procedural mistakes are frequently overlooked by federal courts where, as here, good cause exists to do so.

Thus, for all the foregoing reasons, the Court will consider the content of Plaintiffs' two-page, three-paragraph Jurisdictional Supplement. In doing so, the Court does not hold generally that consideration of any and all extraneous documents is appropriate in the analysis of a facial challenge to subject matter jurisdiction. Plaintiffs' Jurisdictional Supplement is a formal filing, signed by Plaintiffs' counsel and thereby subject to Rule 11, that expressly supplements Plaintiffs' pleading. There is no reason not to consider it. Although Plaintiffs could have simply amended their Complaint when confronted with Defendants' Motion, and perhaps should have done so, the fact that they did not does not preclude the Court from considering their Jurisdictional Supplement. The Court expresses no sentiment on the question of why Plaintiffs decided not to amend, as there appears to be contradictory evidence that they did so out of gamesmanship but also that they did so with the advance blessing of the undersigned and the initial non-opposition of Defendants. It is also worth noting that another judge of this Court presiding over this very same dispute expressly countenanced the filing of a jurisdictional supplement by the very same Plaintiffs presently before the Court. *See Crisby Studio AB v. GoDaddy Inc.*, No. CV-24-02165-PHX-SMB, 2024 WL 4785815, at *1 (D. Ariz. Nov. 14, 2024).

. . .

1    Although Defendants' arguments on this issue are well-taken, the Court finds that

2    demanding an amendment at this juncture is not required, would serve no purpose, and

3    would result in undue delay. Defendants' argument thus appears to be an exhortation to

4    engage in formalism for formalism's sake. The Court declines the invitation. The upshot

5    of all this is that Plaintiffs have adequately alleged that Crisby Studio is a foreign entity

6    that does not break diversity.

7              **2.      123-Reg**

8    Plaintiffs have alleged that 123-Reg is a British LLC that is wholly owned by

9    GoDaddy, Inc. (Supplement at 1.) Defendants argue that there is no such thing as a British

10   LLC and that 123-Reg is actually a British private limited company, which is akin to an

11   American corporation, not an LLC. (MTD at 10.) Thus, as a corporation's citizenship is

12   determined by its place of incorporation and its principal place of business, Plaintiffs must

13   allege 123-Reg's principal place of business before the Court can be satisfied that 123-Reg

14   is indeed a foreign additional party. Defendants further contend that Plaintiffs' assertion

15   that 123-Reg has a "registered address" in England is insufficient to allege the entity's

16   principal place of business. (MTD at 10.) Plaintiffs do not meaningfully respond to this

17   argument, but the Court rejects it nevertheless. Defendants themselves repeatedly state in

18   their briefing that 123-Reg's principal place of business is in the United Kingdom. (MTD

19   at 4, 11, 12.) For much the same reasons given above, the Court will not force Plaintiffs to

20   amend their Complaint to state facts that are entirely undisputed and that have been set

21   forth in filings on the record that are subject to the ethical requirements of Rule 11. The

22   Court is satisfied that 123-Reg is a foreign entity that does not break diversity.

23   Defendants also argue in passing that the Court should disregard the Jurisdictional

24   Supplement's clarification that Prime Loyalty's sole member is domiciled in New York,

25   not just physically located there. The Court declines to do so. Thus, the Court finds that it

26   possesses subject matter jurisdiction over this case. Defendants' Motion is denied on this

27   basis.

28   . . .

1

### B.    Personal Jurisdiction over 123-Reg

2

#### 1.    Legal Standard

3    For a federal court to adjudicate a matter, it must have jurisdiction over the parties.

4 *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982).

5 "When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears

6 the burden of demonstrating that the court has jurisdiction." *In re W. States Wholesale Nat.*

7 *Gas Antitrust Litig.*, 715 F.3d 716, 741 (9th Cir. 2013). "Because there is no statutory

8 method for resolving [personal jurisdiction], the mode of its determination is left to the trial

9 court." *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977).

10    "When a district court acts on a defendant's motion to dismiss under Rule 12(b)(2)

11 without holding an evidentiary hearing, the plaintiff need only make a prima facie showing

12 of jurisdictional facts to withstand the motion to dismiss." *Ballard v. Savage*, 65 F.3d 1495,

13 1498 (9th Cir. 1995). The facts alleged in the complaint are generally accepted as true

14 unless controverted; the court "may not assume the truth of allegations in a pleading which

15 are contradicted by affidavit." *Data Disc.*, 557 F.2d at 1284.

16    To establish personal jurisdiction over a nonresident defendant, the plaintiff must

17 show that the forum state's long-arm statute confers jurisdiction over the defendant and

18 that the exercise of jurisdiction comports with constitutional principles of due process. *Rio*

19 *Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002); *Omeluk v. Langsten*

20 *Slip & Batbyggeri A/S*, 52 F.3d 267, 269 (9th Cir. 1995). Arizona's long-arm statute allows

21 the exercise of personal jurisdiction to the same extent as the United States Constitution.

22 *See* Ariz. R. Civ. Proc. 4.2(a); *Cybersell v. Cybersell*, 130 F.3d 414, 416 (9th Cir. 1997);

23 *A. Uberti & C. v. Leonardo*, 892 P.2d 1354, 1358 (Ariz. 1995) (stating that under Rule

24 4.2(a), "Arizona will exert personal jurisdiction over a nonresident litigant to the maximum

25 extent allowed by the federal constitution"). Thus, a court in Arizona may exercise personal

26 jurisdiction over a nonresident defendant so long as doing so accords with constitutional

27 principles of due process. *Cybersell*, 130 F.3d at 416.

28

Due process requires that a non-resident, non-consenting defendant have sufficient minimum contacts with the forum state so that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)); *see also Mallory v. Norfolk S. Ry. Co.*, 143 S. Ct. 2028, 2039 (2023) (reaffirming that personal jurisdiction exists where a defendant has consented to suit). Courts recognize two forms of contacts-based personal jurisdiction within the confines of due process: "(1) 'general jurisdiction' which arises when a defendant's contacts with the forum state are so pervasive as to justify the exercise of jurisdiction over the defendant in all matters; and (2) 'specific jurisdiction' which arises out of the defendant's contacts with the forum state giving rise to the subject litigation." *Birder v. Jockey's Guild, Inc.*, 444 F. Supp. 2d 1005, 1008 (C.D. Cal. 2006). Here, Plaintiffs argue that 123-Reg is subject to both general and specific personal jurisdiction.

## 2.    General Jurisdiction

Ordinarily, a court has general personal jurisdiction over a defendant only if the "foreign corporation's affiliations with the State are so continuous and systematic as to render it essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 119 (2014). However, in certain circumstances, a court may pierce the corporate veil in order to establish general jurisdiction over a foreign corporation. *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1070–71 (9th Cir. 2015). One such circumstance is where a parent and subsidiary are so intertwined that the latter is the alter ego of the former. *Id*.

A parent-subsidiary relationship alone does not establish two entities as alter egos of each other and thus does not automatically extend general jurisdiction from one to the other. However, personal jurisdiction may be extended "when, in actuality, the foreign entity is not really separate from its domestic affiliate." *Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1021 (9th Cir. 2017). In adjudicating an attempt to pierce the corporate veil, a court must determine whether the unity between the parent and subsidiary is so strong that "attribut[ing] a parent company's contacts with the forum state to its foreign

subsidiary" is reasonable "for the purpose of exercising general personal jurisdiction over the subsidiary." *Ranza*, 793 F.3d at 1065. While courts traditionally use the alter-ego test to exercise jurisdiction over the parent company based on the subsidiary's connections to the forum, "there is no greater justification for bringing the parent into the subsidiary's forum than for doing the reverse." *Id.* at 1072.

To satisfy the alter-ego test and thereby impute general jurisdiction between entities by piercing the corporate veil, a plaintiff must make a *prima facie* case (1) that there is such unity of interest and ownership that the two entities can no longer be viewed as separate and (2) that failure to regard such unity would result in fraud or injustice. *Id.* at 1073.

The unity prong requires that one company exercise "pervasive control" over the other, in such a way or on such a level sufficient to "negate the entities' separate personalities" and render one company "the mere instrumentality" of the other. *Id.* at 1073–74. The Ninth Circuit has emphasized that "total ownership and shared management personnel are alone insufficient to establish the requisite level of control." *Id.* When assessing the first prong of the alter-ego test, courts typically consider nine factors: (1) the commingling of funds and other assets of the entities, (2) the holding out by one entity that it is liable for the debts of the other, (3) identical equitable ownership of the entities, (4) use of the same offices and employees, (5) use of one as a mere shell or conduit for the affairs of the other, (6) inadequate capitalization, (7) disregard of corporate formalities, (8) lack of segregation of corporate records, and (9) identical directors and officers. *Corcoran v. CVS Health Corp.*, 169 F.Supp.3d 970, 983 (N.D.Cal. 2016). The factors can only be satisfied where one party "dictates every facet" of the other party's business, from "broad policy and strategy decisions to routine matters of day-to-day operation." *Id.* Courts also require that such control include a lack of observation of the "corporate formalities necessary to maintain corporate separateness." *Id.*; *see also Ranza*, 793 F.3d 1059 at 1074–75 (explaining that a parent company's "micromanagement" does not "suggest[] the entities failed to observe their separate corporate formalities" such that an alter-ego relationship exists).

Here, Plaintiffs' evidence only addresses the fourth, fifth, and ninth factors detailed above. In arguing that this Court has general jurisdiction over 123-Reg, Plaintiffs allege twelve[3] reasons why 123-Reg and GoDaddy, Inc. should be seen as alter egos:

> (1) [123-Reg's] official registered address is Studio 4th Floor, Parts C&D, East West Tollhouse Hill, Nottingham, England NG1 5FW, which is the same address as GoDaddy's UK office; (2) 123 Reg is a wholly owned subsidiary of GoDaddy, Inc., (3) One of 123 Reg's two directors is also a GoDaddy officer (*see* Doc 1-1, Ex. i); (4) According to its 2023 Annual Report, Doc 1-1, Ex.ii, 123 Reg operated at a significant loss and stated "The company has seen a decrease in revenue of £4.4m in 2023 compared to 2022 across all revenue streams due to low volume of new sales and decrease in renewals *as the customers were transitioned to the GoDaddy Inc. platform*." *Id.* at p. 1 (*Emphasis Added*); (4) GoDaddy Inc. issued a letter of support to provide "financial support as needed for a period until 31 December 2025." *Id.* at p. 8; (5) 123 Reg's UK filings state they represent the "GoDaddy Inc. group of companies, which includes 123 Reg Limited" and align with GoDaddy's strategic reporting (*see* Doc 1-1, Ex. ii); (6) 123 Reg's EU compliance disclosures use data for the GoDaddy group (Doc 17, Ex. iii); (7) GoDaddy manages 123 Reg's technical and operational services, completing a full migration by the end of 2023 (Doc 1-1, Ex. iv); (8) GoDaddy controls 123 Reg's ICANN accreditation relationship with staff based in Arizona (Doc 1, Ex. v); (9) GoDaddy directs 123 Reg's communications and employment decisions (*see* Doc 1, Ex. vi and vii) (10) GoDaddy exclusively auctions 123 Reg's expired domain names (including the Domains) presumably under an Arizona governed agreement; (11) GoDaddy in Arizona provides the "internal platforms and data centers supporting selected products in The Netherlands, Singapore & USA (e/g., Hosting and Server products, Authentication, Network and DNS Services)" (Doc. 1-1, Ex. iii).

(Response at 8–9.) Accepted as true, and taken in the light most favorable to Plaintiffs, the evidence outlined in the Complaint shows only that GoDaddy, Inc. wholly owns 123-Reg, that the two entities have overlapping directors and addresses, and that GoDaddy, Inc. manages 123-Reg's technical and operational services. However, shared offices and directors alone are insufficient to satisfy the alter-ego test. Plaintiffs seem to suggest by citing the migration of 123-Reg customers to the operational services managed by GoDaddy, Inc. that, by the end of 2023, 123-Reg was under such "substantial control" of

---

[3] Plaintiffs listed two factors as "(4)" in their Response. The Court refers to the factors via their numerals in count, rather than by Plaintiffs' listed numerals.

GoDaddy, Inc. that the companies were "operat[ing] as a single entity." (Response at 8–9.) However, Plaintiffs have failed to explain why the migration of some of 123-Reg's customers to GoDaddy, Inc.'s operational platform ought to be sufficient to justify the disregard of 123-Reg's separate corporate structure. As far as the Court can tell, such activity merely shows that the two entities formed an agreement regarding the management of their customers. The level of GoDaddy, Inc.'s involvement in 123-Reg's affairs, as presented by Plaintiffs, is not sufficient to meet the alter-ego test. *See Ranza*, 793 F.3d at 1074. 123-Reg's maintenance of its own corporate records, bank accounts, and accounting suggests that 123-Reg observes all relevant corporate formalities. (*See* Doc. 23 ¶¶ 11–13.)

To be clear, the Complaint and Response do outline several alleged facts indicating that GoDaddy possesses some control over 123-Reg. However, those allegations fall short of proving anywhere near enough control to establish an alter-ego relationship. Notable are Plaintiffs' fifth, tenth, and eleventh allegations that (1) GoDaddy pledged financial support to 123-Reg, (2) GoDaddy, Inc. directs 123-Reg's communications and employment decisions, and (3) there "presumably" exists a contract between GoDaddy, Inc. and 123-Reg for the auction of 123-Reg's expired domain names under Arizona law. The first and second points, while potentially indicative of some level of control, do not allege enough control to constitute an alter-ego relationship. "A parent corporation may be directly involved in financing and macro-management of its subsidiaries . . . without exposing itself to a charge that each subsidiary is merely its alter ego." *Doe v. Unocal Corp.*, 248 F.3d 915, 927 (9th Cir. 2001), *abrogated on other grounds by Daimler*, 571 U.S. 117. Regarding the third point, and putting aside its essentially vague nature, the existence of a contract establishes nothing but a business relationship between the two entities and fails to establish any level of control.

Plaintiffs' assertion that GoDaddy, Inc. "administers 123-Reg's expired domain auctions in Arizona, where GoDaddy's systematic and continuous contacts have generated substantial interstate business," is immaterial to the issue of general jurisdiction, as

minimum contacts is an issue found in inquiries regarding specific jurisdiction, not general. (Response at 9 (citing *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 447–48 (1952)).) In *Perkins*, the Supreme Court did not discuss an alter-ego relationship, or even a parent-subsidiary relationship. Rather, the high court entertained jurisdiction over a foreign company because the company itself had a presence in the forum. *See Perkins*, 342 U.S. at 447–49. Plaintiffs additionally argue—without citing any legal authority—that a hypothetical purchaser's belief that GoDaddy, Inc. and 123-Reg are intertwined because 123-Reg is listed as the registrar of domain names purchased from GoDaddy satisfies the alter-ego test. (Response at 9.) Even if Plaintiffs are correct that one or both entities engaged in misrepresentation, it does not follow that the two entities are alter egos of one another. For all the foregoing reasons, the Court finds that Plaintiffs have not pled facts demonstrating that 123-Reg is the alter ego of a GoDaddy entity such that the Court could permissibly pierce the corporate veil for purposes of establishing general personal jurisdiction over 123-Reg.

### 3.    Specific Jurisdiction

Having concluded that 123-Reg is not amenable to the Court's general jurisdiction, the Court turns to the parties' arguments regarding specific jurisdiction. Plaintiffs contend that 123-Reg is subject to specific jurisdiction by virtue of its alleged agency relationship with GoDaddy, LLC. More specifically, Plaintiffs argue that 123-Reg directed GoDaddy, LLC's auctioning of the domain names and that 123-Reg is therefore within the Court's specific jurisdiction as the principal of GoDaddy, LLC, which is itself subject to the Court's general jurisdiction.

When contemplating an exercise of personal jurisdiction over a nonresident defendant relating to conduct that occurred outside the forum, a federal court typically applies one of two jurisdictional tests, depending on the claim at issue. The two tests are the purposeful-direction inquiry and the purposeful-availment inquiry, which generally correspond to tort and contract claims, respectively. *Impossible Foods Inc. v. Impossible X LLC*, 80 F.4th 1079, 1088–89 (9th Cir. 2023). However, as *Impossible Foods* makes clear,

not every case is governed by a rigid application of those two tests. One circumstance in which an alternative analysis governs is where, as here, a plaintiff seeks to hale a nonresident defendant into court based upon that defendant's alleged agency relationship with a separate entity that is subject to personal jurisdiction in the forum.

In *Daimler*, the Supreme Court cast doubt upon whether an agency relationship could support a finding of general jurisdiction, but it expressly noted that "[a]gency relationships . . . may be relevant to the existence of *specific* jurisdiction." 571 U.S. at 135 n.13 (emphasis in original). In so holding, the Supreme Court rejected the particular agency test that the Ninth Circuit had theretofore employed, but the high court nevertheless approved of the general legal principle that an agency relationship may give rise to specific jurisdiction over a nonresident defendant. *Id.* at 135–36. Defendants argue that "[t]he Supreme Court has held that general jurisdiction cannot be imputed from agent to principal," (Reply at 8), but that is not at all what the Supreme Court held. In *Daimler*, the high court implied, but did not hold, that an agency relationship could not support general jurisdiction over a nonresident defendant. *Daimler*, 571 U.S. at 135–36. However, the Court did not even imply that an agency relationship cannot support specific jurisdiction over such a defendant. As noted, the Court actually implied the exact opposite, writing that "[a]gency relationships . . . may be relevant to the existence of *specific* jurisdiction." *Id.* at 135 n.13 (emphasis in original). Here, Plaintiffs are not attempting to assert general jurisdiction over 123-Reg by virtue of an agency relationship. Instead, they are attempting to assert specific jurisdiction. That attempt is consonant with *Daimler* and its progeny. *See Williams*, 851 F.3d at 1023 ("While *Daimler* voided our agency approach for imputing contacts for the purpose of general jurisdiction, it left open the question of whether an agency relationship might justify the exercise of specific jurisdiction."). Thus, if Plaintiffs show that an agency relationship exists and that the claims of this lawsuit arise out of that relationship, then personal jurisdiction over 123-Reg is proper.

Consistent with that conclusion, numerous district courts in the Ninth Circuit have recognized that an agency relationship can, in theory, give rise to specific jurisdiction over

an out-of-forum defendant regarding out-of-forum conduct. *See A-List Mktg. Sols. Inc. v. Headstart Warranty Grp. LLC*, No. 8:25-CV-00131-FWS-KES, 2025 WL 1674377, at *4–5 (C.D. Cal. May 7, 2025); *IDS Inc. v. AMResorts, LP*, No. LA CV18-06878-JAK (MRWX), 2024 WL 4228238, at *10–11 (C.D. Cal. July 9, 2024). Although the Ninth Circuit has yet to fully announce a new legal standard governing jurisdiction by agency, the appellate court has provided the baseline guidance that "under any standard for finding an agency relationship, the parent company must have the right to substantially control its subsidiary's activities." *See Williams*, 851 F.3d at 1024–25. Here, however, as in all three of the cases cited above, the Court concludes that Plaintiffs have failed to adequately allege that 123-Reg substantially controlled the conduct of the GoDaddy entities.

Plaintiffs make several allegations to support their agency theory. First, Plaintiffs allege the existence of an agreement between GoDaddy, LLC and 123-Reg whereby GoDaddy, LLC auctions 123-Reg's domain names. (Complaint ¶ 8.) While this averment might show some degree of concerted action, it does not allege substantial control. Second, Plaintiffs allege that GoDaddy, Inc., through its CEO and CEO Team, was working with 123-Reg when the domain names were removed from Plaintiffs' accounts. (Complaint ¶ 51.) Again, this shows some level of coordination, but Plaintiffs fail to allege that 123-Reg exercised substantial control over GoDaddy, Inc. Third, Plaintiffs allege that GoDaddy, Inc. and 123-Reg updated certain records so that they no longer listed Plaintiffs as the registrants of the domain names. (Complaint ¶ 53.) This allegation, too, fails to demonstrate substantial control. Although Plaintiffs have alleged that GoDaddy acted on behalf of 123-Reg, Plaintiffs have failed to offer any facts that could support a finding that 123-Reg exerted substantial control over GoDaddy. Plaintiffs' allegation that 123-Reg has migrated to GoDaddy's technology stack, in the absence of an allegation that 123-Reg is controlling that technology, is similarly unavailing. These facts merely suggest that 123-Reg utilized GoDaddy's technology infrastructure to auction domain names and update registration records, which is an insufficient basis to establish specific jurisdiction by agency. Accordingly, in the absence of either general or specific personal jurisdiction

over 123-Reg, the Court must dismiss 123-Reg from this case. The Court now proceeds to an analysis of Defendants' argument that each of Plaintiffs' claims fails as a matter of law.

### C.    Failure to State Claims

#### 1.    Legal Standard

Rule 12(b)(6) is designed to "test[] the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A dismissal under Rule 12(b)(6) for failure to state a claim can be based on either: (1) the lack of a cognizable legal theory; or (2) the absence of sufficient factual allegations to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When analyzing a complaint for failure to state a claim, the well-pled factual allegations are taken as true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.

"While a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (cleaned up and citations omitted). Legal conclusions couched as factual allegations are not entitled to the assumption of truth and therefore are insufficient to defeat a motion to dismiss for failure to state a claim. *Iqbal*, 556 U.S. at 679–80. However, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that 'recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

2.      **Threshold Issue of Contract Formation**

As noted, Plaintiffs bring twelve claims. Defendants assert that all twelve claims fail as a matter of law. With one or two isolated exceptions addressed below, all of Defendants arguments depend in whole or in part on the antecedent premise that Plaintiffs entered into the three contractual agreements at issue in this case: the UTOS, the AMA, and the DNRA. Therefore, before turning to the claim-specific arguments advanced by Defendants, the Court will examine the threshold issue of contract formation.

Although Plaintiffs bring three breach-of-contract claims that presuppose the enforceability of the contracts at issue in this case, Plaintiffs do not concede that any of the three contracts in this case are valid. Each breach-of-contract claim is qualified by language that leaves the door open to a contract-formation challenge. (*See* Complaint ¶ 112 ("To the extent that the GoDaddy Agreements are valid and enforceable, which the Plaintiffs' do not concede, . . . ."); *see also* Complaint ¶¶ 96, 107.) Plaintiffs contend that the various agreements are both procedurally and substantively unconscionable *in toto* and are therefore invalid. Both contentions fail.

First, the contracts at issue are plainly not procedurally unconscionable under Arizona law. Plaintiffs argue that all three contracts are procedurally unconscionable because they run up to 33 pages in length, because the relevant hyperlink was in small print, and because Plaintiffs were not required to click a box or scroll through the contracts. (Complaint ¶¶ 94, 105; Response at 13–14.) Plaintiffs are sophisticated business entities and/or business owners that purchased the domain names at issue to be used in connection with their business activities. (Complaint ¶¶ 36–37, 39, 44–45.) Plaintiffs cite no caselaw from any jurisdiction, much less from Arizona, supporting the proposition that a digital contact entered into by a business is procedurally unconscionable when it is 33 pages in length and does not require the checking of a box or the scrolling of a webpage. (*See* Response 13–14.) In contrast, Defendants cite several Arizona cases upholding the validity of clickwrap contracts akin to those at issue here.[4] (*See* MTD at 20–21.) The Court agrees

_____

[4] The contracts at issue here are clickwrap contracts because Plaintiffs affirmatively allege (1) that the contracts became operative only upon the clicking of the "complete

with Defendants' proposition that a plaintiff who chooses not to read a contract cannot then assert that his choice to forego reading the contract renders it procedurally unconscionable. "One who will not reasonably guard his own interests when he has reasonable opportunity to do so must bear the consequences, because the court will not protect those who, with full opportunity to do so, will not protect themselves." *Jones v. Chiado Corp.*, 137 Ariz. 298, 300 (Ct. App. 1983). Therefore, the 33-page length of the contracts, the fact that there were three contracts, and the fact that Plaintiffs were not compelled to click a box indicating they had read the contracts are all of no moment, particularly where, as here, Plaintiffs are sophisticated business entities and/or business owners. Plaintiffs' assertion that the hyperlink was in "small print" is a red herring, as Plaintiffs have never alleged that they were unaware of the existence or importance of the hyperlink.

Plaintiffs also argue that the contracts are procedurally unconscionable because they relate to expired domain names that could only be purchased through a GoDaddy auction, as opposed to new, never-before-purchased domain names that could be bought and registered through any number of registrars. (*See* Complaint ¶ 8.) Thus, according to a chain of logic that the Court does not fully comprehend and that Plaintiffs do not fully explain, the contracts at issue here are procedurally unconscionable because they relate to a product over which Defendants have a monopoly. (Response at 14.) This argument is underdeveloped, but it is unpersuasive in any event. According to Plaintiffs' proposition, every contact concerning every good or service that is in some sense unique would be procedurally unconscionable. As Defendants' counsel noted at oral argument, that would mean that all contracts concerning real estate are automatically unenforceable as a matter of law. The Court rejects Plaintiffs' position.

The remainder of Plaintiffs' unconscionability argument is a series of assertions that the contracts in this case are unenforceable because several isolated provisions thereof are unconscionable. These arguments are unavailing. First, Defendants assert that, insofar as any provision of any relevant contract is unconscionable, such provision is severable and

purchase" button and (2) that Plaintiffs were informed of that fact. (Complaint ¶¶ 94, 105.)

therefore does not affect the validity of the contract as a whole. (MTD at 22.) Arizona law embraces the doctrine of severability in the context of contractual unconscionability. *See* A.R.S. § 47-2302. When a contractual provision is shown to be unconscionable, "Arizona courts must either (1) refuse to enforce an unconscionable contract, (2) refuse to enforce any unconscionable portion of a contract, or (3) limit the application of any unconscionable clause of a contract to avoid any unconscionable result." *Maxwell v. Fid. Fin. Servs., Inc.*, 184 Ariz. 82, 91 (1995); *see also Mousa v. Saba*, 222 Ariz. 581, 587 ¶ 25 (Ct. App. 2009) ("In Arizona, even if one part of a severable contract is void, the court may enforce the remainder of the contract."). Plaintiffs offer no response to Defendants' severability argument. The Court therefore deems the issue conceded. *See Brown v. Sperber-Porter*, No. CV-16-02801-PHX-SRB, 2017 WL 10410091, at *4 (D. Ariz. Dec. 20, 2017) (noting that "a court may consider an argument conceded when a party fails to counter it").

Some of the provisions that Plaintiffs identify as potentially unconscionable are wholly impertinent to the parties' dispute in this case. For instance, Plaintiffs contend that the contracts at issue here are procedurally unconscionable because they contain provisions that permit GoDaddy to unilaterally modify the terms thereof and that GoDaddy has in fact unilaterally modified the terms thereof. (Response at 14–15.) However, Plaintiffs do not allege that any of the three contracts at issue here were unilaterally modified in any manner that even remotely bears upon this lawsuit. The unilateral-modification provision being immaterial to this matter, the Court declines to consider it further. Insofar as Plaintiffs do identify contractual provisions whose operation would be both relevant and unconscionable, such as the term giving Defendants unlimited discretion to unwind any transaction for any reason, the Court will address such provisions in the context of Plaintiffs' claims for breach of contract and breach of the implied covenant. But as Plaintiffs have not offered any position on the issue of severability, the Court concludes that the contracts themselves are not void for unconscionability.

. . .

. . .

### 3. The Claims

#### a. The Contract Claims

Defendants contend that all of Plaintiffs' contract claims fail because (1) Plaintiffs have not identified a particular contractual provision that was breached and (2) the contracts expressly permitted Defendants to engage in the conduct that Plaintiffs allege was wrongful, namely unwinding the auction and purchase of the two domain names at issue. The Court disagrees. As to the first point, the Complaint describes a transaction whereby Defendants were required to effectuate a transfer of domain name ownership. (*See, e.g.*, Complaint ¶ 96 ("[T]he AMA requires that for an expired domain name auction to be completed, the winning bidder (called the 'Buyer' in the AMA), must pay the winning bid amount plus a one (1) year renewal fee. Once that is completed, 'Change of ownership will begin upon the completion of the check-out process and receipt of Buyer's funds.'").) Therefore, insofar as Defendants failed to discharge their obligations under the contracts, and absent a valid reason for so failing, Defendants breached the contracts. Plaintiffs have adequately described the nature of the alleged breach, and the Court declines Defendants' invitation to embrace a level of formalism that is no longer appropriate under the federal judiciary's standard of notice pleading.

Regarding the second point, Defendants' argument presents a question of fact that cannot be the basis of a dismissal at this juncture. Defendants note that "[t]he UTOS and DNRA expressly allow GoDaddy to 'cancel or transfer any domain name registration' for any reason, including, *inter alia*: (a) to 'correct mistakes' made by GoDaddy in offering any of its services, (b) to 'correct mistakes' of any domain name registrar, or (c) to avoid any potential civil liability (including potential claims by the original registrant of the Domains)." (MTD at 24–25 (citations omitted).) The crux of this case is Defendants' assertion that they rescinded Plaintiffs' domain names to correct some sort of an error. (*See* MTD at 1.) But whether an error occurred is a question of fact that cannot be settled upon the face of the Complaint. Indeed, Plaintiffs evince skepticism that any error occurred. (*See* Response at 1.) Plaintiffs also present an argument, both in their Complaint and in their

briefing, that the kind of error that likely occurred here is not the kind of error that could form the basis of a domain name revocation under the contracts. (*See* Complaint ¶ 108 ("However, even the unenforceable DNRA does not provide a mechanism for Defendant, as a *Registrar*, to deny, cancel or transfer any renewal of a domain name, for an error committed by an *expired domain name auction provider*."); Complaint ¶ 109 ("By removing the Domain Names from Plaintiffs' registrar accounts due to an 'error' committed by it as an auction service provider, Defendant breached the DNRA."); Complaint ¶ 145 ("If there were any errors by the auction service provider, it would have had to bring a legal action to attempt to recover the names. Rather than following the appropriate legal courses of action, Defendant abused its position as a registrar to misappropriate plaintiffs' property.").) The Court is in no position to adjudicate whether an error occurred and, if so, whether that error permitted Defendants to unwind the transactions at issue here. Accordingly, this alleged error cannot be the basis of a dismissal.

If, alternatively, Defendants mean to argue that the contracts' grant of "unlimited and sole discretion" to Defendants means that the existence of any such error is immaterial, then the focus of the analysis would shift to whether the exercise of such an unbounded term is substantively unconscionable (or, if such provision is deemed conscionable in the abstract, whether its specific exercise violated the implied covenant of good faith and fair dealing). This, too, is a question of fact, as Arizona unconscionability law embraces an inquiry into the "commercial setting, purpose and effect" of an allegedly unconscionable contractual provision. *See* A.R.S. § 47-2302(B). Therefore, Defendants' contentions fail, and Plaintiffs' contract claims survive.

### b.    The Estoppel Claim

Defendants argue that Plaintiffs' estoppel claim fails because (1) Plaintiffs' relations with GoDaddy, LLC are governed by contract and (2) Plaintiffs have identified no promise made by GoDaddy, Inc. (MTD at 26.) It must be noted here that, although all of Plaintiffs' contract claims nominally sound against both GoDaddy entities, it appears undisputed that the contracts only bind GoDaddy, LLC. (*See* Complaint Ex. N at 1; Complaint Ex. O at 1;

Doc. 24-1 at 1; *see also* Response at 24 (averring that "there was no express contract between Plaintiffs and [GoDaddy, Inc.]").) In any event, Plaintiffs' response to Defendants' argument is unavailing.

Plaintiffs concede that GoDaddy, Inc. never made a promise to Plaintiffs that could form the basis of a claim for promissory estoppel, but Plaintiffs nevertheless maintain that GoDaddy, Inc. ought to be vicariously liable for the actions of GoDaddy, LLC because an agency relationship existed between them. (Response at 29.) The Court fails to understand the thrust of this argument. Even if the Court assumes *arguendo* that such an agency relationship exists and that as a result GoDaddy, Inc. bears liability for GoDaddy, LLC's alleged misconduct, it does not follow that GoDaddy, Inc. is properly a defendant on a claim of promissory estoppel. Plaintiffs appear to have confused the *doctrine* of agency by estoppel with the *claim* of promissory estoppel. One of the cases cited by Plaintiffs, (*see* Response at 29), explains that "[u]nder the estoppel theory, a person will be held liable as a party to a transaction purportedly done on his account as a result of his manifestations to third parties that another is his agent or as a result of his inaction if he knows third parties believe another to be his agent and he does not take reasonable steps to notify them otherwise." *Fuqua Homes, Inc. v. Grosvenor*, 116 Ariz. 424, 427 (Ct. App. 1977). That method of establishing an agency relationship is not the same thing as a claim for promissory estoppel, which is an equitable claim permitting a plaintiff to recover upon a promise made by a defendant and upon which the plaintiff foreseeably and detrimentally relied. *See Satamian v. Great Divide Ins. Co.*, 257 Ariz. 163, 171 ¶ 20 (2024). Although the existence of an agency relationship might permit Plaintiffs to hold GoDaddy, Inc. liable for GoDaddy, LLC's alleged malfeasance, such liability cannot extend to liability on a claim of promissory estoppel, as such claim is precluded as to GoDaddy, LLC and has not been adequately alleged as to GoDaddy, Inc. The Court will therefore dismiss this claim.[5]

. . .

---

[5] Had the Court not already concluded that it lacks personal jurisdiction over 123-Reg, this conclusion would extend equally to it, as would the conclusions in the subsequent sections of this Order.

### c.   The Tort Claims

Defendants argue that Plaintiffs' tort claims fail because they violate the economic loss doctrine. The Court agrees, but only as to GoDaddy, LLC. In Arizona, "[t]he principal function of the economic loss doctrine [] is to encourage private ordering of economic relationships and to uphold the expectations of the parties by limiting a plaintiff to contractual remedies for loss of the benefit of the bargain. These concerns are not implicated when the plaintiff lacks privity and cannot pursue contractual remedies." *Flagstaff Affordable Hous. Ltd. P'ship v. Design All., Inc.*, 223 Ariz. 320, 327 ¶ 38 (2010). As Plaintiffs lack a contractual relationship with GoDaddy, Inc., the economic loss doctrine does not bar the claims against it. The doctrine does, however, bar the tort claims against GoDaddy, LLC, as the claims against that entity do not pertain to any duties or eventualities beyond those contemplated within the contracts. Plaintiffs argue that the economic loss doctrine does not apply outside the contexts of construction defects and product defects, but Plaintiffs are wrong. *See Cook v. Orkin Exterminating Co.*, 227 Ariz. 331, 332 ¶ 1, 335 ¶ 20 (Ct. App. 2011) (applying the doctrine to bar tort claims relating to a defendant's alleged failure to exterminate termites as required by contract); *Shaw v. CTVT Motors, Inc.*, 232 Ariz. 30, 32 ¶ 15 (Ct. App. 2013) (noting that "Arizona appellate courts have applied the economic loss rule to various tort claims"). Plaintiffs offer no reason why the Court should permit them to sue GoDaddy, LLC in tort when contract law provides for the possibility of a full recovery. Accordingly, the Court dismisses the tort claims against GoDaddy, LLC.

Next, Defendants argue that Plaintiffs' negligence claim fails because "GoDaddy owed Plaintiffs no duty of care other than contractual duties." (MTD at 27.) That argument is duplicative of Defendants' economic-loss argument, which the Court has already accepted. Defendants also argue that "Plaintiffs do not, and cannot, allege that GoDaddy Inc. or 123-Reg owed Plaintiffs any duty" and that "Plaintiffs also do not allege that 123-Reg or GoDaddy Inc. provided any 'false information in a business transaction' to Plaintiffs, as required to state a claim for negligent misrepresentation." (MTD at 28 n.6

1    (citation omitted).) The Court disagrees. The Arizona judiciary has embraced a relatively
2    restrictive conception of legal duty. *See Quiroz v. ALCOA Inc.*, 243 Ariz. 560, 565 ¶¶ 14–15
3    (2018). Foreseeability of harm plays no role in the determination of whether a defendant
4    owed a plaintiff a duty. *Id.* Rather, "duty in Arizona is based on either recognized common
5    law special relationships or relationships created by public policy." *Id.* "Duties based on
6    special relationships may arise from . . . 'conduct undertaken by the defendant.'" *Id.*
7    (quoting *Gipson v. Kasey*, 214 Ariz. 141, 145 ¶ 18 (2007). The Complaint alleges that
8    Defendants undertook conduct that created a legal duty, specifically listing the domain
9    names for auction and declaring Plaintiffs the winner of that auction. (*See, e.g.*, Complaint
10   ¶¶ 83–84.) The Court expresses no opinion on whether that conduct can create a duty under
11   Arizona law, as no party argues this point beyond the topic-sentence assertions already
12   quoted above. The Court merely holds that Plaintiffs have at least *alleged* the existence of
13   a duty. Accordingly, the Court will not dismiss Plaintiffs' claims for negligence and
14   negligent misrepresentation.

15          Next, Defendants argue that Plaintiffs have failed to support their claim of gross
16   negligence with adequate factual support. (MTD at 28.) Plaintiffs do not meaningfully
17   respond to this argument, and the Court agrees with Defendants in any event. Except for
18   the allegations supporting the claims of tortious interference and trespass to chattels, the
19   Complaint contains nothing beyond conclusory statements in support of the claim for gross
20   negligence. Therefore, the gross-negligence claim is either unsupported or duplicative.
21   Either way, the Court dismisses it.

22          Next, Defendants argue that Plaintiffs' various claims for tortious interference fail
23   because "the alleged 'improper' act—unwinding the auctions of the Domains to correct an
24   error or mistake, and issuing Plaintiffs refunds (plus additional in-store credit)—were
25   exercises of GoDaddy's express contractual rights." (MTD at 29.) That argument
26   presupposes a premise that cannot be verified at the motion-to-dismiss stage of this lawsuit.
27   As the Court explained *supra*, it is a question of fact whether Defendants breached the
28   relevant contracts when they unwound the domain-name transactions at issue here. The

Court therefore rejects Defendants' position. Defendants also argue that Prime Loyalty "failed to 'identify a specific relationship' that any defendant purportedly interfered with, and failed to allege more than the mere 'speculative hope of a business expectancy.'" (MTD at 29 (citation omitted).) The Court disagrees. Plaintiffs allege that "[p]rior to submitting any bids for the domain Butane.com, Plaintiff Prime secured investment funding from Mike Giordano, a long-time associate of Prime, with over twenty years of experience in the butane industry." (Complaint ¶ 39.) "Plaintiff Prime and Giordano mutually agreed that, should they successfully acquire the Butane.com domain name using funds contributed by both parties, they would establish a joint white-label butane business under the Butane.com brand, which Giordano would primarily oversee and manage." (Complaint ¶ 39.) "[Mr. Giordano] began preparing one of his warehouses in South Florida, which had already been certified as OSHA-compliant for the storage of butane-related products, to accommodate the initial supply of Butane.com-branded items." (Complaint ¶ 39.) "Additionally, Giordano entered into contractual negotiations with his established network of suppliers, distributors, and vendors to carry the new Butane.com-branded products." (Complaint ¶ 39.) The Court fails to understand, and Defendants do not meaningfully explain, how the foregoing allegations lack sufficient specificity to state a claim. The Court will not dismiss Plaintiffs' claims for tortious interference.

Next, Defendants argue that Plaintiffs' claim for trespass to chattels fails because domain names "cannot be the subject of such a claim under Arizona law." (MTD at 27.) The parties' disagreement on this point hinges upon the meaning of the holding from *McAlister v. Loeb & Loeb, LLP*, No. 1 CA-CV 23-0212, 2024 WL 372214 (Ariz. Ct. App. Feb. 1, 2024), wherein the Arizona Court of Appeals noted that it had previously held that a claim for trespass to chattels "may involve 'intangible property that is merged in, or identified with, some document,' such as 'a stock certificate or an insurance policy.'" *McAlister*, 2024 WL 372214, at *7 ¶ 40 (quoting *Miller v. Hehlen*, 209 Ariz. 462, 472, ¶ 35 (Ct. App. 2005)). "Intangible rights are 'merged' in a document 'when by the appropriate rule of law, the right to the immediate possession of a chattel and the power to acquire such

possession is represented by a document.'" *Id.* (quoting Restatement (Second) of Torts § 242 cmt. a (1965)). The court went on to hold that "in the modern digitized world, electronic touching may suffice." *Id.*, at *8 ¶ 41. "Consistent with that view, courts have recognized trespass to chattel claims where a party contacts another's computer network via spam emails or search-robot software." *Id.* Thus, if Plaintiffs' property rights in the domain names were merged into some digital document, and that document was unlawfully electronically touched by Defendants in such a way as to dispossess Plaintiffs of their rights over the domain names, a trespass to chattels occurred. Defendants contend in their Reply brief that *McAlister* is inapposite because, unlike a digital patent application, a domain name "is neither merged in, nor identified with, any document." (Reply at 20.) The Court cannot credit this argument, as it is not clear from the face of the Complaint whether a registrant's property rights in a domain name merge into a document, and the Court cannot properly glean such facts from a representation made in a reply brief. *See Symbiont Nutrition LLC v. W. Agric. Ins. Co.*, 671 F. Supp. 3d 991, 998 (D. Ariz. 2023). The Court will not dismiss Plaintiffs' claim for trespass to chattels.

Finally, Defendants argue that the Complaint's claim for an injunction should be dismissed, as an injunction is a remedy, not a cause of action. (MTD at 30.) Plaintiffs offer no response. Accordingly, the Court will dismiss this claim, but such dismissal carries no prejudice with respect to Plaintiffs' ability to procure injunctive relief on their surviving claims.

**IT IS THEREFORE ORDERED** granting in part and denying in part Defendants' Motion to Dismiss (Doc. 40). 123-Reg is dismissed from this lawsuit for lack of personal jurisdiction. The claims in the Complaint (Doc. 1) for gross negligence, estoppel, and injunction are dismissed as to the remaining defendants. The tort claims are dismissed as to GoDaddy, LLC only. The residue stands.

Dated this 1st day of July, 2025.

Honorable John J. Tuchi
United States District Judge